**United States District Court
for the Western District of Virginia
Lynchburg Division**

| | |
|---|---|
| League of Women Voters of Virginia; Katherine D. Crowley; Erikka Goff; and Seijra Toogood,, | |
| *Plaintiffs*, | |
| *v.* | Civ. No. 6:20-cv-00024 |
| **Virginia State Board of Elections; Robert H. Brink, John O'Bannon,** and **Jamilah D. Lecruise,** in their official capacities as Chairman, Vice-Chair, and Secretary of the Virginia State Board of Elections, respectively; and **Christopher E. Piper,** in his official capacity as Commissioner of the Virginia Department Of Elections, | **Voter Defendants' Opposition to Plaintiffs' Preliminary-Injunction Motion** |
| *Defendants*. | |

## Voter Defendants' Opposition to Plaintiffs' Preliminary-Injunction Motion[1]

Plaintiffs seek the extraordinary remedy of a preliminary injunction near an election when the U.S. Supreme Court's *Purcell* Principle, *see* Part III.B, requires rejection of late changes to prevent vote deprivation and suspect elections—due to the confusion caused by the injunction itself—and to allow election officials to focus on conducting the election, not defending suits like this. The potential for all these harms is greater, not less, where there are COVID-19 concerns because election officials are working to run an election and provide voter safety, and voters' attention is not focused on last-minute changes, expecting instead that they can rely on the usual procedures mandated by the General Assembly.

---

[1] On April 22, 2020, Plaintiffs filed a preliminary-injunction motion seeking to remove the absentee-voting witness requirement. Intervening Defendants Sheila DeLappe Ferguson, Sandy Burchett, and Diane Crickenberger (collectively "Voters" or "Voter Defendants") timely respond.

But Plaintiffs' motion can readily be denied because they fail their burden to justify stripping the General Assembly's vital safeguard against absentee ballot fraud ("Anti-Fraud Witness Requirement"). And their requested relief would violate Voter Defendants' fundamental right to vote because the stripped safeguard would strongly increase the likelihood of illegal votes, thereby debasing by dilution Voter Defendants' right to vote. *See Reynolds v. Sims*, 377 U.S. 533 (1964); *Bush v. Gore*, 531 U.S. 98 (2000). The requested relief would also violate the right to vote in other ways, established below. And it would violate the Elections Clause because a federal election must be conducted in the "Manner prescribed . . . by the Legislature," U.S. Const. art. I, § 4, cl. 1, and the requested relief would remove what the General Assembly prescribed.

## Facts

### A. COVID-19

Plaintiffs paint a grim picture of COVID-19 that is no longer accurate. While it is true that COVID-19 is a virus with serious potential consequences and has resulted in a global pandemic, the situation is beginning to improve.[2] Indeed, the curve is flattening, the spread of the virus is being controlled, the death rate is lowering, testing is increasing, and the death rate is lower than originally expected.[3] States are starting to relax their stay-at-home orders including reopening *inter alia* retail businesses, restaurants, gyms, beaches, salons; and restarting elective medical

---

[2] *See This is where all 50 states stand on reopening*, CNN.com, https://www.cnn.com/interactive/2020/us/states-reopen-coronavirus-trnd/ (last visited April 26, 2020).

[3] *Id; see also Provisional Death Counts for Coronavirus Disease (COVID-19)*, Center for Disease Control and Prevention ("CDC"), https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm (last visited April 27, 2020); *COVIDView*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (last visited April 27, 2020); *Coronavirus death rate may be lower than previously thought*, LiveScience.com, https://www.livescience.com/death-rate-lower-than-estimates.html (last visited April 27 2020) (showing that the death rate is around .66%).

procedures.[4] And many of the states that have not yet re-opened, have established plans to do so in the month of May.[5]

Any alleged risk of COVID-19 for the primary is purely speculative. Plaintiffs' evidence, if taken as true, detailed the current state of the affairs at the time of filing. But as shown, this information shifts quickly, the situation is improving, and Plaintiffs' information is already outdated. Moreover, at the time of filing Plaintiffs' Motion, there were still 63 days until the primary election, so it cannot be said that the situation will be the same on or close to election day. And the election has already been moved once, so it is possible that the election could be delayed again if the situation in Virginia were not improved.

Social distancing and good hygiene practices are the most effective ways to stop transmission of the virus.[6] Social distancing means "deliberately increasing the physical space between people to avoid spreading illness. Staying at least six feet away from other people lessens [the] chances of catching COVID-19."[7]

These same social distancing and good hygiene practices— which are effective for preventing the spread of the virus when going out for essential services, like grocery shopping and other

---

[4] *See This is where all 50 states stand on reopening*, CNN.com, https://www.cnn.com/interactive/2020/us/states-reopen-coronavirus-trnd/ (last visited April 26, 2020).

[5] *Id.*

[6] *See Coronavirus disease (COVID-19) advice for the public*, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public (last visited April 26, 2020); *Stop the Spread of Germs*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/stop-the-spread-of-germs.pdf (last visited April 26, 2020).

[7] *Coronavirus, Social and Physical Distancing and Self-Quarantine*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/ coronavirus/coronavirus -social-distancing-and-self-quarantine (last visited April 26, 2020).

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                    -3-

essential services—are also an effective way to prevent the spread of the virus for in-person voting or voting activities, such as finding a witness for an absentee ballot. Voters are able to vote in-person using social distance, gloves, masks, hand-sanitizer, etc. to protect themselves and others from the virus. Indeed, there has been no link between in-person voting and contracting of the disease—Plaintiffs do not claim or offer any evidence that the individuals listed in Pls. Prelim. Inj. Br., Doc. 17, Pageid#102-103, contracted the disease *from* the polling locations or *from* voting in-person. Moreover, weeks after the Wisconsin election, COVID-19 cases had not spiked.[8] And voters can employ these same techniques for securing a witness for their absentee ballot. Therefore, it cannot be said that in-person voting or absentee-ballot voting (with the required Anti-Fraud Witness Requirement) increases the risk of contracting COVID-19.

### B.   Absentee Ballot Fraud

Virginia history, past and present, is riddled with examples of voter fraud. Evidence of voter fraud in the Commonwealth starts as early as the 1960's when a federal probe resulted in mail ballot fraud charges.[9] There were similar allegations in the 1970s and 1980s.[10] In 2004, 15 individuals were convicted of voter fraud after conspiring to manipulate the elections in Appalachia through various unlawful means, including buying votes, stealing absentee ballots, and forging

---

[8] *Two weeks after election, COVID-19 cases have not spiked in Wisconsin but experts urge caution about conclusions*, Milwaukee Journal Sentinel, https://www.jsonline.com/story/news/2020/04/22/covid-19-hasnt-spiked-after-wisconsin-election-experts-urge-caution/2997394001/ (last visited April 26, 2020).

[9] Laurence Hammack, *Trial Begins Form Mayor Charges Election Violations*, THE ROANOKE TIMES, July 19, 2006, available at: https://www.roanoke.com/archive/trial-begins-for-former-mayor-charged-with-election-violations/article_e018b5b2-86c8-5c10-90b1-0b0dd05685a5.html.

[10] *Id*.

ballots.[11] In 2016, there was an FBI investigation after 20 voter applications were made under the names of dead people.[12] And most recently, in 2018, a man committed voter fraud when he attempted to cast absentee ballots for both himself and his deceased wife.[13]

As shown, efforts to commit voter fraud have continued, efforts which would only increase in volume and rate of success if the Plaintiffs' requested remedy is permitted.

## C.   Anti-Fraud Witness Requirement

In response to the instances of absentee ballot fraud, the General Assembly added the Anti-Fraud Witness Requirement to combat and reduce this threat to democracy. The Anti-Fraud Witness Requirement requires that upon "receipt of a mailed absentee ballot, the voter shall, in the presence of a witness, (I) open the sealed envelope marked 'ballot within' and (ii) mark and refold the ballot, without assistance and without making known how he marked the ballot[.]" Va. Code § 24.2-707(A). After marking the absentee ballot, the voter shall:

 (a) enclose the ballot in the envelope provided for that purpose, (b) seal the envelope, (c) fill in and sign the statement printed on the back of the envelope in the presence of a witness, who shall sign the same envelope, (d) enclose the ballot envelope and any required assistance form within the envelope directed to the general registrar, and (e) seal that envelope and mail it to the office of the general registrar or deliver it personally to the general registrar.

---

[11]  Laurence Hammack, *Ex-Mayor to Plead Guilty in Fraud Case,* THE ROANOKE TIMES, Nov. 9, 2006, available at: https://www.roanoke.com/archive/ex-mayor-to-plead-guilty-in-vote-fraud-case/article_a5bb2cd8-a966-559a-ac3c-ffd955dc520b.html.

[12] Graham Moomaw, *Investigation Launched After Dead People Are Registered to Vote In Harrisonburg*, Richmond Times-Dispatch, Sept. 29, 2016, available at: https://www.richmond.com/news/virginia/investigation-launched-after-dead-people-are-registered-to-vote-in/article_e008ce00-0365-57a2-95c0-4d9aa70012f9.html.

[13]  *See* Steve Roberts, Jr., *Court Docs: James City Man Indicted on Voter Fraud Charges*, THE MORNING CALL, April 9, 2019, available at https://www.mcall.com/va-vg-richard-dohmen-indicted-0409-story.html.

*Id*. There are no requirements that a witness be within six feet of a voter in order to witness the signature. In fact, it is implicitly required that a witness *not* be in close proximity to the voter, since the witness is not permitted to assist with the ballot or know how the ballot was marked. *Id*.

## D.  Virginia's E-Notary Laws

Virginia allows for electronic notarization (e-notarization). A properly designated notary may perform an "electronic notarial act" or "electronic notarization," Va. Code §§ 47.1-2, which includes taking acknowledgments, administering oaths and affirmations, certifying copies of any document as a true copy, certifying affidavits or depositions of witnesses, perform verification of fact, and performing "such other acts as may be specifically permitted by law." Va. Code § 47.1-12. A voter and notary could comply with the Virginia Anti-Fraud Witness Requirements via a video conference in which the voter would open and mark their ballots in the presence of the notary. *See* Va. Code § 24.2-707(A). The voter would then enclose their ballots in the provided envelope, seal the envelope, and "fill in and sign the statement printed on the back of the envelope" while the notary witnessed the process via the video conference technology. At that point, the e-notary could supply a notarial certificate including an electronic seal, Va. Code § 47.1-2, to the voter to be included in the returned envelope. This would fulfill the Anti-Fraud Witness Requirement and retain an important safeguard.

## Argument

In their attempt to strip the General Assembly's Anti-Fraud Witness Requirement, Plaintiffs were required to show (1) likely merits success, (2) irreparable harm, (3) a favorable balance of equities, and (4) the public interest favoring their requested relief. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). They have not made the "clear showing" required for

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                            -6-

such an "extraordinary remedy." *Id.* at 24, 22. So Plaintiffs failed to meet their burden here. As established below, Plaintiffs' preliminary-injunction motion should be denied because:

I.   Plaintiffs are unlikely to succeed on the merits because they have not satisfied the controlling analyses here established;

II.  Plaintiffs are unlikely to succeed on the merits under *Anderson-Burdick* because the Anti-Fraud Witness Requirement is a "reasonable, nondiscriminatory restriction" readily justified as an anti-fraud safeguard;

III. Plaintiffs are unlikely succeed on the merits under *Reynolds-Bush* because their requested relief violates Defendant Voters' fundamental right to vote, including under the *Purcell* Principle and the Elections Clause; and

IV.  Plaintiffs cannot satisfy the remaining preliminary injunction requirements.

# I.

### Plaintiffs are unlikely to succeed on the merits because they have not satisfied the controlling analyses here established.

Plaintiffs are unlikely to prevail on the merits in their attempt to strike the General Assembly's Anti-Fraud Witness Requirement because they have not satisfied any of the controlling analyses, all of which they must meet. Here we lay the analytical foundations and establish the tests and analyses, which are further explained and applied in following Parts.

Preliminarily, note the three *foundations* of the controlling analyses. First, a fundamental right to vote has been recognized as arising from the First and Fourteenth Amendments to the U.S. Constitution. *See, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). Second, to protect the rights of *all* voters, and to protect the *Republic* (by insuring the integrity of elections and the confidence of the People that elections are fair), government must impose procedural *safeguards* against illegal voting because absent those there is (a) debasement of voters' rights by dilution with illegal votes and (b) danger to a Republican form of government. *See, Bush v. Gore*, 531 U.S. 98, 109 (2000) ("procedural safeguards" required). Third, there is *no*

constitutional right to vote *by absentee ballot*, but rather it is the *Legislature's* role to balance (a) the interest in voting of those with difficulties in doing so and (b) the anti-vote-fraud safeguards required to prevent debasement by dilution by illegal votes of *all* voters' by right to vote and to protect the integrity of, and the people's confidence in, the elections. *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th 2004). On those foundations are built the four controlling analyses.

The first is the *Anderson-Burdick* test. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). This test applies to state election laws and recognizes that government *must* have election procedures and *safeguards*, so there is considerable defer-ence to that legislative need and the level of scrutiny goes up or down with the degree of burden at issue—assuming that the burden is cognizable and established. *Id.* at 434. As set out in Part II, the *Anderson-Burdick* test governs Plaintiffs' challenge to the absentee-ballot-witness provision. But as shown there, Plaintiffs are unlikely to succeed on the merits because they can't establish a sufficient burden to get beyond rational-basis review since (a) absentee voters can meet the wit-ness requirement in several ways while socially distancing, (b) Plaintiffs' portrayal of COVID-19 problems is speculative and overblown, especially as problems diminish, and (c) any burden must be balanced against the need for anti-fraud safeguards, which *Griffin* held to be uniquely within the legislature's power and abilities—and the General Assembly has already done the bal-ancing. The General Assembly's balanced approach is readily, rationally justified by the require-ment that the  General Assembly impose safeguards to protect (a) all voters' right to vote and (b) the legitimacy of elections.

The second controlling analysis is in the *Reynolds-Bush* case line. *Reynolds*, 377 U.S. 533 (1964); *Bush*, 531 U.S. 98. This analysis applies specifically to debasement of the right to vote

by dilution, which is either a per-se ban or considered under strict scrutiny. *See* Part III. And as set out in Part III, this analysis applies to establish that what Plaintiffs seek would unconstitutionally debase by dilution Voter Defendants' (and all voters') fundamental right to vote.

The third controlling analysis is the *Purcell* Principle, by which the U.S. Supreme Court requires lower federal courts to not alter election procedures and protections near an election because doing so engenders confusion that in itself violates the right to vote and the integrity of elections. Under that Principle, near-election requested relief is simply not granted. *See* Part III.B.

The fourth controlling analysis is the dictate of the Election Clause, U.S. Const. art. I, § 4, cl. 1, that federal elections (at issue here given federal candidates) be conducted in the "Manner . . . prescribed by the Legislature." Here the General Assembly has prescribed a "Manner" that Plaintiffs ask this Court to remove—a safeguard against absentee-ballot fraud—so that requested relief cannot be granted absent a truly clear federal constitutional violation. *See* Part III.C.

## II.

### Plaintiffs are unlikely to succeed on the merits under *Anderson-Burdick* because the Anti-Fraud Witness Requirement is a "reasonable, nondiscriminatory restriction" readily justified as an anti-fraud safeguard.

To begin with, there is a state-action problem. Plaintiffs don't challenge the Anti-Fraud Witness Requirement as unconstitutional *absent* COVID-19, only *during* COVID-19 problems, Complaint, Doc. 1, Pageid#33 (Relief Requested for while under "emergency orders" and "social distancing"). But COVID-19 and resulting problems "are not impediments created by the State." *Bethea v. Deal*, 2016 WL 6123241, at *2 (S.D. Ga. Oct 19, 2016). Plaintiffs don't challenge the Governor's action in moving the election. So Plaintiffs believe the Commonwealth has passive

liability for not *changing* its law in the face of issues not of its making, which is not the sort of

claim *Anderson-Burdick* balances, which are legislative *acts*. *See Bethea*, *id.* at *2-3 (no "prece-

dent that would constitutionally or statutorily mandate that Defendants provide an extension in

the absence of any actual government action that burdens an individual's right to vote").

But if balancing is done here, Plaintiffs acknowledge that their challenge to the Anti-Fraud

Witness Requirement would be governed by the *Anderson-Burdick* test. Pls.' Prel. Inj. Br., Doc.

17, Pageid#112.[14] They are unlikely to succeed on the merits under that test. The test requires

"weighing 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff

seeks to vindicate' against 'the precise interests put forward by the State as justifications for the

burden imposed by its rule,'" considering "'the extent to which those interests make it necessary

to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at

788–89). Under this test, strict scrutiny applies to "'severe' restrictions," *id.* at 434, but rational-

basis scrutiny applies to "reasonable, nondiscriminatory restrictions":

> the rigorousness of our inquiry into the propriety of a state election law depends upon the
> extent to which a challenged regulation burdens First and Fourteenth Amendment rights.
> Thus, as we have recognized when those rights are subjected to "severe" restrictions, the
> regulation must be "narrowly drawn to advance a state interest of compelling importance."
> *Norman v. Reed*, 502 U.S. 279, 289 (1992). But when a state election law provision im-
> poses only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth
> Amendment rights of voters, "the State's important regulatory interests are generally
> sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788; see also *id.*, at 788-789,
> n. 9.

As established next, (**A**) the Anti-Fraud Witness Requirement is a "reasonable, nondiscrimi-

---

[14] Count II of the Complaint alleges "Violations of Section 2 of the Voting Rights Act, 52
U.S.C. § 10301," Complaint, Doc. 1, Pageid#31, but Plaintiffs' preliminary-injunction-brief Ta-
ble of Authorities shows that provision is not cited, Pls.' Prel. Inj. Br., Doc. 17, Pageid#90, so
that is not at issue here.

natory restriction, and (**B**) it is readily justified by the Commonwealth's vital anti-fraud interest.

## A. The Anti-Fraud Witness Requirement is a "reasonable, nondiscriminatory restriction."

The Anti-Fraud Witness Requirement is (**1**) "reasonable" and (**2**) "nondiscriminatory." These are established in turn below.

Preliminarily note that this is not a *new* issue in current, similar litigation. In the litigation before Wisconsin held its recent primary with in-person and ordinary-absentee-ballot-rule voting, the U.S. District Court for the Western District of Wisconsin considered a similar challenge to an absentee-ballot-witness requirement and provided relief similar to that requested here. *Democratic National Committee v. Bostelmann*, Nos. 3:20-cv-00249-wmc, 3:20-cv-00278-wmc, 3:20-cv-00284-wmc, 2020 U.S. Dist. LEXIS 57918 (W.D. Wisc. Apr. 2, 2020). But that was promptly stayed by the Seventh Circuit. *Bostelmann*, slip op. 3,[15] Nos. 20-1538, 20-1539, 20-1545 & 20-1546 (7th Cir. Apr. 3, 2020) (citing *Griffin*, 385 F.3d at 1130). The Seventh Circuit held that the relief was overbroad and the district court had not adequately considered the government's strong anti-fraud interest and the *Purcell* Principle:

> [T]he motions for a stay are GRANTED as to that portion of the district court's order that enjoins the enforcement of Wis. Stat. § 6.87(2) for absentee voters who provide a written affirmation or other statement that they were unable to safely obtain a witness certification despite reasonable efforts to do so. The court concludes that the district court did not give adequate consideration to the state's interests in suspending this requirement. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," and "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The court is also cognizant of the Supreme Court's admonition that "[c]ourt orders affecting elections . . . can them-

---

[15] The slip opinion could not be found on LEXIS or Westlaw, but it is available at https://moritzlaw.osu.edu/electionlaw/litigation/documents/DNC_v_Bost_BL-30.pdf.

selves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4-5. This court is concerned with the overbreadth of the district court's order, which categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combatting voter fraud. *Griffin*, 385 F.3d at 1130.

Slip op. at 3. That same logic and analysis should be applied here to reject requested relief.

Also preliminarily, note that the requested relief here is also overbroad. Part of that overbreadth is that Plaintiffs make a *facial* challenge. The Complaint *seems* at one point to seek a narrower, as-applied remedy, Complaint, Doc. 1, Pageid#33 ("especially for voters at risk of health complications"), but then it seeks the broad, facial remedy of dispensing with the Anti-Fraud Witness Requirement altogether, *id*. at. Pageid#34 ("count . . . absentee ballots . . . missing a witness signature"). And Plaintiffs' preliminary-injunction brief argues for facial invalidation of the Requirement. *See, e.g.*, Pls. Prelim. Inj. Br., Doc. 17, Pageid#96 ("Plaintiffs are thus likely to succeed on their claim that the witness requirement unconstitutionally burdens the fundamental right to vote."); *see also id*. at Pageid#129 (Conclusion seeks facial relief of disregarding absent signatures). But for such a facial challenge, Plaintiffs must establish that *no* circumstances exist where the Requirement could be validly applied. *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid"). Plaintiffs have made no effort to meet that required test,[16] and so requested relief must be denied on that basis alone. "[T]he burden some voters face[] ca[n]not prevent the state from applying the law generally." *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir.

---

[16] Though Plaintiffs speculate that the allegedly too-high burden would particularly impact certain demographics, they make no effort to tailor their remedy to those.

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                        -12-

2016). And given the "broad attack" Plaintiffs bring—not a narrow, as-applied challenge—they "bear a heavy burden of persuasion" to prevail. *Crawford*, 553 U.S. at 200.

The requested relief is also overbroad because it seeks relief so long as there is a Virginia or federal emergency order in place "regarding COVID-19 transmission" "and/or while public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19 . . . ." Complaint, Doc. 1, Pageid#33. Of course related emergency orders might be in place long after there is a significant risk of harm because they permit special assistance from and actions by governmental entities, which might be needed even after the serious risk is subsiding to deal with the aftermath. And social distancing recommended in such orders and by health authorities is for the *purpose* of making individuals safe, so it is what can be done *during* in-person and ordinary absentee-ballot-procedure voting, providing no reason to alter those normal procedures. So this overbreadth also dooms requested relief.

### 1.   The Anti-Fraud Witness Requirement is reasonable.

A witness requirement for absentee ballots is well within the scope of reasonable tools that the General Assembly could choose in asserting its *undisputed* interest in preventing vote fraud and insuring both actual and apparent election integrity. *Burdick* recognized that "'as a practical matter, there must be a substantial regulation of elections *if they are to be fair and honest* and if some sort of order, rather than chaos, is to accompany the democratic processes.'" 504 U.S. at 433 (citation omitted; emphasis added). As noted above, the Seventh Circuit rejected a similar challenge based on the strong governmental interest in preventing vote fraud. *See supra* at 11 (*Bostelmann* and cited authorities). So the Anti-Fraud Witness Requirement is an inherently reasonable, traditional way that a state may combat ballot fraud—and how prevalent that is or isn't

need not be established because this interest is well established and cognizable without more.

*Burdick* requires a balancing of the degree of burden on the right to vote with a state's applicable interests. 504 U.S. at 434. The degree of burden is discussed next, which must be balanced against the Commonwealth's  interests established in Part II.B. With proper balancing, the Requirement is readily established as a reasonable, neutral burden justified by state interests.

The benchmark for a reasonable burden is *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008), which under *Burdick* held that it was not unreasonable to require those lacking photo identification (required to vote) to bear "the inconvenience of going to the Bureau of Motor Vehicles, gathering required documents, and posing for a photograph" to get a free ID card because that did "not qualify as a substantial burden on most voters' right to vote . . . ," *id.* at 198 (Stevens, J., joined by Roberts, C.J. and Kennedy, J.) (controlling op.). This insubstantial burden was closely related to legitimate state interests in "election modernization" (including cleaning up voter roles), preventing "voter fraud," and "safeguarding voter confidence." *Id.* at 192-97. As that burden was reasonable, Plaintiffs must prove any burden here substantially greater.

Plaintiffs don't actually dispute that the Commonwealth has strong interests in preventing fraud and assuring election integrity. They acknowledge that ordinarily the Anti-Fraud Witness Requirement imposes "perhaps only a minor-to-moderate burden on the right to vote." Pls. Prelim. Inj. Br., Doc. 17, Pagid#95. But, "[d]uring the pandemic," Plaintiffs allege, "it will force thousands of voters to choose between disenfranchisement and placing their health at grave risk," *id.*, and "thousands" jumps to "tens of thousands" later. *Id.* Pageid#111. That claim is overblown and wrong.

Plaintiffs' projections are as speculative as the early COVID-19 models with highly inflated

numbers of deaths. Those projections were subsequently, substantially reduced more than once. Plaintiffs cite a March 11, 2020 *Wall Street Journal* article in asserting that "COVID-19 [is] a deadly disease that is now a global pandemic." Complant, Doc.1, Pageid#10, ¶ 28.[17] No one disputes it has been declared a pandemic and it has been deadly. But that was a *March 11* article and *much* has already changed since then to undercut this claimed factual foundation for stripping the Anti-Fraud Witness Requirement, and much more will change before the *June 23* primary, nearly two months from now. This Court may and should take judicial notice of the widespread news, reports, studies, findings, and changing government declarations and guidelines that show the downward-changing projections of deaths from the virus, the lowered fatality rate (as it is learned that more individuals were infected than thought and only had moderate or mild illness or no symptoms), the lowered hospitalization rates, the dramatic increase in testing capabilities, the surplus supply of ventilators, the lack of hospitals and medical staff being overwhelmed due to the flattening curve, the shut-down of unneeded extra hospital facilities in New York, the development of treatments, the ongoing clinical trials of treatments, the progress being made on vaccines, the success of social distancing and hand washing and mask wearing, the likely (though yet debated) rise of individual and herd immunity,[18] as well as the widespread and ongoing reopening of society by government officials due to the reducing risk. *See supra* Facts (outlining some of these commonly known facts). For example, Wisconsin had an in-person

---

[17] Plaintiffs similarly cite newspaper and other articles, of which this Court may and should take judicial notice, weighing their credibility based on the Court's own experience.

[18] Since the development of herd immunity is a typical human response to viruses, Plaintiffs have the burden to establish that it will not happen with COVID-19, just as they have the burden for all proof for their preliminary-injunction motion.

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                    -15-

election, with distancing, masks, gloves, hand sanitizing, facilities sanitizing, and plexiglass shields between election-board workers and voters, and there was no resulting spike in COVID-19. *See supra* note 8. And as Plaintiffs acknowledge, the Commonwealth's Governor already moved the federal primary from May 5 to June 23, nearly two months from now, so he could do it again if needed to allow more time for dangers to further subside. Pls. Prelim. Inj. Br., Doc. 17, Pageid#103-04. Plaintiffs speculate while harms recede, undercutting their foundation. For present analytical purposes any burden posed by COVID-19 is receding and should continue to do so over the next two months.

Government guidelines for present still encourage social distancing, wearing masks, and frequent hand washing or sanitizing. But they don't prevent going out for essential services, such as grocery shopping. Essential services include important government activities, which includes voting and activities related to voting, such as finding a witness to witness the signing of a ballot. One can avoid this requirement by going to the polls, and there practice social distancing and other measures to prevent harm as was done in Wisconsin's recent election.

And there are ways to socially distance with a witness.[19] For example, a voter may go to a neighbor's house, knock and step back six feet, explain the need to the neighbor, sign the absentee ballot in the witness's presence, place the ballot down where one is standing and back up six feet so the witness can pick up the ballot and sign it before backing up so the voter can retrieve the ballot and finish the procedure while being witnessed. This voter-witness dance is quite simple, as are easy variations to fit different situations.

---

[19] The following example ideas were provided by the Wisconsin Legislature in an amicus brief in *Bostlemann*, No. 3:20-cv-249 and -278, Doc. 31 at 19-20 (Mar. 30, 2020).

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                                      -16-

Or  have the witness observe through a window, then slide the signed ballot under the door for the witness's signature, who then slides it back under the door and backs up so the voter can retrieve the ballot remaining six feet away with a door between. The same can be done with a cell-phone or online video connection in place of the window, followed by the door-slide procedure described.

Or a voter and e-notary could comply with the Anti-Fraud Witness Requirement via a video conference. *See supra* at 6. This would fulfill the Anti-Fraud Witness Requirement and retain an important safeguard.

These and other similar options are easily done and not beyond the reasonable efforts of most people—and they must make the sort of reasonable efforts required in *Crawford*. Almost all people who live alone can do something like what is described. For those who truly can't, a narrow as-applied challenge might be appropriate, but Plaintiffs have brought a broad facial challenge so they must meet the *Salerno* test, and they have not shown that the foregoing options won't allow most people to vote with the required reasonable effort—let alone show that there are *no* situations in which the Anti-Fraud Ballot Requirement may be applied. So most people can satisfy the Anti-Fraud Witness Requirement while complying with social distancing, mask wearing, and hand washing guidelines with no more reasonable effort than was required in *Crawford*. Certainly, Plaintiffs have not proven otherwise, and they have the preliminary-injunction burden and the *Salerno* burden in this preliminary-injunction motion. So under *Burdick*, there is no severe burden and no strict scrutiny for this reasonable requirement.

**2.  The Anti-Fraud Witness Requirement is nondiscriminatory.**

*Burdick* speaks of "reasonable, nondiscriminatory restrictions." 504 U.S. at 434. As just

shown, the Anti-Fraud Witness Requirement is reasonable. It is also nondiscriminatory. On its

face, it requires a witness for *every* absentee voter, without regard to who they are or anything

unique about them, certainly not with regard to anything relating to some suspect class (though

this is a *Burdick* analysis, not an equal-protection analysis, so suspect-class analysis is not in-

volved). Plaintiffs talk of a history of racism, but that has nothing to with the neutral requirement

that every absentee voter has a witness. And Plaintiffs argue about problems for certain subsets

of individuals, but that fails to prove a *Burdick* violation for two simple reason. First, they have

not shown that anyone in any subset can't perform the reasonable effort to obtain a witness that

is outlined above and is no more difficult that what the U.S. Supreme Court held to be reasonable

in *Crawford*. So as in *Crawford*, "we cannot conclude that the statute imposes 'excessively bur-

densome requirements' on any class of voters." 553 U.S. at 202 (citation omitted). Second,

"[g]iven the fact that petitioners have advanced a broad attack . . . , seeking relief that would in-

validate the statue in all its applications, they bear a heavy burden of persuasion." *Id.* at 201 (cit-

ing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)). "A facial chal-

lenge must fail where the statute has a plain plainly legitimate sweep." *Id.* at 202 (citations omit-

ted; quotations marks altered). Consequently, "[w]hen we consider only the statute's broad appli-

cation to all [Virginia] voters we conclude that it 'it imposes only a limited burden on voters'

rights.'" *Id.* at 202-203 (quoting *Burdick*, 504 U.S. at 439). And that analysis controls here. So

the Anti-Fraud Witness Requirement does not discriminate in any cognizable way.

**B.   The Anti-Fraud Witness Requirement is readily justified by the Commonwealth's vital interests in preventing vote fraud and safeguarding voter confidence.**

As established, the Anti-Fraud Witness Requirement is a reasonable, nondiscriminatory requirement. As such, it is easily justified by the Commonwealth's strong interests in preventing absentee-ballot fraud and protecting the integrity of elections. *See, e.g.*, *Crawford*, 553 U.S. at 194-97 (recognizing state interests in preventing "voter fraud" and "safeguarding voter confidence" ). The Requirement prevents and discourages vote fraud in multiple ways. It assures that the voter is actually the one filling out the ballot. The witness can assure that the voter is not being coerced or unduly influenced. *See* Principles of Election Law § 103, cmt. c (Am Law Inst. 2018) ("through intimidation, other undue influence, or outright vote buying"). And the witness can assure that the voter is signing her ballot spontaneously, without trying to reproduce another's signature from an exemplar. Absent the Requirement, absentee ballots could be seized from mail boxes and voted by others. *See Veasey v. Abbott*, 830 F.3d. 216, 255-56 (5th Cir. 2016) (en banc) ("people who harvest mail-in ballots from the elderly"). "[V]oting fraud is a serious problem in U.S. elections generally," which is facilitated by absentee voting." *Griffin*, 385 F.3d at 1130-31. "Voting by mail makes vote fraud much easier to commit." *Nader v. Keith*, 385 F.3d 729, 734 (7th Cir. 2004). "Absentee ballots remain the largest source of potential voter fraud." Carter-Baker Comm'n on Fed. Elections Reform, *Building Confidence in U.S. Elections* 46 (2005). Also on the Commonwealth's side of the balance is assuring the integrity of elections, of which preventing and discouraging absentee-ballot fraud is part. The Commonwealth has an "indisputably . . . compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 231 (1989); *see also*

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (same). And this integrity is achieved when "only the votes of eligible voters" are counted. *Crawford*, 553 U.S. at 196). "[T]he striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment . . . ." *Griffin*, 385 F.3d at 1131. And the Commonwealth has struck a balance that under *Burdick* is a permissible, reasonable, nondiscriminatory balance.

## III.

### Plaintiffs are unlikely to succeed on the merits under *Reynolds-Bush* because their requested relief violates Defendant Voters' fundamental right to vote, including under the *Purcell* Principle and the Elections Clause.

While the Anti-Fraud Witness Requirement is a reasonable, nondiscriminatory restriction, and is readily justified by the Commonwealth's vital anti-fraud interest, the remedy that Plaintiffs seek is unconstitutional. Defendant Voters have a fundamental right to vote, which includes the right to not have their votes debased or diluted by removal of vital safeguards.

### A.  The requested violates the right to vote by removing safeguards against fraudulent votes that dilute legal votes.

The requested relief strips a vital safeguard established by the General Assembly designed to protect against fraudulent votes that dilute Voters' votes. This lack of a mandatory safeguard is a severe burden on Voters' fundamental right to vote.

The federal right to vote is fundamental, *Harper*, 383 U.S. at 667, and well-established: "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted. *Reynolds*, 377 U.S. at 554. "The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* at 555 (internal citations omitted). "And the right of suffrage

can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* The right to vote inheres in, and is protected by, the First and Fourteenth Amendments of the U.S. Constitution. Virginia also recognizes the right to vote. *See* Va. Const. Art. II, § 1 (detailing the qualifications of voters).

The *Anderson-Burdick* test does not apply when evaluating the constitutionality of the requested relief, even though it would typically govern actual challenges to Virginia's legislatively enacted election laws. This is so because the test by its terms applies to "[I] a challenge to [ii] a state election law," *id.*, and the requested relief involves no "challenge to" any "state election law." The requested relief is not legislated "state election law," but rather it would require this Court to *override* and *replace* legislated state election law. So the *Anderson-Burdick* test doesn't apply to evaluating the constitutional infirmities of the requested relief.

Rather, the applicable scrutiny where voter disenfranchisement is involved, such as by vote dilution, is found in the *Reynolds-Bush* case line. *Reynolds*, 377 U.S. 533; *Bush*, 531 U.S. 98.[20] In considering whether, under the federal Equal Protection Clause, "any constitutionally cognizable principles . . . would justify departures from the basic standard of equality among voters," *Reynolds*, 377 U.S. at 561, *Reynolds* held that the right to vote is "fundamental": "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." 377 U.S. at 561-62. So franchise impairments get careful, meticulous scrutiny: "Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and polit-

---

[20] Though *Bush* was decided long after *Anderson* and *Burdick*, no opinion in *Bush* cited *Burdick* and only one concurrence cited *Anderson*, once, but for another proposition. 551 U.S. at 112 (Rehnquist, joined by Scalia and Thomas, JJ., concurring). So those older cases have no bearing on the required analysis here.

ical rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.* at 562. After reviewing arguments that these were "complex" issues, the Court held that "[t]o the extent that a citizen's right to vote is debased, he is that much less a citizen," *id.* at 567, and "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State," *id.* at 568.

Building on *Reynolds*, *Bush* didn't discuss the scrutiny level, but held that the Florida Supreme Court could not by its orders and interpretations of state law dilute voters' fundamental right to vote, 551 U.S. at 107-11, which was either a per-se ban of vote dilution or at least an exercise of the strict scrutiny now required in equal-protection challenges involving fundamental rights with an analysis and outcome so readily apparent that it required no detailing.

*Bush* is particularly analogous because it addressed the actions of the Florida Supreme Court (not the legislature) and found them in violation of the vote-dilution barred by *Reynolds*. The issue here, is action by this Court that would do the same, were the Court to grant Plaintiffs' requested relief. *Bush* noted that "[t]he petition present[ed] the following questions: whether the Florida Supreme Court established new standards for resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the United States Constitution[21] and failing to comply with 3 U.S.C. § 5, and whether the use of standardless manual recounts violates the Equal Protection and Due Process Clauses." 551 U.S. at 103. The Court found that "it is not necessary to

---

[21] In elections selecting federal candidates, this provision mandates that the *Legislature*, establish procedures: "Each State shall appoint, in such Manner as the Legislature thereof may direct . . . . ." So the requested relief here could not be used in choosing federal candidates because it is not the Manner directed by the Legislature. *See* Part III.C.

decide whether the Florida Supreme Court had the authority under the legislative scheme for re-solving election disputes to define what a legal vote is and to mandate a manual recount imple-menting that definition," *id.* at 105, because "recount mechanisms implemented in response to the decisions of the Florida Supreme Court do not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right," *id. Bush* also noted that where *both* sides claim they are vindicating the right to vote, constitutional guarantees such as equal protection still control. *Id.* at 105.[22] And *Bush* highlighted the fact that the Florida Su-preme Court order lacked the necessary "safeguards" to assure confidence in the outcome. As *Bush* put it, adequate "safeguards" are mandatory, *id.* at 109:

> [W]e are presented with a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards. When a court orders a statewide remedy, there must be at least some assurance that the rudimentary require-ments of equal treatment and fundamental fairness are satisfied.

That mandate to maintain "safeguards" to assure confidence in the election is particularly rele-vant to Defendant Voters' argument below.

So the requested relief here is either barred *per se*[23] if votes are diluted or it would be subject to strict scrutiny and Plaintiffs must prove it is narrowly tailored to a compelling governmental interest.

---

[22] As *Bush* put it, regarding both sides claiming they advance the right, *id.*:
There is no difference between the two sides of the present controversy on these basic propositions. Respondents say that the very purpose of vindicating the right to vote jus-tifies the recount procedures now at issue. The question before us, however, is whether the recount procedures the Florida Supreme Court has adopted are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate.

[23] If government may *not* dilute voters' right to vote, doing so cannot be justified under *any* interest-tailoring analysis.

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                    -23-

Under *Reynolds* and *Bush* it is readily seen that vote dilution cannot be justified.  The requested relief violates the Voters' right to vote by diluting their votes with illegal votes given the removal of a vital safeguard against illegal voting established by the General Assembly.[24] It is all but certain that, without the Anti-Fraud Witness Requirement, many absentee ballots will be unlawfully received, voted, and counted in the primary, as Virginia has a significant history with absentee ballot fraud. *See supra* pages 4-5 (detailing absentee voting fraud issues from 1960s to modern day); *see also Griffin*, 385 F.3d at 1130-31 ("Voting fraud is a serious problem in the U.S. . . . and is facilitated by absentee voting. . . . [A]bsentee voting is to voting in person as a take-home exam is to a proctored one.") (citations omitted). Those individuals who illegally vote will unlawfully negate and ultimately dilute the choices made by the lawfully registered voters of the Commonwealth— voters the General Assembly has carefully and methodically taken great care to protect.[25]

Since the requested relief dispenses with current statutory protections against illegal voting

---

[24] While vote dilution in *Reynolds* and *Bush* was reviewed under an equal-protection analysis, *Reynolds* held that "[t]he right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." 377 U.S. at 555 (internal citations omitted), and those violations don't involve equal protection. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise," *id.*, which is not limited to the equal-protection context. Likewise, "the Fifteenth and Nineteenth Amendments prohibit a State from overweighting or diluting votes on the basis of race or sex," *id.* at 557, which is not limited to the equal-protection context. So challenges based on vote debasement or dilution are not limited to the equal-protection context.

[25] Plaintiffs claim that the Anti-Fraud Witness Requirement has been ineffectual. Pls. Prelim. Inj. Br., Doc. 17, Pageid# 86, 129. But Plaintiffs cite no evidence to support that claim. Plaintiffs further argue that the witness requirement is unnecessary because "attempts to manipulate the absentee process" are rare. *Id.* at 123. But as shown, there have been many efforts to manipulate the absentee voting process. Eliminating this safeguard would surely lead to more manipulation efforts.

Voter Defs. Opp'n.
to Pls. Prelim. Inj.                         -24-

found in absentee law, the requested relief is a cognizable dilution of the votes of eligible, registered voters such as Defendant Voters. That risk is cognizable because "safeguards" are required, *Bush*, 531 U.S. at 109, and because "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy" and "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell*, 549 U.S. at 4. This dilution requires strict scrutiny, because "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *id.* at 562, which the requested relief fails.

While strict scrutiny is required (if the requested relief is not barred *per se*), Plaintiffs have not justified their requested relief, which must be established if the requested relief is constitutional. Absent their proof that removal of the Anti-Fraud Witness Requirement is justified under the controlling interest-tailoring analysis, the requested relief must be considered an unconstitutional violation of Voter Defendants' right to vote and rejected.

In sum, because the weakened safeguards in the requested relief predict dilution and debasement by illegal voting and create doubt about the legitimacy of the election, the right to vote of Defendant Voters is violated.

**B.   The requested relief violates the right to vote under the *Purcell* Principle.**

The requested relief also violates what has come to be called the *Purcell* Principle. *See, e.g.*, Richard L. Hasen, *Reining in the* Purcell *Principle*, 43 Fl. St. U. L. Rev. 427 (2016). That Principle is named for *Purcell*, 549 U.S. 1. The Principle is anchored in the right to vote and its potential for debasement. *Id.* at 4 (citing *Reynolds*, 377 U.S. at 555). Among its critiques of the Ninth Circuit for staying a voter-identification requirement near an election, the Court held in *Purcell*

that such near-election court orders *themselves* risk debasement and dilution of the right to vote because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. at 4-5. The "possibility that qualified voters might be turned away from the polls," *id.* 4, violates their right to vote. So the general rule is that no court order altering election procedures near an election is permissible because it violates the right to vote. And because the Principle is anchored in the right to vote, it applies to state and local election administrators as well because their election-altering actions pose the same risk.

On April 6, 2020, the U.S. Supreme Court issued an opinion in *Republican National Committee v. Democratic National Committee*, No. 19A1016, 2020 U.S. LEXIS 2195 (U.S. Apr. 6, 2020) (per curiam), *slip op. available at* https://www.supremecourt.gov/opinions/19pdf/19a101 6_o759.pdf, again applying that Principle, which it summarized thus:

> This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election. See *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam); *Frank v. Walker*, 574 U. S. 929 (2014); *Veasey v. Perry*, 574 U. S. __ (2014).

2020 U.S. LEXIS 2195, at **2-3. This *RNC* case stayed a lower-court order allowing voters to mail absentee ballots after election day. *RNC* recited various problems that the lower-court order posed and said they "underscore[] the wisdom of the *Purcell* principle, which seeks to avoid this kind of judicially created confusion." *Id.* at **3. A crucial point was that the lower-court order "fundamentally alters the nature of the election." *Id.*

The requested relief also fundamentally alters the nature of Virginia's election, drastically changing the absentee voting requirements. This fundamental alteration of the nature of the election raises the same possibility of voters losing their franchise as in *Purcell* and *RNC*. Here, as in

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                              -26-

*RNC*, the *Purcell*-Principle should apply as applicable: "[W]hen a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this Court, as appropriate, should correct that error." Slip op. 3.

**C.   The requested relief violates the Voters' right to vote in, and have, a federal election in the legislature's prescribed manner.**

The requested relief violates Voters' right to have, and to vote in, a federal election where the "Manner" of election is "prescribed . . . by the Legislature," as required:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. Candidates for federal office are on the Primary ballot. *See* https://www.elections.virginia .gov/media/castyourballot/candidatelist/June-2020-Primary-Candidates-List-(4)-1.pdf  (Virginia Dep't of Elections, "Certified Candidates in Ballot Order for June 23, 2020 Primary Elections"). So the Primary must be conducted in the Legislature's prescribed manner. But the requested relief is not at all what the Legislature chose and is contrary to controlling legislation. Virginia law requires that absentee voters, *inter alia*, open and mark their ballots in the presence of a witness. Va. Code § 24.2-707(A). It also requires that voters enclose their ballots in the provided envelope, seal the envelope, and "fill in and sign the statement printed on the back of the envelope in the presence of a witness, who shall sign the same envelope[.]" *Id*.

The requested relief seeks to eliminate this Anti-Fraud Witness requirement, thereby seeking to conduct the election in a manner not authorized by the Legislature and contrary to the Legislature's choices. They seek to eliminate safeguards against vote fraud that the Legislature

chose. So the requested relief violates Article I, § 4, cl. 1, including a violation of the Voter's

right to have, and to vote in, such an election as the U.S. Constitution prescribes.

Recall that in *Bush* the U.S. Supreme Court listed a similar provision requiring that elections

for presidential electors be conducted in the manner chosen by the Legislature as an issue in the

case, but decided that it need not reach it because what the Florida Supreme Court had done fell

so woefully short of what was required under the vote-dilution ban that the manner-of-election

issue need not be reached. 551 U.S. at 103 ("whether the Florida Supreme Court established new

standards for resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the

United States Constitution"). Similarly here, the parallel manner-of-election provision for other

federal elections is an issue that may not need to be reached because the vote-dilution claims un-

der the fundamental right to vote can readily decide the case. But if the Court doesn't decide this

case on vote-dilution or another claim, this issue must be reached. And the requested relief vio-

lates Article I, § 4, cl. 1, so the Anti-Fraud Witness Requirement must not be enjoined absent a

truly clear federal constitutional violation, which is not present here.

## IV.

**Plaintiffs cannot satisfy the remaining preliminary injunction requirements.**

Not only are Plaintiffs unlikely to succeed on the merits, they also cannot satisfy the remain-

ing requirements: irreparable harm, a favorable balance of equities, and the public interest favor-

ing their requested relief. *See Winter*, 555 U.S. at 20. As discussed, the Supreme Court has made

clear that '[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Id*.

at 24.

In each case, courts must balance the competing claims of injury and must consider the
effect on each party of the granting or withholding of the requested relief. In exercising

their sound discretion, courts of equity should pay particular regard for the public conse-
quences in employing the extraordinary remedy of injunction.

*Id*. (internal citations and quotes omitted).

**A. Plaintiffs do not have irreparable harm.**

Plaintiffs have not been irreparably harmed. First, there is no constitutional right to vote ab-
sentee. *Griffin*, 385 F.3d at 1131-33. Second, the Anti-Fraud Witness Requirement is a reason-
able and nondisriminatory restriction. *See* Part II. Third, the Anti-Fraud Witness Requirement
does not deprive Plaintiffs of their right to vote as there are other remedies at law that would al-
low them to vote and protect their health.[26] Indeed, there are a multitude of ways that Plaintiffs
can comply with the Anti-Fraud Witness Requirement *without Court intervention*. Plaintiffs
could accomplish this: (1) via social distancing (which the CDC has found is an effective way to
curb spread of the virus), (2) via smartphone or videochat, or (3) by using an e-notary (which is
permitted under Virginia law). *See supra* at 16-17 (detailing options to comply with the witness
requirement). So, Plaintiffs have not been irreparably harmed.

On the other hand, if this Court were to enforce to eliminate the Anti-Fraud Witness Re-
quirement, Defendant Voters would be deprived of their fundamental right to vote (*see* Part III),
causing irreparable harm. This factor favors the denial of the preliminary injunction.

**B. The balance of equities weighs against the granting of a preliminary injunction.**

The balance of equities tip strongly in favor of Voter Defendants.

As discussed, Plaintiffs burdens are minimal, as (1) Plaintiffs do not have a constitutional

---

[26] Plaintiffs seek an extreme remedy—eliminating the Anti-Fraud Witness Requirement—for
all Virginians. But "injunctive relief should be no more burdensome to the defendant than neces-
sary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S.
753, 765 (1994).

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                    -29-

right to vote absentee, (2) the Anti-Fraud Witness Requirement is a reasonable and non-discriminatory restriction, and (3) the Plaintiffs have many remedies at law that would allow them to vote and protect their health. *See supra* Part IV.A.

On the other hand are two significant injuries that would result from removal of the Anti-Fraud Witness Requirement. First, Virginia "indisputably has a compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4 (internal citations omitted). But if the Anti-Fraud Witness Requirement is removed, Commonwealth Defendants cannot preserve that integrity.[27] Without the Anti-Fruad Witness Requirement, there will be a significantly increased risk of illegal voting, fraud, and manipulation of the absentee process (which has long been a problem in Virginia). Second, Voter Defendants have core, fundamental, constitutional rights that will be violated by the removal of the Anti-Fraud Witness Requirement. The requested relief is not authorized by the General Assembly, is in violation of controlling laws, and opens this election up to fraud—diluting and debasing Voter Defendants' right to vote.

Alone, either one of Commonwealth Defendants' and Voter Defendants' harms weighs against the granting of the preliminary injunction. But taken together, there can be no doubt that the balance of equities tips heavily in favor of denying the preliminary injunction.

## C. The public interest disfavors the injunction.

The public interest weighs favors denial of the preliminary injunction. The Supreme Court has made clear that:

---

[27] And "the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which [ ] judges should not interfere unless strongly convinced that the legislative judgment is grossly awry. *Griffin*, 385 F.3d at 1131.

**Voter Defs. Opp'n.
to Pls. Prelim. Inj**.                    -30-

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised.

*Purcell*, 549 U.S. at 4. Public confidence in the integrity of elections weighs against a preliminary injunction.

But the public also have an interest in confidence in the voting process. "Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id*. at 5. Indeed "the late hour of Plaintiffs' request exponentially increases the disruption to [the Commonwealth's] electoral process and potentially impairs [its] ability to guarantee the integrity of its elections. *Bethea*, 2016 WL 6123241, at *3; *see also Arizona Democratic Party v. Reagan*, No. CV-16-03618-PHX-SPL, 2016 WL 6523427, at *10 (D. Ariz. Nov. 3, 2016) (holding that at times like these when public moral is low, last minute changes to election law "poses a realistic possibility that the public's confidence in the state's ability to competently administer elections and protect against disorder would be undermined and dissuade them from going to the ballot box next week.") And the potential for all these harms is greater, not less, where there are COVID-19 concerns because voters' attention is not focused on last-minute changes, expecting instead that they can rely on the usual procedures mandated by General Assembly. So public confidence in the election process  also weighs against a preliminary injunction.

While the public has a significant interest in the integrity of the election and confidence in the election process, Plaintiffs' burden is minimal. Plaintiffs argue that the "public interest . . . favors permitting as many qualified voters to vote as possible." But nothing about the Anti-Fraud

Witness Requirement prevents voting. Pls.' Prel. Inj. Br., Doc. 17, Pageid# 128. Again, (1) there is not a constitutional right to vote absentee, (2) the Anti-Fraud Witness Requirement is a reasonable and nondisriminatory restriction, and (3) the Plaintiffs have many remedies at law that would allow them to vote and protect their health. *See supra* Part IV.A. Plaintiffs could comply with the Anti-Fraud Witness Requirement (1) via social distancing, (2) via smartphone or videochat, or (3) by using an e-notary. *See supra* at 16-17. And these suggested remedies also comply with CDC and Virginia guidelines to protect the public health and prevent the spread of the virus. *See* Pls.' Prel. Inj. Br., Doc. 17, Pageid# 128 (arguing for safeguarding public health). So no public health interest justifies the requested relief.

The public interest favors denial of Plaintiffs' Preliminary Injunction.

## Conclusion

For the reasons show, Plaintiffs' Motion for Preliminary Injunction should be denied. If this Court grants Plaintiffs any relief, Voter Defendants respectfully request that this Court stay its decision for 24 hours, so that an emergency appeal in the Fourth Circuit may be filed.

Date: April 28, 2020

Respectfully Submitted,

_____/s/_____

| | |
|---|---|
| Bradley P. Marrs (VSB#25281) | James Bopp, Jr.* |
| Patrick C. Henry II (VSB#80468) |    IN Atty. No. 2838-84 |
| Marrs & Henry | Courtney Turner Milbank* |
| 7202 Glen Forest Drive, Suite 307 Richmond, VA 23226 |    IN Atty. No. 32178-29 |
| | True the Vote, Inc. |
| (804) 662-5715 |    Voters' Rights Initiative |
| (804) 662-5712 (fax) | THE BOPP LAW FIRM, PC |
| bmarrs@marrs-henry.com | 1 South Sixth St. |
| phenry@marrs-henry.com | Terre Haute, IN 47807-3510 |
| | Telephone: (812) 232-2434 |
| *Local Counsel for Proposed Intervenors* | E-mails: jboppjr@aol.com, |
| |     cmilbank@bopplaw.com |
| | |
| | *Lead Counsel for Proposed Intervenors* |
| | |
| | *\* Admitted Pro Hac Vice* |

**Voter Defs. Opp'n.**
**to Pls. Prelim. Inj**.                         -33-

# Certificate of Service

I hereby certify that the foregoing document was served electronically on April 28, 2020, upon the following counsel via the United States District Court for the Western District of Virginia, electronic filing system:

Vishal Mahendra Agraharkar-
   vagraharkar@acluva.org

Adriel I. Cepeda Derieux-
   acepedaderieux@aclu.org

Eden Brooke Heilman-
   eheilman@acluva.org

Dale Ho- dho@aclu.org

Sophia Lakin-
   slakin@aclu.org

Theresa Lee-
   tlee@aclu.org

Davin McKay Rosborough-
   drosborough@aclu.org

Carol L. Lewis- clewis@oag.state.va.us

Heather Hays Lockerman-
   hlockerman@oag.state.va.us

_____/s/_____
Bradley P. Marrs (VSB#25281)
Patrick C. Henry II (VSB#80468)
Marrs & Henry
7202 Glen Forest Drive, Suite 307 Richmond, VA 23226
(804) 662-5715
(804) 662-5712 (fax)
bmarrs@marrs-henry.com
phenry@marrs-henry.com

*Local Counsel for Proposed Intervenors*

James Bopp, Jr.*
   IN Atty. No. 2838-84
Courtney Turner Milbank*
   IN Atty. No. 32178-29
True the Vote, Inc.
   Voters' Rights Initiative
THE BOPP LAW FIRM, PC
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434
E-mails: jboppjr@aol.com,
      cmilbank@bopplaw.com

*Lead Counsel for Proposed Intervenors*

*\* Admitted Pro Hac Vice*