CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
5/5/2020
JULIA C. DUDLEY, CLERK
BY:   s/ A. Little
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF VIRGINIA, *et al.*,<br><br>            *Plaintiffs*,<br><br>        v.<br><br>VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,<br><br>            *Defendants*. | CASE NO. 6:20-CV-00024<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

In this action, League of Women Voters of Virginia and several voters have sued the Virginia State Board of Elections, and a number of state officials, arguing that Virginia's witness signature requirement for absentee ballots is an unconstitutional burden on the right to vote as applied during the COVID-19 pandemic. The parties later reached a partial settlement, and jointly sought approval of a consent decree that would enjoin enforcement of the witness signature requirement for Virginia's primaries on June 23, 2020, for voters who believe they may not safely have a witness present while completing their ballot.

Plaintiffs' case alleges a probable violation of federal law—that is, applying the witness requirement during this pandemic would impose a serious burden on the right to vote, particularly among the elderly, immunocompromised, and other at-risk populations. Weighed against those risks, the present record reflects the likelihood that the burden would not be justified by the witness requirement's purpose as an anti-fraud measure. Thus, the Court finds that the partial settlement in the proposed consent decree is fair, adequate, and reasonable given the strength of the Plaintiffs' case, and that entering it is not against the public interest, illegal, or the product of collusion. The

Court will grant the motion, approving the agreement, which has no bearing on Virginia's local elections on May 19, nor does it address future elections.

## I.   BACKGROUND

A. <u>Factual Background</u>

1. *The COVID-19 Pandemic*

On March 12, 2020, Virginia Governor Ralph Northam declared a state of emergency in response to the public health threat posed by COVID-19, pursuant to Executive Order 51. Dkt. 63 at ¶ 8. Approximately three weeks later, he directed all residents to remain in their homes, subject to limited exceptions, pursuant to Executive Order 53, and later extended that order's restrictions until June 10, 2020, pursuant to Executive Order 55. Dkt. 63 at ¶¶ 9–10. Executive Order 55 directs residents "to practice social-distancing by, among other things, staying at least 'six feet' apart." Dkt. 63 at ¶ 10; *see* Dkt. 1 at ¶ 3. In addition, the federal government has issued guidelines through the Centers for Disease Control and Prevention ("CDC") directing individuals to "stay home as much as possible"[1] and to "put distance between yourself and other people." Dkt. 35-1 at ¶ 6.[2] The CDC has also instructed individuals to "use voting methods that minimize direct contact." *Id.*[3]

On April 24, 2020, Governor Northam released his administration's plan for relaxing the restrictions Virginia has imposed in response to the COVID-19 pandemic. Dkt. 35-1 at ¶ 7.[4] The

---

[1] quoting Centers for Disease Control and Prevention, *Coronavirus Disease 2019: What You Can Do*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html (last accessed May 4, 2020).

[2] quoting Centers for Disease Control and Prevention, *Coronavirus Disease 2019: How to Protect Yourself*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed May 4, 2020).

[3] quoting Centers for Disease Control and Prevention, *Recommendations for Election Polling Locations*, available at https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last accessed May 5, 2020).

[4] citing Virginia Governor, *Forward Virginia: A Blueprint for Easing Public Health Restrictions*, April 24, 2020 available at

first phase of this plan will not begin until there have been fourteen days of consistent decline in the in the percentage of positive cases reported each day. *Id.* As of May 5, 2020, data from the Virginia Department of Health demonstrate that this goal has not yet been met.[5] However, on May 4, 2020, Governor Northam announced that restrictions on commercial activities may be eased starting on May 15, 2020, but he reiterated that Virginians—especially those with increased vulnerability to COVID-19—should continue to isolate at home.[6] Regardless of these restrictions, Virginia will still permit in-person voting, along with absentee voting, for the June 23 primary election.[7] Dkt. 63 at ¶ 12.

There is no dispute that, based on the Census Bureau's 2018 Current Population Survey, over twenty-five percent of Virginians over the age of eighteen live alone. Dkt. 1 at ¶ 78.[8] Nor do the parties dispute that some at-risk populations are more likely to live alone, such as Virginians over the age of sixty-five. *Id.* While "[p]eople of every age can and have contracted COVID-19, including severe cases . . . geriatric patients are at the greatest risk of severe cases, long-term

---

https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/Slide-Deck-4-24-2020-.pdf (last accessed May 5, 2020).

[5] Virginia Department of Health, *COVID-19 & You*, available at https://www.vdh.virginia.gov/coronavirus/ (last accessed May 4, 2020).

**[6]** Virginia Governor, *Governor Outlines Phased Plan to Safely, Gradually Ease Restrictions*, May 4, 2020, available at https://www.governor.virginia.gov//media/governorvirginiagov/governor-of-virginia/pdf/Forward-Virginia-Presentation-5.4.pdf.

[7] The June 23 primary features several intraparty races for U.S. House of Representative seats, Democratic primaries for five local elections, and a Republican primary for the U.S. Senate Seat currently held by Sen. Mark Warner. *See* Va. Dept. of Elections, *Certified Candidates in Ballot Order for June 23, 2020 Primary Elections*, available at www.elections.virginia.gov/media/castyourballot/candidatelist/June-2020-Primary-Candidates-List-(4)-1.pdf (last accessed May 5, 2020).

[8] citing 2018 Current Population Survey, U.S. Census Bureau, statistics accessed by using the Census Bureau Current Population Survey Table Creator tool at https://www.census.gov/cps/data/cpstablecreator.html.

impairment, and death." Dkt. 16-1 (Declaration of Dr. Arthur L. Reingold) at ¶ 7. This is also true of those "with immunologic conditions and with other pre-existing conditions, such as hypertension, certain heart conditions, lung diseases . . . diabetes mellitus, obesity, and chronic kidney disease." *Id.*

To date, the Virginia Department of Health has calculated over 20,000 confirmed or probable cases of COVID-19, over 2,700 hospitalizations, and over 700 deaths attributed to the disease.[9] The data likely undercount the actual number of positive cases, because of the Commonwealth's limitations with regard to testing capacity. Dkt. 64-4 (Declaration of M. Norman Oliver, Virginia Health Commissioner) at ¶ 12.

2. *Virginia's Absentee Voting Scheme*

Va. Code § 24.2-612 requires that absentee ballots be made available forty-five days prior to the June 23, 2020 primary election—Saturday, May 9, 2020. Dkt. 35-1 at ¶ 8; Dkt. 64-3 (Declaration of Christopher E. Piper) at ¶ 5. Or, in localities whose general registrar is closed on that day, ballots must be made available on Friday, May 8, 2020. *Id.*

General registrars maintain lists of voters who have requested and returned absentee ballots, and absentee ballots are only accepted from voters whose names are on that list. Dkt. 64-3 at ¶ 7. Upon receiving a valid request for an absentee ballot and confirming that the applicant is a registered voter in the jurisdiction, the registrar provides an absentee voter's package which includes the following: a sealed envelope containing the ballot and a second envelope containing printed instructions as well as a "Statement of Voter" form, which the absentee voter is required to sign, attesting to their identity, residency status, and that they "marked the ballot(s) in the

---

[9] Virginia Department of Health, *COVID-19 & You*, available at https://www.vdh.virginia.gov/coronavirus/ (last accessed May 5, 2020).

presence of [a] witness, without assistance or knowledge on the part of anyone as to the manner in which [the voter] marked it" and that they the voter has "not voted and will not vote in this election at any other time or place." Va. Code § 24.2-706; *see* Dkt. 1 at ¶ 66; Dkt. 63 at ¶ 2. Pertinent here, Va. Code § 24.2-706 and Va. Code § 24.2-707—the provision Plaintiffs challenge as unconstitutional—requires that the absentee voter "mark[] the ballot(s) in the presence of [a] witness, without assistance or knowledge on the part of anyone as to the manner in which [the voter] marked it" and that the voter personally attest to the ballot being so witnessed. *See* Dkt. 1 at ¶ 67; Dkt. 63 at ¶ 3. Individuals who make a willfully false material statement or entry on an absentee ballot are at the risk of being charged with a Class 5 felony. Va. Code § 24.2-1012. Those who would sign the name of another qualified voter are at risk of being charged with a Class 4 felony. Va. Code § 24.2-1012.

A voter's failure to obtain a witness signature on their absentee ballot is an omission that is "always material" that renders the ballot invalid. *See* 1 Va. Admin. Code 20-70-20(B); Dkt. 1 at ¶ 70. However, "[t]he illegibility of a voter's or witness's signature . . . shall not be considered an omission or error." 1 Va. Admin. Code 20-70-20(C)(10); *see* Dkt. 1 at ¶ 71.

B. <u>Procedural History</u>

On April 17, 2020, the League of Women Voters of Virginia and three individual voters—Katherine D. Crowley, Erikka Goff, and Seijra Toogood—("Plaintiffs") sued the Virginia State Board of Elections and, in their official capacities, its Chairman (Robert H. Brink), Vice-Chair (John O'Bannon), and Secretary (Jamilah D. LeCruise), as well as the Commissioner of the Virginia Department of Elections (Christopher E. Piper) ("State Defendants"), seeking to enjoin enforcement of Va. Code § 24.2-707(A), which mandates that all absentee ballots be signed by a witness before submission. Dkt. 1. ¶¶ 1–2. Given the public health crisis spawned by the COVID-

19 pandemic, Plaintiffs argue that the requirement unduly burdens their right to vote. As evidence, Plaintiffs cite Governor Ralph Northam's stay-at-home order presently in effect through June 10, 2020, as well as state and federal government social distancing guidelines. Dkt. 1 ¶¶ 2–3; *see* Va. Executive Order No. 2020-55. Social distancing measures are expected to remain in place until there is a treatment or vaccine for COVID-19. Dkt. 1 at ¶ 35.

On April 21, 2020, Plaintiffs moved for a preliminary injunction that: (1) prohibits State Defendants from enforcing the aforementioned witness requirement for all Virginia voters for the June 23, 2020 primaries and for any and all subsequent elections in Virginia until such time as in-person interactions required by compliance with the witness requirement no longer pose a risk to public health and personal safety; (2) orders State Defendants to issue guidance instructing city and county election officials to count otherwise validly cast absentee ballots that are missing a witness signature for Virginia's June 23 primary elections; and (3) orders State Defendants to conduct a public information campaign informing Virginia voters about the elimination of this requirement, in coordination with city and county election officials. Dkt. 16.

On April 23, 2020, two days after Plaintiffs filed their motion for a preliminary injunction, a group of three voters (Sheila DeLappe Ferguson, Sandy Burchett, and Diane Crickenberger) filed a motion to intervene in this case. Dkt. 22. The next day, the Republican Party of Virginia ("RPV") together with another three voters (Vincent E. Falter, Mildred H. Scott, and Thomas N. Turner, Jr.) also filed a motion to intervene in this case. Dkt. 28. The Court held a status conference that day with the Plaintiffs, State Defendants, and the proposed intervening parties in order to develop an expedited briefing schedule and entertain the litigants' preliminary views on a variety of other topics. After the motions to intervene were fully briefed, the Court denied both motions to

intervene as they related to the six voters, and it permitted the RPV to intervene as a defendant in the suit. Dkts. 55, 57.

On April 27, 2020, Plaintiffs and State Defendants filed their "Joint Motion for Entry of Partial Consent Judgment and Decree," Dkt. 35, which would resolve these parties' dispute over the application of the witness signature requirement for only the upcoming June election. The Court held a second status conference on April 29, 2020, to preliminarily discuss the impact of the joint motion for a partial consent decree on this case. Dkt. 39. On April 30, 2020, the Court received the RPV's brief in opposition to the approval of the consent decree. Dkt. 58. The next day, Plaintiffs and State Defendants filed their reply briefs in support of their proposed agreement. Dkts. 62, 64. That week, the Court also accepted two amicus briefs in this case: one from the Public Interest Legal Foundation ("PILF") and Landmark Legal Foundation, Dkt. 48, and another from The Honest Elections Project, Dkt. 50. It also construed the rejected voter intervenors Sheila DeLappe Ferguson, Sandy Burchett, and Diane Crickenberger's brief in opposition to Plaintiffs' motion for a preliminary injunction as a brief of amicus curiae. Dkt. 55 at 1 n.1.

On May 4, 2020, the Court heard oral argument from Plaintiffs, State Defendants, and Intervenor-Defendant on the merits of both the pending motion for a preliminary injunction, Dkt. 16, and the motion for approval of the consent decree, Dkt. 35. This Memorandum Opinion addresses only the approval of the latter motion. Plaintiffs' motion for a preliminary injunction remains pending.[10]

---

[10] Although the Court notes that, pursuant to the proposed consent agreement, Plaintiffs have agreed to withdraw their motion for a preliminary injunction upon approval of the agreement. Dkt. 35-1 at ¶ 12.

C.  Proposed Settlement Agreement

On April 27, 2020, Plaintiffs and the State Defendants filed their "Joint Motion for Entry of Partial Consent Judgment and Decree," Dkt. 35, which would resolve these parties' dispute over the application of the witness signature requirement for only the upcoming June primary election. The proposed partial consent judgment and decree provides in part:

> Defendants shall issue updated instructions to include with all absentee ballots as provided in Va. Code § 24.2-706—or issue guidance instructing all relevant city and county election officials to modify or amend the printed instructions accompanying each absentee ballot—to inform voters that any absentee ballot cast in the June Primary without a witness signature will not be rejected on that basis and specifically informing voters in bold print that they may disregard the witness signature line on the absentee ballot envelope if they believe they may not safely have a witness present while completing their ballot.

Dkt. 35-1 at 6. The Commissioner of the Virginia Department of Elections would also be required under this agreement to undertake "additional reasonable steps to inform the public that the witness requirement will not be enforced for those absentee voters who believe they may not safely have a witness present while completing their ballot, and issue guidance instructing all relevant city and county election officials to do the same." *Id.* Plaintiffs would then withdraw their motion for a preliminary injunction and waive any entitlement to attorneys' fees and costs that have accrued up to the date the agreement is approved by the Court. *Id.*

To be clear—this agreement only resolves the most pressing matter in dispute between Plaintiffs and State Defendants: the absentee ballot voting requirements for the June 23, 2020 primary election before the ballots are made available on May 8, 2020. It does not affect the requirements for Virginia's local elections held on May 19, 2020, nor any future election. The parties have made clear that this proposed consent decree does not resolve Plaintiffs' claims as to other elections affected by COVID-19 that are scheduled to occur after the June 23, 2020 primaries. Dkt. 36 at 6.

## II.    LEGAL STANDARD

Consent decrees have a dual nature, carrying elements "of both judgment and contract." *Szaller v. Am. Nat. Red Cross*, 293 F.3d 148, 152 (4th Cir. 2002). As such, the Fourth Circuit has instructed courts to scrutinize their terms in order to first determine whether such agreements are "fair, adequate, and reasonable" and also to ensure that in approving and issuing a consent judgment, that a court does not stamp its imprimatur upon an agreement that is "illegal, a product of collusion, or against the public interest." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); *see Ohio Valley Envt'l Coalition v. Pocahontas Land Corp.*, No. 2:15-cv-15515, 2017 WL 988115, at *2 (S.D. W. Va. Mar. 14, 2017). In all this, courts should "be guided by the general principle that settlements are encouraged . . . [but] should not blindly accept the terms of a proposed settlement." *United States v. North Carolina*, 180 F.3d at 581. Toward these efforts, the Court must assess "the strength of the plaintiff's case," *id.* (citing *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)), and

> [w]hile this assessment does not require the court to conduct "a trial or a rehearsal of the trial," the court must take the necessary steps to ensure that it is able to reach "an informed, just and reasoned decision." *Id.* (internal quotation marks omitted.) In particular, the "court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement."

*Id.* (quoting *Carson v. American Brands, Inc.*, 606 F.2d 420, 430 (4th Cir. 1979) (en banc) (Winter, Circuit Judge, dissenting), *adopted by Carson v. Am. Brands, Inc.*, 654 F.2d 300, 301 (4th Cir. 1981) (en banc) (per curiam)); *see United States v. E.I. du Pont de Nemours & Co.*, No. 5:16-cv-00082, 2017 WL 3220449, at *11 (W.D. Va. July 28, 2017). As in this case, "when a settlement has been negotiated by a specially equipped agency, the presumption in favor of settlement is particularly strong." *Md. Dept. of Env't v. GenOn Ash Mgmt., LLC*, Nos. 10-cv-0826, 11-cv-1209,

12-cv-3755, 2013 WL 2637475, at *1 (D. Md. June 11, 2013) (citing *U.S. v. City of Welch*, No. 1:11-00647, 2012 WL 385489, at *2 (S.D. W. Va. Feb. 6, 2012)).

### III.   ANALYSIS

The Court has scrutinized the terms of the proposed settlement agreement, Dkt. 35-1, and all other submissions in the record. As the following analysis explains, the Court has determined that, based on the strength of Plaintiffs' case and the quality of the counsel representing the parties to the agreement, as well as the factors for consideration, the proposed consent decree is "fair, adequate, and reasonable." Further, the Court finds that that this agreement is in the public interest, and that it is not unlawful or the product of collusion between the drafting parties.

A. Fair, Adequate, and Reasonable

In analyzing whether an agreement is fair, adequate, and reasonable, the Court must examine the strength of the plaintiff's case. *United States v. North Carolina*, 180 F.3d at 581 (citing *Flinn*, 528 F.2d at 1172–73). The Fourth Circuit has further directed courts to consider "the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who adopted the settlement." *United States v. North Carolina*, 180 F.3d at 581.

The Court begins by considering the experience of counsel who proposed the settlement, *see id.*, and finds that the American Civil Liberties Union and American Civil Liberties Union of Virginia have provided fair and adequate legal counsel in representing Plaintiffs in the adoption of the partial settlement agreement. *See Carcaño v. Cooper*, No. 1:16-cv-236, 2019 WL 3302208, at *6 (M.D.N.C. July 23, 2019) (assessing fairness and adequacy of proposed settlement and determining that the plaintiffs were "well-represented" by the American Civil Liberties Union of

North Carolina). The same can be said for the representation provided to the State Defendants in this case by the Virginia Office of the Attorney General.

Next, as to the "stage of the proceedings," *United States v. North Carolina*, 180 F.3d at 581, given the unusually expedited nature of these proceedings, the parties have not engaged in any discovery to be sure. In fact, given that Plaintiffs' complaint was filed just over two weeks ago, the time for State Defendants to file a responsive pleading has not yet even passed. However, there is little indication this is a case for which the length or amount of discovery, or indeed any discovery at all *from defendants* will be particularly relevant to the strength of Plaintiffs' case. Unlike many other lawsuits, many of the documents necessary to prove Plaintiffs' case are not uniquely in the State Defendants' possession. Rather, Plaintiffs would presumably rely, as they have thus far in this action, on government reports, state and federal public health policies and orders, as well as the declarations of experts in order to demonstrate that the witness signature requirement has impermissibly burdened a segment of the electorate. As such, the lack of discovery from State Defendants in this case is not as relevant of a consideration as it might otherwise be.

The Republican Party of Virginia, or "RPV," cites the opinion of one of our sister courts in this Circuit for the proposition that "[w]here there has been little adversarial activity, a federal court must be especially discerning when presented with a proposal in which elected state officials seek to bind their successors as to a matter about which there is substantial political disagreement." Dkt. 58 at 17 (quoting *Carcaño*, 2019 WL 3302208, at *6). Given the expedited nature of the case and consequently the limited opportunities for adversarial testing to date, this Court agrees with the RPV that it should be particularly discerning in determining whether the agreement is fair, adequate, and reasonable. However, weighing in Plaintiffs' and State Defendants' favor is the fact

that this partial settlement agreement is expressly short term. It applies to only the June 23, 2020 primary election, which is no more than seven weeks away. In no reasonable terms does the record point to a conclusion that the agreement will bind successors in office in any way. *Horne v. Flores*, 557 U.S. 443, 449 (2009); *Carcaño*, 2019 WL 3302208, at *6 (stating that "where there has been little adversarial activity, a federal court must be especially discerning when presented with a proposal in which elected state officials seek to bind their successors").

The Court also finds that the limited nature of the settlement agreement's relief weighs in favor of a finding that it is "fair, adequate, and reasonable." *See United States v. North Carolina*, 180 F.3d at 581. The parties have agreed to a settlement that does not address their entire dispute, nor does it provide all the relief Plaintiffs sought in their motion for preliminary injunction, which would have applied to elections beyond the June 23, 2020 primary election. Rather, the proposed agreement deals with only the most pressing issue in this litigation: the requirements to vote in the June 23, 2020 primary election. Dkt. 36 at 6 (joint brief supporting partial consent judgment) ("Plaintiffs will continue to seek [relief for elections beyond the June Primary affected by COVID-19] as this litigation moves forward."). Nor can the relief be said to be wholly one-sided. Plaintiffs have given up their ability to seek attorneys' fees leading up to this point in the litigation. Dkt. 35-1 at ¶ 14. Given the number of extensive briefs filed to date, the Court expects that is not an insignificant sum Plaintiffs have agreed to take off the table. The RPV argues that the first of these compromises is illusory, because any suit related to the November election is not yet ripe. But given the evidence in the record that the COVID-19 pandemic will likely pose a threat during that election, whether that claim is ripe for adjudication is a legal question for which an answer is far from clear. *See* Dkt. 17-1 at ¶¶ 12–15 (stating that disease transmission will continue until a vaccine has been developed and placed into wide use or herd immunity is obtained, neither of

which are expected in 2020); 35-1 at ¶ 3 (suggesting continued community transmission through the summer and into the fall of 2020). Limiting the relief sought by Plaintiffs to just this election is not an "illusory" promise.

It is also significant to the Court that Plaintiffs have pleaded a probable violation of federal law. *See Kasper v. Bd. of Election Comm'rs of the City of Chi.*, 814 F.2d 332, 342 (concluding the district court was right to insist "on a demonstration of at least a probable violation of that law as a condition to the entry of this decree" that would enjoin a state statute). Indeed, the existence of a probable violation of federal law further speaks to the strength of Plaintiffs' case against the State Defendants. *See United States v. North Carolina*, 180 F.3d at 581 ("While this assessment does not require the court to conduct 'a trial or a rehearsal of the trial,' the court must take the necessary steps to ensure that it is able to reach 'an informed, just and reasoned decision.'"); *Flinn*, 528 F.2d at 1172 (stating that "the most important factor to be considered in determining whether there has been such a clear abuse of discretion [in approving a settlement] is whether the trial court gave proper consideration to the strength of the plaintiffs' claims on the merits"). Thus, while the Court need not decide whether Plaintiffs had established their claim "to a legal certainty," nor need it reach "any dispositive conclusions on . . . unsettled legal issues in the case," *Flinn*, 528 F.2d at 1172–73 (internal quotations omitted), it is appropriate and necessary to examine the merits of Plaintiffs' settled claims in order to determine whether success was at least probable, *cf. Kasper*, 814 F.2d at 342. "So long as the record before it is adequate to reach an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise, it is sufficient." *Flinn*, 528 F.2d at 1173.

In their complaint, Plaintiffs allege that the witness signature requirement places a severe burden on those Virginia voters who live alone, and especially those who have a preexisting health condition or are immunocompromised. This is because, as Plaintiffs allege, the requirement forces them to interact with another individual, risking COVID-19 transmission, in order to exercise their right to vote. Each of the individual Plaintiffs, who all live alone, have alleged that they do not feel safe interacting with a witness in order to fulfill the requirement. And so, despite their desire to vote in upcoming elections, they feel they must refrain from voting. Plaintiff League of Women Voters of Virginia ("the League") has "nearly 2,000 members across Virginia, some of whom live alone and are vulnerable to becoming severely ill from COVID-19 because they are elderly and/or have underlying health conditions." Dkt. 1 at 7. The League claims that some amount of these members will be unable to comply with the witness requirement on absentee voting "without placing their own health at risk." *Id.*

Like other fundamental constitutional rights, the right to vote is subject to regulation. At least with regard to federal elections, the Elections Clause of the Constitution anticipates this: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4, cl. 1.

When evaluating a purportedly unconstitutional burden on the right to vote, courts resort to the framework that the U.S. Supreme Court set forward in *Anderson v. Celebrezze,* 460 U.S. 780 (1983), and *Burdick v. Takushi,* 504 U.S. 428 (1992), which has become known as the *Anderson-Burdick* balancing test. This inquiry's rigorousness depends on the severity of the constitutional burden posed by the challenged regulation. *Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017). Where the burden posed by the regulation can be characterized

14

as "severe," the challenged restriction must "be narrowly drawn to advance a state interest of compelling importance," *id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)), otherwise known as strict scrutiny, *see Fusaro v. Cogan*, 930 F.3d 241, 257–58 (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)). The class of state election laws that are subject to strict scrutiny is "limited." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016). However, where the challenged election regulation "imposes only reasonable, nondiscriminatory restrictions" upon constitutional rights, it may generally be justified by "the State's important regulatory interests." *Marcellus*, 849 F.3d at 175 (quoting *Norman*, 502 U.S. at 289). The *Anderson–Burdick* balancing test requires the court to measure "the character and magnitude of the asserted injury" against "the precise interests put forward by the State as justifications for the burden." *Anderson*, 460 U.S. 780, 789; *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1638374, at *11 (D. Wisc. Apr. 2, 2020) (applying *Anderson-Burdick* test in evaluating a similar witness signature requirement); *Fitzgerald v. Alcorn*, 285 F. Supp. 3d 922, 948 (W.D. Va. 2018).

The Supreme Court has made clear that it has not identified any "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." *Crawford v. Marion Cty. Election Bd.*, 553, U.S. 181, 191 (2008). Rather, "however slight that burden may appear" the reviewing court must find that it is "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995) ("We believe that a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational.").

15

In ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote. But these are not ordinary times. In our current era of social distancing— where not just Virginians, but all Americans, have been instructed to maintain a minimum of six feet from those outside their household—the burden is substantial for a substantial and discrete class of Virginia's electorate. During this pandemic, the witness requirement has become "both too restrictive and not restrictive enough to effectively prevent voter fraud." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 235 (4th Cir. 2016).

On the one hand, the measure is too restrictive in that it will force a large class of Virginians to face the choice between adhering to guidance that is meant to protect not only their own health, but the health of those around them, and undertaking their fundamental right—and, indeed, their civic duty—to vote in an election. The Constitution does not permit a state to force such a choice on its electorate. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).

The RPV argues that concerns of the health risks associated with the witness requirement are either overblown or can be mitigated if, for example, the absentee voter asks the witness to "observe the act of voting the ballot from more than six feet away" and then sign as witness later "from a safe distance," accompanied by handwashing. *See* Dkt. 63 at 6 (¶ 17); *see* May 4, 2020 Hr'g Draft Tr. at 37–38 (arguing that employing "practices employed by people throughout the Commonwealth" like "wearing masks," or other "common sense" steps, can sufficiently mitigate risks). And, to be sure, those voting absentee with a witness would be well-advised to practice social distancing.

But for many—especially the elderly, immunocompromised, and others at greatest risk of medical complications or death if they contract the virus—such measures come up far short. Indeed, evidence in the record reflects that that the virus can be transmitted with "ease"—including

by droplet transmission when an infected individual sneezes, coughs, and the like; and potentially also through "tiny droplets containing the virus remain in the air and can be inhaled"—and further, individuals who are infected with the virus can transmit the virus before they develop any symptoms. Dkt. 16-1 (Declaration of Dr. Arthur L. Reingold) ¶¶ 8, 10, Dkt. 17-1. *Id.* ¶¶ 8, 10; *see also* CDC, How COVID-19 Spreads ("The virus that causes COVID-19 is spreading very easily and sustainably between people.").[11] Evidence in the record also reflects that "the only ways to limit [COVID-19's] spread are self-isolation, social distancing, frequent handwashing, and disinfecting surfaces"; that "[s]elf-isolation involves not physically interacting with those outside one's home"; and that social distancing involves "maintaining at least six feet of distance between individuals." Dkt. 16-1 at ¶ 10; Dkt. 17-1. Substantially similar advice is being given by federal, state, and local health officials—to keep distance with others outside the home whenever possible. Notwithstanding the proffered steps which could be taken to mitigate the risks to health in having somebody witness one's absentee ballot, many would be dissuaded from exercising their vote both on account of the remaining health risks and required steps to mitigate them—again, especially those who are elderly, immunocompromised, or otherwise at grave risk from the virus. That substantial burden on the right to vote has not been justified by countervailing, demonstrated interests in the witness requirement.

Indeed, the witness signature requirement is not restrictive enough in that the record does not demonstrate that it is especially effective in preventing voter fraud.[12] Although it is nowhere near dispositive of the issue, at the Court's hearing on May 4, 2020, counsel for the RPV conceded that he was unaware of any quantitative data "one way or the other" on the witness signature

---

[11] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[12] None of the parties dispute that this is the state's justification for the requirement.

requirement's efficacy. The Court does find persuasive, however, the enforcement weaknesses apparent in the statute. For example, the witness need not print their name or the date below their signature—in fact, the Commonwealth does not require that the witness be identified in any way whatsoever. What is more, the illegibility of the witness signature is not grounds for rejecting the ballot. 1 Va. Admin. Code 20-70-20(B).[13]

And, while at least one amicus brief in the record has put forward research which it argues documents the incidence of voter fraud in the Commonwealth, Dkt. 48 (amicus brief of PILF and Landmark Legal Foundation) (providing research that it claims demonstrates portions of Virginia's voter roll could be matched to individuals with a "verifiable record of death"), there is no evidence in the record at this time that even suggests that permitting some voters to opt-out of the witness signature requirement would increase voter fraud in a meaningful way. *See* Dkt. 64-3 (Declaration of Christopher Piper, Commissioner of Virginia Department of Elections) ("Voter list maintenance is entirely unrelated to the witness requirement."). This is particularly true when considering all of the other means of combatting voter fraud integrated into the absentee-voting system. For example, in addition to risking serious felony charges for absentee voting malfeasance, general registrars maintain a separate list of voters, aside from the general voter rolls, who have requested and returned absentee ballots, and absentee ballots are only accepted from voters whose names are on that list. Dkt. 64-3 at ¶ 7. For the fraudster who would dare to sign the name of another qualified voter at the risk of being charged with Class 4 and Class 5 felonies, Va. Code § 24.2-1012 & 1016,

---

[13] Indeed, although a witness requirement is seemingly easy to implement, a significant majority of the states have chosen other means to combat voter fraud. The Commonwealth is only one of eleven states that has a witness or notarization requirement. Dkt. 17 at 22 (citing Chart, "Verifying Authenticity of Absentee/Mailed Ballots," Voting Outside the Polling Place: Absentee, All- Mail and other Voting at Home Options, Nat'l Conf. of State Legislatures (Apr. 3, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx        and collecting state statutes).

writing out an illegible scrawl on an envelope to satisfy the witness requirement would seem to present little to no additional obstacle—at least based on the record before the Court.

Because of the compromises the parties reached during settlement, experience of the counsel in this case, and the clear strength of the Plaintiffs' case against the State Defendants, the Court concludes that the proposed partial settlement agreement is fair, adequate, and reasonable. *See United States v. North Carolina*, 180 F.3d at 581.

### B. Settlement's Relationship to the Public Interest

The RPV argues that the public interest is served "by respecting state control over electoral processes" and so it contends that this Court cannot enter a consent decree without first making a finding that the state law to be enjoined by the consent decree violates federal law. At the outset, the Court notes that it is unsurprising the parties did not agree that the witness requirement is deficient in the eyes of the federal Constitution. The proposed consent decree only partially settles the dispute between them, and the remaining claims as to later elections hinge on the same constitutional question at issue in the settled claim: whether the witness signature requirement passes constitutional muster. Unless the parties were to settle the entire suit, it would be imprudent for any lawyer to make such a sweeping concession. Nor would it matter much if it did. The Court could not accept on the basis of a state executive's mere agreement that a state statute was constitutionally infirm. The ability to make such a finding is unique to the judicial branch. *See Nat'l Revenue Corp. v. Violet*, 807 F.2d 285, 286–87 (1st Cir. 1986) (holding that the district court could not enter a declaratory judgment declaring a state statute invalid merely based on the "agreement of the parties").

The parties vigorously debate how the Seventh Circuit's reasoning in *Kasper v. Board of Election Commissioners of the City of Chicago*, 814 F.2d 332 (7th Cir. 1987) (Easterbrook, J.),

applies to this case. *See, e.g.,* Dkt. 58 at 18; Dkt. 62, at 8; Dkt. 64 at 3. In particular, the RPV points

to that court's articulation that "[a]n alteration of the [state] statutory scheme may not be based on

consent alone; it depends on an exercise of federal power, which in turn depends on a violation of

federal law." Dkt. 58 at 18 (quoting *Kasper*, 814 F.2d at 342). That principle makes a great deal

of sense. As the *Kasper* court stated, "The Board may not 'consent' to a higher budget or a new

organic statute. Its Commissioners could not 'consent' to be free of the threat of removal by the

circuit court; it is equally outside the power of the Board to agree to violate state law in other

ways." *Id.*; *see Evans v. City of Chicago*, 10 F.3d 474, 480 (1993) (en banc) (stating that "entry

and continued enforcement of a consent decree regulating the operation of a governmental body

depend on the existence of a substantial claim under federal law. Unless there is such a claim, the

consent decree is no more than a contract, whose enforcement cannot be supported by the diversity

jurisdiction and that has in court no more force than it would have outside of court").

The Seventh Circuit concluded that it was therefore appropriate for the district court to

insist "on a demonstration of at least a probable violation of that law as a condition to the entry of

this decree." *Id.* (finding that the consent decree could not be entered because plaintiffs' complaint

did not allege a violation of federal law). At bottom, the *Kasper* court's reasoning speaks to the

nature of a consent decree as both a contract and a judgment. *Szaller v. Am. Nat. Red Cross*, 293

F.3d 148, 152 (4th Cir. 2002). Just as a state party could not contract away an obligation to act in

accordance with the law, a district court cannot ratify such an agreement through a consent decree.

*Kasper*, 814 F.2d 332 ("A consent decree is not a method by which state agencies may liberate

themselves from the statutes enacted by the legislature that created them.").

The RPV's concern that the executive branch of Virginia might seek the shield of a federal

judgment in order to provide it free reign to ignore acts of the legislature would be more concerning

to this Court, however, if Plaintiffs' case did not actually demonstrate a probable violation of federal law, but that is not the case here. *See supra* Part III.A (evaluating strength of Plaintiffs' federal constitutional claim). A consent decree, like the one before this Court, that permits the State Defendants to avoid the likely unconstitutional application of a state law—at least with regard to the June primary election—is neither unlawful, nor against the public interest. *See Common Cause Ind. v. Marion Cty. Election Bd.*, No. 1:17-cv-01388, 2018 WL 3770134, at *2 (S.D. Ind. Aug. 9, 2018) (holding that intervening party the State of Indiana's objection to a consent decree governing early in-person voting that "was necessary to remedy a probable violation of federal law" was not compelling because it only argued that "it is not in the public interest for a federal court to enter, enforce, and monitor a consent decree that dictates the operation of state-run elections"). While the RPV argues that the public interest is served "by respecting state control over electoral processes," it is better served when parties come to a settlement agreement over an electoral process that is likely being applied unconstitutionally. *Id.* ("The State's lawyers may entertain what preferences they will, but violations of federal rights justify the imposition of federal remedies."). This is particularly true in the context of this agreement, which takes place during the worst pandemic this state, country, and planet has seen in over a century. The public health implications have been vast and unprecedented in the modern era, with no one left untouched by the risk of transmission. The evidence in the record points to the conclusion that adherence to the witness signature requirement in June would only increase that risk. *See, e.g.,* Dkt. 35-1 at ¶ 3 (citing research from University of Virginia researchers predicting that if current restrictions remain in place through June 10, 2020, "COVID-19 cases in Virginia will likely not peak until approximately August."); Dkt. 16-1 (Declaration of Dr. Arthur L. Reingold) at ¶ 16.

For these reasons, the Court also concludes that the proposed consent decree is not illegal nor against the public interest. *See United States v. North Carolina*, 180 F.3d at 581.

C. <u>Product of Collusion</u>

"Absent evidence to the contrary, the court may presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *McCurley v. Flower Foods, Inc.*, No. 5:16-cv-00194, 2018 WL 6650138, at *2 (D.S.C. Sept. 10, 2018) (internal quotations omitted)); *Funkhouser v. City of Portsmouth*, No. 2:13-cv-520, 2015 WL 12765639, at *3 (E.D. Va. May 14, 2015) ("In the absence of any evidence to the contrary, it is presumed that no fraud or collusion occurred.").

Intervenor-Defendant RPV argues that the proposed consent agreement carries "too many hallmarks of collusion" in order to pass the Court's muster. Principally, the RPV points to how the State Defendants "have so far failed to defend the absentee ballot witness statute." Dkt. 58 at 17. Rather, the RPV contends that their decision to "almost immediately . . . enter into the Consent Decree to enjoin its use, [to] issue[] a press release touting their deal" and to oppose the RPV's intervention in this suit, "which would leave the statute having no defender in [c]ourt," provides strong circumstantial evidence of collusion. *Id.* The RPV correctly states that

> a judgment entered into by non-adverse parties "is no judgment of the court. It is a nullity . . . ." *Lord v. Veazie*, 49 U.S. 251, 256 (1850). Put another way, there is "no case or controversy within the meaning of Art. III of the Constitution" when "both litigants desire precisely the same result . . . ." *Moore v. Charlotte-Mecklenburg Bd. of* [*Educ.*], 402 U.S. 47, 47-48 (1971).

Dkt. 58. But that is not the case before this Court. Rather, as the parties have made express both during the status conference on April 29, 2020, the proposed settlement does not resolve all of the issues in this case. *See, e.g.*, Dkt. 36 at 6 (joint brief supporting partial consent judgment) ("Plaintiffs will continue to seek [relief for elections beyond the June Primary affected by COVID-

19] as this litigation moves forward."). Rather, this *partial* consent decree resolves the dispute between them only as to the June 23, 2020 primary election.

Although the Court notes that State Defendants have not filed a brief in opposition to Plaintiffs' preliminary injunction, nor have they entered a responsive pleading to Plaintiffs' complaint, State Defendants' litigation posture is fully consistent with an arms-length negotiation among opposing parties to seek a negotiated solution to a narrow, immediate dispute rather than collusion. For example, pursuant to their proposed settlement, Plaintiffs have agreed to retract their preliminary injunction. And, given that Plaintiffs' complaint was filed a little over two weeks ago, the deadline for State Defendants to file their responsive pleading has not yet passed. That State Defendants would oppose intervening parties—even one attempting to intervene as defendants in this suit, as the RPV has done—after negotiating a settlement agreement with the Plaintiffs is neither a surprise nor a hallmark of collusion.

Moreover, as Plaintiffs and State Defendants highlight, the cases that the RPV cites that had found collusion do not remotely resemble the situation presented by this case. For example, in *Moore v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 47, 47–48 (1971), the Supreme Court stated that "at the hearing both parties argued to the three-judge court that the anti-busing law was constitutional and urged that order of the district court adopting the [plan] should be set aside." Because the Court was "confronted with the anomaly that both litigants desire precisely the same result, namely a holding that the anti-busing statute is constitutional," it held that there was no case or controversy as required under Article III of the U.S. Constitution. The Supreme Court's opinion in *United States v. Johnson* presents perhaps the most extraordinary facts of the cases that the RVP cited. In that case, the Supreme Court found that

> [t]he affidavit of the plaintiff, submitted by the Government on its motion to dismiss the suit as collusive, shows without contradiction that he brought the present

proceeding in a fictitious name; that it was instituted as a 'friendly suit' at appellee's request; that the plaintiff did not employ, pay, or even meet, the attorney who appeared of record in his behalf; that he had no knowledge who paid the $15 filing fee in the district court, but was assured by appellee that as plaintiff he would incur no expense in bringing the suit; that he did not read the complaint which was filed in his name as plaintiff; that in his conferences with the appellee and appellee's attorney of record, nothing was said concerning treble damages and he had no knowledge of the amount of the judgment prayed until he read of it in a local newspaper. Appellee's counter-affidavit did not deny these allegations.

319 U.S. 302, 303–04 (1943). In comparison, the facts presented by *Lord v. Veazie*, which the RVP also cites, are far 'tamer,' given the Supreme Court merely found that "a number of affidavits were filed . . . [that] proved that none of the persons whose interest was adverse to that of the plaintiff and defendant had any knowledge of these proceedings, until after the case was removed to this court." 49 U.S. 251, 253 (1850).

Similar to this case, the Middle District of North Carolina recently encountered in *Carcaño v. Cooper*, 2019 WL 3302208, an intervenor-defendant who claimed that the plaintiffs and the state defendants in the case "were not in reality opposed to each another and, therefore, that any proposed consent decree is necessarily collusive." *Id.* at *6. That court found that the state executive branch defendants "certainly had little interest in litigating [the] case," failing to file a responsive pleading or pre-answer motion, such as a motion to dismiss, to the plaintiff's fourth amended complaint in the nearly two years after it had been filed. What is more, the defendants in that case failed to "evince any support for [the intervenor-defendants'] attempts to obtain dismissal on their behalf, despite the fact that—as the court's ruling on [intervenor-defendant's] motion to dismiss explains—the majority of [plaintiffs'] claims have been found to lack merit." *Id.* The Court at least suggested that the lack of interest in litigating the case may have been the result of the change in the executive administration. *Id*. ("It is certainly true that, unlike their immediate predecessors, the Executive Branch Defendants have shown little interest in litigating this case."). Despite the want of a thoroughly adversarial process at that point of the litigation, the court in that

case approved the proposed consent decree, because it found that it was still fair, adequate, reasonable, and was not against the public interest, unlawful, or a product of collusion. In comparison, the State Defendants in the instant case have similarly failed to file any motion to dismiss or a responsive pleading, but the comparisons end there. Indeed, rather than letting nearly two years pass, the State Defendants still have several days to timely make such filings. Further, Plaintiffs' claim, at least as to the June election, has significant merit. *See supra* Part II.B. Given these considerations, this Court has even more reason than the *Carcaño* court to look beyond such adversarial deficiencies.

And, unlike in the cases that the RPV has cited, there is nothing in the record that points to any collusion between Plaintiffs and State Defendants in filing this lawsuit and coming to their proposed settlement agreement. Rather, Plaintiffs formally provided notice to the State Defendants of their intent to sue on April 15, 2020, Dkt. 62-1 at 1, two days before they filed their suit and twelve days after the proposed partial settlement was filed with the Court, Dkt. 35. That they came to at least a partial agreement so swiftly might be more remarkable in a case that moved at an average pace. But given the obvious interest in obtaining a resolution in this case before absentee ballot packages for the June primary are prepared and made available to registered absentee voters beginning on May 8, 2020—so as to limit voter confusion over any necessary change in the witness signature requirement and conserve resources in preparing the ballots and printing ballot instructions—the swift timing of an agreement nearly two months in advance of the June 23, 2020 primary is not altogether remarkable.

Lastly, while the parties would have done far better to have remained silent as to the prospects of a settlement agreement that had not yet been approved, it is far from unusual for counsel to refer to a settlement agreement that they negotiated as a "win" for their clients, even

defendants. Because the RPV can point to no more than speculation, the Court finds that the record does not support a finding that the agreement was the product of collusion. *See Funkhouser*, 2015 WL 12765639, at *3 (E.D. Va. May 14, 2015) ("In the absence of any evidence to the contrary, it is presumed that no fraud or collusion occurred."). Accordingly, the Court finds the proposed consent decree is not a product of collusion. *See United States v. North Carolina*, 180 F.3d at 581.

D. <u>Burdens on Third-Party Obligations, Rights, or Duties</u>

The U.S. Supreme Court in its opinion in *Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland,* 478 U.S. 501, 529 (1986), speaks to the situation before this Court:

> A consent decree is primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating. It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to. Block the decree merely by withholding its consent.

*See Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017) ("The Supreme Court adopted this approach for good reason; otherwise, one party could hold the other parties hostage in ongoing litigation, and a global settlement or judgment would be the only option."). As the Ninth Circuit has remarked, the rule is "especially applicable" where the intervenor, among other things, participates in the hearing on the proposed consent decree and briefs the proposed remedy. *Sierra Club*, 868 F.3d at 1067 ("The notion that the Consent Decree breezed through without the [intervenors'] input or due consideration by the district court is belied by the record.").

The *Local No. 93* Court went on to explain that two parties who come to a settlement may not of course dispose of a third-party's claims or impose "duties or obligations on a third party, without that party's agreement." *Local No. 93*, 478 U.S. at 529. The RPV argues that the proposed

agreement before the Court does just that. It claims that its "statutory and constitutionally protected interest in the conduct of its own primary" is impacted by the elimination of the witness signature requirement for the contests held on June 23, 2020. Dkt. 58 at 11. Specifically, the RPV claims that the requirement's elimination would force it to "[a]ccept a risk of fraudulent or otherwise unauthorized voting in that primary" and that it endangers its interest, both for itself and its members, "in preventing voter fraud and enhancing public confidence in the integrity of elections." *Id.*

This Court is not convinced. While the record does contain some information on the incidence of voter fraud, including its higher incidence in absentee voting, Dkt. 63 at ¶ 31; *see also* Dkt. 48 (amicus brief of PILF and Landmark Legal Foundation) (providing research that it claims demonstrates portions of Virginia's voter roll could be matched to individuals with a "verifiable record of death"), there is nothing in the record that would permit the Court to draw the conclusion that elimination of the witness requirement as it is currently enforced would do anything to meaningfully increase that risk. *See* Dkt. 64-3 (Declaration of Christopher Piper, Commissioner of Virginia Department of Elections) ("Voter list maintenance is entirely unrelated to the witness requirement."). In fact, as the Court has already explained, *supra* Part II.B, this is particularly true when considering all of the other means of combatting voter fraud integrated into the absentee-voting system. Even assuming that the elimination of the requirement did increase voter fraud in a meaningful way, the proposed consent decree does bind the RPV to take or not to take any action. *Local No. 93*, 478 U.S. at 529–30. In fact, it does not reference the RPV or any other political party whatsoever. "It imposes no legal duties or obligations" on the RPV and "only the parties to the decree can be held in contempt of court for failure to comply with its terms." *Id*. And, lastly, the

consent decree does not purport to resolve or otherwise extinguish any claims that the RPV might have. *Id.*

Rather, this consent decree's scope is quite limited: it affects one of several verification requirements that the Commonwealth must accept for a single election's absentee ballots. In doing so, it does not involve any of the RPV's statutory functions or rights in providing for the nomination of its candidates. Va. Code § 24.2-508. Even still, "consent decrees can alter the state law rights of third parties . . . where the change is necessary to remedy a violation of federal law." *State v. City of Chicago*, 912 F.3d 979, 988 (7th Cir. 2019) (internal citations and quotations omitted). Accordingly, even if the RPV had or needed standing to raise its objections, such objections would not warrant rejection of the proposed agreement.

## IV.   CONCLUSION

For the foregoing reasons, the Court will approve the proposed settlement agreement, Dkt. 35-1. It finds that the agreement is fair, adequate, and reasonable and, further, it is not the product of collusion, illegal, or against the public interest. Lastly, the agreement does not purport to extinguish the claims of any third party, nor does it impose any obligations or duties on any third party.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this ____5th____ day of May, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE