**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division**

CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

6/19/2020

JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF VIRGINIA; KATHERINE D. CROWLEY; and SEIJRA TOOGOOD,<br><br>Plaintiffs,<br><br>v.<br><br>VIRGINIA STATE BOARD OF ELECTIONS; ROBERT H. BRINK, JOHN O'BANNON, and JAMILAH D. LECRUISE, in their official capacities as Chairman, Vice-Chair, and Secretary of the Virginia State Board of Elections, respectively; and CHRISTOPHER E. PIPER, in his official capacity as Commissioner of the Virginia Department of Elections,<br><br>Defendants. | Case No.: 6:20-cv-00024-NKM<br><br>AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

1.      Virginia Attorney General Mark Herring recently said that "[f]ree and fair elections are at the core of our democracy and no Virginian should have to choose between their health and exercising their right to vote."[1] Plaintiffs League of Women Voters of Virginia, Katherine Crowley, and Seijra Toogood agree. Yet Virginia's requirement that each voter submitting a mail absentee ballot have another individual witness and sign their ballot envelope does exactly that:

---

[1] Press Release, Ralph Northam, Governor of Virginia, Governor Northam Announces Plans to Postpone Upcoming Virginia Elections in Response to COVID-19 (Apr. 8, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-855995-en.html.

2

presents tens of thousands of Virginia voters like Plaintiffs with the Hobson's choice of either risking their health to vote or not voting at all.

2.     Plaintiffs therefore bring this action challenging the constitutionality of Virginia's witness requirement on absentee ballots to preserve their and many other Virginians' fundamental right to vote in the midst of the pandemic of a respiratory disease known as the coronavirus disease 2019 ("COVID-19"), caused by the spread of a novel coronavirus, SARS-CoV-2. Without relief, the extreme burden the witness requirement places on voters in the current environment far outweighs any marginal benefit to the Commonwealth in retaining it.

3.     The "United States is now the 'epicenter' of the global pandemic and has far more confirmed COVID-19 cases than any other nation."[2] The Centers for Disease Control and Prevention ("CDC") and the Virginia Department of Health have both urged people to avoid coming within six feet of individuals with whom they do not reside, as a key to both slowing the spread of the virus and keeping individuals healthy. As such, Governor Ralph Northam has ordered that all Virginians remain at home except for the basic necessities through at least June 10, 2020.[3]

4.     In the midst of this crisis and especially during a stay-at-home mandate, Virginia's requirement that every individual filling out an absentee ballot find another adult to witness their filling out of the ballot and sign on their ballot envelope alongside the voter's own signed attestation amounts to an unconstitutional burden on the right to vote. This is certainly true for

---

[2] General Order No. 2020-11, *In re: Court Operations Under the Exigent Circumstances Created by the Outbreak of Coronavirus Disease (COVID-19): Temporary Policy for Remote Proceedings and Public Access to Such Proceedings* (hereinafter "*In re Court Operations*"), Case No. 2:20mc7 (E.D. Va. Apr. 6, 2020).

[3] *See* Va. Executive Order No. 2020-55, https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf

Virginia's federal office primaries in June, and will likely be true for voting in the November general election as well.

5.     The COVID-19 outbreak means that the witness requirement will disenfranchise many thousands of Virginians like the individual Plaintiffs who cannot risk contact with other individuals to vote in person or obtain a witness signature on their absentee ballot. Over a quarter of Virginians age 18 and over live by themselves, and almost a third of Virginians over 65 years of age—one of the groups most vulnerable to COVID-19—live alone.[4] And the impact of this requirement will also fall more heavily on Virginians with disabilities and African Americans, who both live alone in larger percentages than the population as a whole.[5]

6.     The witness requirement mostly directly and disproportionately harms African Americans during the COVID-19 pandemic, though, because they face greater rates of severe health complications and death from COVID-19. Virginia's history of voting-related discrimination against African Americans, as well as continuing discrimination in areas such as education, employment, and health, interacts with the witness requirement to hinder their ability to participate effectively in the political process in violation of Section 2 of the Voting Rights Act.

7.     Over half a million Virginians cast ballots in the June 2018 Democratic and Republican primaries, and over 3.98 million Virginians cast ballots in the November 2016 general election. The Virginians who live alone and would have otherwise voted in the upcoming elections but will not, or those whose absentee ballots will be rejected, will therefore likely number in the

---

[4] 2018 Current Population Survey, U.S. Census Bureau, statistics accessed by using the Census Bureau Current Population Survey Table Creator tool at https://www.census.gov/cps/data/cpstablecreator.html.

[5] *Id.*

tens of thousands, if not hundreds of thousands, given the likely explosion of voting by mail this year.

8.      The witness requirement is not worth this massive disenfranchisement of Virginia voters and its disproportionate harm to elderly voters, African American voters, and voters with disabilities. While election integrity is an important interest, the witness requirement does very little if anything—and it is certainly not narrowly tailored—to serve this interest in light of the many other provisions of Virginia law that safeguard absentee voting and penalize those who abuse the process. The fact that Virginia is one of only 11 states that require an individual submitting an absentee ballot to have a witness sign their ballot envelope further underscores the requirement's lack of necessity. Regardless, whatever additional marginal benefits the witness requirement may offer, such benefit is greatly outweighed by the risk of disenfranchisement. The lack of an opportunity to cure a missing witness signature further compounds the burden.

9.      Plaintiffs therefore ask that the Court enjoin Virginia's absentee witness requirement and declare it unconstitutional and in violation of Section 2 of the Voting Rights Act for this year's elections.

## PARTIES

10.      Plaintiff Katherine D. Crowley is a resident of Lexington, Virginia, where she is a registered voter. She has been a Virginia registered voter for many years and has consistently voted in both state and federal elections. She lives in Virginia's Sixth congressional district, where there is no congressional primary this year, but she intends to vote in the November 2020 general election.

11.      Because of the COVID-19 outbreak, Ms. Crowley does not feel safe voting in person for the November election if COVID-19 community transmission persists or recurs during

that time frame. She would request an absentee ballot, but she lives by herself and does not feel safe finding an individual to witness and sign her absentee ballot envelope so she will not be able to vote in the November election or have her vote counted if the witness requirement remains in place. This is because she not only intends to follow any stay-at-home order if in place and practice social distancing if needed, but also because she has a previous medical diagnosis that she is concerned may put her at a higher risk for contracting COVID-19 and facing heightened medical consequences if she does. If the witness requirement is lifted, she will vote by absentee ballot in the November general election should COVID-19 transmission present a risk to her health at that point.

12.     Plaintiff Seijra Toogood is a resident of Fairfax, Virginia, where she is a registered voter. She has been a Virginia registered voter for many years and has consistently voted in both state and federal elections. She lives in Virginia's Eleventh congressional district and would like to vote in the June 23, 2020 primary election being held for that district.

13.     Because of the COVID-19 outbreak, Ms. Toogood does not feel safe voting in person during the race. She has requested an absentee ballot, but she lives by herself and does not feel safe finding an individual to witness and sign her absentee ballot envelope so she will not be able to vote in the June primary or have her vote counted if the witness requirement remains in place. This is because she is not only following the Governor's stay-at-home order and practicing social distancing, but also because she has underlying heart and respiratory issues that put her at a higher risk for contracting COVID-19 and facing serious medical consequences if she does. Similarly, if COVID-19 community transmission either persists or resurges around the time of the November general election, she will not be able to vote or have her vote counted if the witness requirement remains in place. If the witness requirement is lifted, she will vote by absentee ballot

6

in the June primary, as well as in the November general election should COVID-19 transmission present a risk to her health at that point. As an African-American Virginian, Ms. Toogood is also aware of the ongoing history of voting, economic, and health discrimination against African Americans in Virginia, and believes the witness requirement perpetuates and worsens this discrimination.

14.     Plaintiff League of Women Voters of Virginia ("the League") is a nonprofit, nonpartisan membership organization that was founded in 1920. Its principal address is 1011 E. Main Street, Ste. 214A, Richmond, VA 23219.

15.     The League works to encourage informed and active participation in government and influence public policy through education and advocacy. The League supports full voting and representational rights for all eligible Commonwealth citizens and promotes policies that encourage voter participation. The League has nearly 2,000 members across Virginia, some of whom live alone and are vulnerable to becoming severely ill from COVID-19 because they are elderly and/or have underlying health conditions. Certain of these members will seek to vote absentee in upcoming elections but will be unable to comply with the witness requirement without placing their own health at risk.

16.     The League regularly conducts voter registration and get-out-the-vote activities for thousands of voters across the state, and in recent weeks it has been advocating through letters and calls to state officials for expanded use of voting by mail, absentee voting by mail and elimination of the witness requirement in order to better protect the health of voters and poll workers during the COVID-19 outbreak. The League anticipates that it will have to divert additional resources from its regular activities to advocate for lifting the requirement and to conduct outreach to its

members and the voters they serve to ensure they understand and can find ways to comply with the requirements if possible.

17.     Defendant Virginia State Board of Elections (the "Board") is the regulatory authority authorized to make rules and regulations that, consistent with election laws, govern the work of local electoral boards, general registrars, and officers of election in properly administering elections in Virginia. Through the Department of Elections, it is also responsible for supervising and coordinating the work of the county and city electoral boards and registrars to ensure uniformity in their practices, as well as ensuring that electoral boards and general registrars are properly trained to carry out their duties. The Board also prescribes forms for voter registration and elections. *See* Va. Code § 24.2-103(a); Va. Code § 24.2-105. The Board sets standards that "tightly regulate[]" the "form of ballots used in Virginia elections." *Marcellus v. State Bd. of Elections*, 849 F.3d 169, 172 (4th Cir. 2017).

18.     Defendant Robert H. Brink is the Chairman of the Virginia Board of Elections. As Chairman, he is responsible for presiding over Board meetings and performing the functions of a presiding officer. As a member of the Board, he is also one of three individuals responsible for the actions of the Board. 1 Va. Admin. Code 20-20-30. He is sued in his official capacity.

19.     Defendant John O'Bannon is the Vice-Chair of the Virginia Board of Elections. As Vice-Chair, he is responsible for performing the Board Chairman's duties in the Chairman's absence. As a member of the Board, he is also one of three individuals responsible for the actions of the Board. 1 Va. Admin. Code 20-20-30. He is sued in his official capacity.

20.     Defendant Jamilah D. Lecruise is the Secretary of the Virginia Board of Elections. As Secretary, she is "authorized to do all things necessary to the proper execution of the law creating and governing the board and in the performance of the duties imposed upon it" so long as

they are not such as they can only be performed "by the board in its corporate capacity." 1 Va. Admin. Code 20-20-30. She also has the "authority to conduct the board's administrative and programmatic operations and to discharge the board's duties consistent with specific delegations of authority." 1 Va. Admin. Code 20-20-60. As a member of the Board, she is also one of three individuals responsible for the actions of the Board. She is sued in her official capacity.

21.     Defendant Christopher E. Piper is the Commissioner of the Virginia Department of Elections (the "Department"). The Department conducts the Board's administrative and programmatic activities and discharges the Board's duties within its delegated authority. The Department is also responsible for administering and maintaining the Commonwealth's voter registration system and overseeing registered voter list maintenance, and for providing electronic applications for voter registration and absentee ballots. As Commissioner, Defendant Piper is responsible for overseeing the day-to-day operations of the Department. He also has powers "to designate alternative methods and procedures to handle" absentee applications and ballots "in the case of an emergency that will not allow sufficient time for the distribution and handling of absentee ballot applications and absentee ballots . . . for qualified voters who are unable to vote in person because of the emergency." Va. Code § 24.2-713. He is sued in his official capacity.


## JURSIDICTION AND VENUE

22.     This action arises under the First and Fourteenth Amendments to the U.S. Constitution as well as Section 2 of the Voting Rights Act, and is brought under 42 U.S.C. §§ 1983 and 1988 and authorized under 52 U.S.C. § 10302 to seek injunctive and declaratory relief for

violations of constitutional and statutory rights under color of state law. This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

23.     This Court has personal jurisdiction over Defendants because each is either a state agency or sued in their official capacity as a state official, and the violations complained of concern their conduct in such capacities.

24.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

25.     Venue in the Western District of Virginia is proper based on 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred or will occur there, including concerning Plaintiff Crowley (City of Lexington) who resides there.

## FACTS

### Transmission of COVID-19 and Public Health Guidelines

26.     The novel coronavirus, SARS-CoV-2, is the virus that causes COVID-19, a deadly disease that is now a global pandemic.[6]

27.     According to the CDC, this coronavirus spreads aggressively and asymptomatic people can spread it.[7] All age groups have contracted the disease.[8] There is no vaccine, and there is no cure.

28.     As of early April, the United States led the world in the total number of COVID-19 cases, surpassing even China and Italy before spread of the virus has even peaked. As many as

---

[6] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794.

[7] Centers for Disease Control and Prevention, How Coronavirus Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 15, 2020).

[8] Robert Verity, PhD., et al., Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis, Lancet Infec Dis (March 30, 2020), 6.

240,000 people in the United States may die from COVID-19 during the current outbreak, even accounting for existing governmental and public health interventions.[9]

29.     The World Health Organization ("WHO") estimates that approximately 20 percent of those infected by SARS-CoV-2 require hospitalization.[10] This is because COVID-19 can severely damage lung tissue, cause a permanent loss of respiratory capacity, and also damage tissues in the kidney, heart, and liver.[11]

30.     Despite some initial comparisons to seasonal influenza, estimates from early March put the fatality rate for people infected with COVID-19 at approximately ten times higher than even a severe flu season, including in countries with advanced health care systems.[12]

31.     While people of all ages have contracted and died from COVID-19, it is particularly fatal for older individuals. Preliminary reports based on WHO data show a 3.6% mortality rate for individuals between 60-69 years old, an 8% mortality rate for those 70-79 years old, and a 14.8% mortality rate for those who are 80 years old or older.[13] COVID-19 also poses greater risks for

---

[9] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, WASH. POST (April 1, 2020, 12:02 am), https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/.

[10] World Health Organization, Q&A on Coronaviruses (COVID-19), "Should I Worry About COVID-19?," https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[11] Centers for Disease Control and Prevention, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited Apr. 15, 2020).

[12] Betsy McKay, Coronavirus vs. Flu Which Virus is Deadlier, WALL ST. J. (Mar. 10, 2020, 12:49 PM), https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879.

[13] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited Apr. 15, 2020).

people with preexisting heart and respiratory conditions, individuals with compromised immune systems, and those with many other conditions.[14]

32.     The effects of the pandemic on social life will last well into the summer of 2020, if not much longer. While there is some reason to believe that transmission may taper somewhat in the summer months, experts have indicated that COVID-19 "will face less immunity and thus transmit more readily even outside of the winter season," and that season changes are "unlikely to stop transmission."[15] Further, even those who develop an immune response to the virus after an infection are not necessarily safe from reinfection, as we do not yet have sufficient data about how long immunity to the virus will last.[16] This week, Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases, said that he "can't guarantee" in-person voting will be safe in November, because of a potential resurgence of COVID-19 in the fall.[17]

33.     Because there is no vaccine, social distancing measures, including maintaining at least six feet of space between people (as well as consistent hygiene practices), are the only known effective measures for protecting against transmission of COVID-19.[18] The CDC has issued guidance informing individuals to avoid public gatherings until at least May 15, 2020.

---

[14] Centers for Disease Control and Prevention, *Groups at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 15, 2020).

[15] Marc Lipsitch, DPhil, Professor of Epidemiology and Director, Center for Communicable Disease Dynamics, Harvard T.H. Chan School of Public Health, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?*, https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/.

[16] Apoorva Mandavilli and Katie Thomas, *Will an Antibody Test Allow Us to Go Back to School or Work?*, N.Y. TIMES (Apr. 11, 2020), https://www.nytimes.com/2020/04/10/health/coronavirus-antibody-test.html

[17] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe*, CBSNews.com (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.

[18] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-

34.     For this reason, the CDC has issued specific guidelines concerning voting during the COVID-19 pandemic. Among other things, it recommends that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations" including "mail-in methods of voting if allowed in the jurisdiction."[19]

35.     These recommendations make sense, given the relative risks of voting in person during the pandemic versus voting by mail. There is no evidence that SARS-CoV-2 can be spread through the mail, and the U.S. Postal Service has further changed their policies to "eliminate the requirement that customers sign our Mobile Delivery Devices for delivery" and now require the customer "to step back a safe distance or close the screen door/door so that they may leave the item in the mail receptacle or appropriate location by the customer door."[20]

36.     In contrast, the risks of interpersonal interaction while voting have already borne out unfortunate results. In Illinois, a person who worked at a Chicago polling place during the March 17 primary died from COVID-19,[21] while another tested positive after voting in person.[22] And during Florida's recent primary, two Broward County poll workers tested positive for

---

self-quarantine (last visited Apr. 15, 2020); Declaration of Dr. Jonathan Louis Golob at ¶ 8, ECF No. 5, *Dawson v. Asher*, 2:20-cv-00409-JLRMAT (W.D. Wash. Mar. 16, 2020).

[19] Centers for Disease Control & Prevention, *Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)* (updated Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

[20] United States Postal Service. *USPS Statement on Coronavirus* (Apr. 2, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General)

[21] Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, NBC CHICAGO (Apr. 13, 2020, 10:59 AM), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[22] Gov. Pritzker Encourages Illinoisans to Vote by Mail After In-Person Voter Tests Positive for Coronavirus, NBC CHICAGO (Apr. 12, 2020, 6:07 PM), https://www.nbcchicago.com/news/local/gov-pritzker-encourages-illinoisans-to-vote-by-mail-in-upcoming-general-election/2254687/..

COVID-19, one of whom was handling driver's licenses as part of the identification verification process.[23]

37.     In Milwaukee and Green Bay, Wisconsin, voters experienced multi-hour waits and lines stretching blocks upon blocks because government officials there were unable to create a viable vote-by-mail process for all voters.[24] These are the opposite of constitutionally appropriate conditions called for in an infectious disease pandemic.[25] Virginia must not emulate them.

**COVID-19 in Virginia**

38.     Virginia faces a steadily rising number of COVID-19 cases. As of March 31, the Virginia Department of Health ("VDH") was reporting "widespread community transmission across the state."[26] And as of April 16, VDH reported 6,889 COVID-19 diagnoses in Virginia, resulting in 1,114 hospitalizations and 208 deaths.[27] Moreover, as of late March, "Virginia's fatality rate, based on the number of <u>known</u> cases, is relatively higher than many other states" and "insufficiency of current testing suggests the likelihood that COVID-19 is substantially more

---

[23] Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, S. FLA. SUN SENTINEL (Mar. 26, 2020), https://www.sun-sentinel.com/coronavirus/fl-ne-broward-elections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

[24] Parker Schorr, *Wisconsin's pandemic election: Long waits, face masks as voters go to polls*, THE CAP TIMES (Apr. 8, 2020), https://madison.com/ct/news/local/govt-and-politics/wisconsin-s-pandemic-election-long-waits-face-masks-as-voters-go-to-polls/article_bfd2c391-f390-5364-8c14-a88b548fe017.html; Benjamin Swasey, *Wisconsin Vote Ends As Trump Blames Governor For Long Lines*, NPR (Apr. 7, 2020 12:23 PM), https://www.npr.org/2020/04/07/828835153/long-lines-masks-and-plexiglas-barriers-greet-wisconsin-voters-at-polls.

[25] Devi Shastri, *In-person voting was likely a 'disaster' for Wisconsin's efforts to flatten coronavirus curve*, national experts say, MILWAUKEE JOURNAL SENTINEL (Apr. 8, 4:51 PM), https://www.jsonline.com/story/news/politics/elections/2020/04/08/coronavirus-wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/.

[26] Va. Dep't of Health, *COVID-19 Cases in Virginia*, http://www.vdh.virginia.gov/coronavirus/ (last visited Apr. 16, 2020).

[27] *Id.*

widespread in Virginia than it appears from the official numbers."[28] Tragically, one of the nation's deadliest COVID-19 outbreaks appears to have occurred at an assisted living center in Richmond, where at least 45 residents have died and around 80 percent have been diagnosed as positive.[29]

39.     VDH has "urge[d] all Virginians to stay home and practice social distancing. If you have to go out for critical things like grocery shopping or medical care, stay at least 6 feet away from others."[30] It has also adopted "Guiding Principles for Community Mitigation Strategies" based on similar CDC guidance. Among these principles are considering "all aspects of a community that might be impacted, including populations most vulnerable to severe illness and those that may be more impacted socially or economically, and select appropriate actions," and identifying "ways to ensure the safety and social well-being of groups that may be especially impacted by mitigation strategies, including individuals at increased risk for severe illness."[31]

40.     Since early March, Governor Northam has also taken a series of increasingly aggressive actions in response to the growing threat posed by the virus, including an emergency declaration and numerous executive orders.

41.     Notably, on March 12, 2020, invoking his statutory and Virginia constitutional authority, Governor Northam declared a State of Emergency for Virginia "to continue to prepare

---

[28] *In re Extension to Modifications of Ct. Operations: S. to Gen. Orders 2020-02 and 2020-03*, No. 2:20MC7, 2020 WL 1441770, at *1 (E.D. Va. Mar. 24, 2020).

[29] Danielle Ivory, et al., N.Y. TIMES, *Coronavirus Outbreak at Virginia Nursing Home Spirals Out of Control as 45 Die* (Apr. 14, 2020), https://www.nytimes.com/2020/04/14/us/coronavirus-nursing-homes.html.

[30] *Id.*

[31] Virginia Department of Health, Schools, *Workplaces & Community Locations*, http://www.vdh.virginia.gov/coronavirus/schools-workplaces-community-locations/ (last visited Apr. 15, 2020).

and coordinate our response to the potential spread of COVID-19, a communicable disease of public health threat."[32]

42.     On March 13, he closed all Virginia K-12 schools for a minimum of two weeks, and eventually extended that order for the remainder of the academic year.[33]

43.     Governor Northam advised on March 17 that Virginians "with chronic health conditions or aged 65 or older should self-quarantine," and ordered all DMV offices closed.[34] He also requested and the Supreme Court of Virginia granted a suspension of "non-emergency court proceedings in all district and circuit courts" absent specific exceptions through April 6, and extended and tolled non-exempted court deadlines for 21 days.[35]

44.     On March 23, Governor Northam ordered all non-essential businesses closed until at least April 23 and banned public gatherings of more than 10 people.[36]

45.     On March 30, Governor Northam issued a statewide "Stay at Home" order to last at least until June 10, directing all Virginians to stay at home except under extremely limited circumstances. He added: "We are in a public health crisis, and we need everyone to take this

---

[32] Va. Exec. Order No. 2020-51 (Mar. 12, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/eo/EO-51-Declaration-of-a-State-of-Emergency-Due-to-Novel-Coronavirus-(COVID-19).pdf.

[33] Press Release, Ralph Northam, Governor of Virginia, Governor Northam Orders All Virginia K-12 Schools Closed for Minimum of Two Weeks (Mar. 13, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854442-en.html; Press Release, Ralph Northam, Governor of Virginia, *Governor* Northam Orders Statewide Closure of Certain Non-Essential Businesses, K-12 Schools (Mar. 23, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855292-en.html.

[34] Press Release, Ralph Northam, Governor of Virginia, Governor Northam Announces New Measures to Combat COVID-19 and Support Impacted Virginians (Mar. 17, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854487-en.html.

[35] *Id.*

[36] Press Release, Ralph Northam, Governor of Virginia, Governor Northam Orders Statewide Closure of Certain Non-Essential Businesses, K-12 Schools (Mar. 23, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855292-en.html.

seriously and act responsibly. Our message to Virginians is clear: **stay home**. We know this virus spreads primarily through human-to-human contact, and that's why it's so important that people follow this order and practice social distancing."[37]

46.   Virginia received a Major Disaster Declaration from the federal government on April 2.[38]

47.   Just this week, researchers at the University of Virginia projected that COVID-19 cases in Virginia may not peak until mid-August.[39]

48.   Faced with local elections in some parts of Virginia scheduled for May, and a primary for federal races in June, both the Governor and Elections Department have begun to take some steps in recognition of the dual priorities of public health and representative government.

49.   For one, the Virginia Department of Elections has issued guidance that all registered Virginia voters may vote absentee by mail in the June primary (and May elections if they go forward) due to the COVID-19 outbreak by selecting reason "2A My disability or illness" on the ballot application.[40] Defendants have further encouraged Virginians to use this option, with the

---

[37] Va. Exec. Order No. 2020-55 (Mar. 30, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf; Press Release, Ralph Northam, Governor of Virginia, Governor Northam Issues Statewide Stay at Home Order (Mar. 30, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855702-en.html (emphasis added).

[38] Press Release, Ralph Northam, Governor of Virginia, Virginia Receives Major Disaster Declaration from Federal Government for COVID-19 (Apr. 2, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-855921-en.html.

[39] Mel Leonor & Justin Mattingly, *UVA researchers project mid-August peak for new COVID-19 cases in Virginia*, RICHMOND TIMES DISPATCH (Apr. 13, 2020), https://www.richmond.com/special-report/coronavirus/uva-researchers-project-mid-august-peak-for-new-covid-19-cases-in-virginia/article_c4e2c008-1617-52d8-ad08-706abfb3d696.html.

[40] Va. Dep't of Elections (@vaELECT), Twitter (Mar. 23, 2020, 8:34 AM), https://twitter.com/vaELECT/status/1242067184521748480; Va. Dep't of Elections, *Absentee Ballots*, https://www.elections.virginia.gov/casting-a-ballot/absentee-voting/.

Department of Elections "encourag[ing] voters to protect their health during COVID-19 outbreak," and noting that absentee voting for the upcoming elections "is strongly encouraged."[41]

50.    On April 8, Governor Northam exercised his statutory authority to move the June primary elections from June 9, 2020, to June 23, 2020, and requested that General Assembly move the May General Election and all special elections scheduled for May 5, 2020 to the November 3, 2020 General Election. He took these actions "to further mitigate the spread of COVID-19," and for purposes of "protecting the health and safety of Virginians during this pandemic and ensuring our citizens can make their voices heard in a safe, fair, and uniform manner."[42]

51.    This Court has taken similar steps in light of the pandemic. For example, on March 24, the Court extended its restriction on in-person court proceedings to "any criminal, civil and bankruptcy proceedings on or before May 2, 2020."[43]

## COVID-19's Impact on African American Virginians in Light of Ongoing and Historical Discrimination

52.    Nationally, the COVID-19 epidemic has had a particularly devastating effect in African-American communities. A recent analysis—one of the first attempts to examine the racial disparities of COVID-19 cases and deaths nationwide—found that, in areas where the demographic data has been publicly shared by government officials, African-Americans have

---

[41] Va. Dep't of Elections, *Absentee Ballots*, https://www.elections.virginia.gov/casting-a-ballot/absentee-voting/ (last visited Apr. 15, 2020).

ress Release, Ralph Northam, Governor of Virginia, Governor Northam Announces Plans to Postpone Upcoming Virginia Elections in Response to COVID-19 (Apr. 8, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-855995-en.html.

[43] Am. Standing Order No. 2020-5, *In re: Court Operations Under the Exigent Circumstances Created by COVID-19* (W.D. Va. Mar. 24, 2020).

made up 42% of people who have died from COVID-19, despite accounting for roughly only 21% of the total population in these areas.[44]

53.    Virginia fits this trend, witnessing racially disparate patterns of serious illness and mortality due to COVID-19. "African Americans constitute approximately 20% of Virginia's population, but make up about 30% of the total number of reported positive cases in Virginia."[45] Public health experts believe that these statistics likely understate the racially disparate effect of COVID-19 in African-American communities in Virginia. For example, Dr. Robert Winn, the Director of the Massey Cancer Center at Virginia Commonwealth University, estimates that "[i]n some cases," African Americans are "three to six times more [likely to be infected by the COVID-19 virus] than their white counterparts."[46]

54.    Courtney Cogburn, an associate professor at the Columbia University School of Social Work, noted that "[t]here are patterns at this intersection of race and socioeconomic status that make it very clear this is just not a story about poverty." That is, racial disparities in serious illness and death due to COVID-19 are inextricably linked to a long history and ongoing patterns of racial discrimination against African Americans:

---

[44] Kat Stafford, et al., *Outcry over racial data grows as virus slams black Americans*, ASSOCIATED PRESS, (Apr. 8, 2020), https://apnews.com/71d952faad4a2a5d14441534f7230c7c?fbclid=IwAR1plunY_qfeA2KrSU-PA1TuJobAwQh53a_Qlkf5dw0dWjz-iz85GA1FOt4.

[45] Nana-Séntuo Bonsu, *Disproportionate numbers appearing in African American COVID-19 cases in Virginia; doctor explains*, WKTR (Apr. 10, 2020), https://www.wtkr.com/news/disproportionate-numbers-appearing-in-african-african-covid-19-cases-in-virginia-doctor-explains; *see also* Elizabeth Thomas & Dr. Nancy A. Anoruo, *Coronavirus is disproportionately killing the black community. Here's what experts say can be done about it*, ABC NEWS (Apr. 9, 2020), https://abcnews.go.com/Politics/coronavirus-disproportionately-killing-black-community-experts/story?id=70011986.

[46] Matthew Fultz, *African Americans 3 to 6 times more likely to get COVID-19, expert says*, WTVR (last updated Apr. 13, 2020), https://www.wtvr.com/news/coronavirus/african-americans-3-to-6-times-more-likely-to-get-covid-19-expert-says.

A history of systemic racism and inequity in access to health care and economic opportunity has made many African Americans far more vulnerable to the virus. Black adults suffer from higher rates of obesity, diabetes and asthma, which make them more susceptible, and also are more likely to be uninsured. They also often report that medical professionals take their ailments less seriously when they seek treatment.[47]

55.     Virginia has long experienced patterns of racial discrimination in health and socioeconomic life patterns that render African-American Virginians at greater risk of severe health complications from COVID-19. As Governor Northam has acknowledged,

We know that long-standing racial inequities in things like access to health care, education, and economic opportunities lead to differences in underlying health conditions. The existence of such inequities is one reason why communities of color, including African American people, are more likely to have some of the underlying health conditions that put them at greater risk with COVID-19.[48]

56.     Similarly, Virginia Health Commissioner Norman Oliver has acknowledged that racial inequalities render African-American Virginians particularly vulnerable to COVID-19, noting that lack of access to health care in African-American communities contributes "to much higher disease burden, with twice the rate of diabetes, hypertension, obesity," resulting in "underlying problems [that] then place these folks at higher risk of mortality from COVID-19." Health Commissioner Oliver further noted that African Americans in Virginia more frequently "tend to be concentrated in the essential industries and are working," with "less social distancing . . . and less opportunity for teleworking."[49] And Dr. Winn of VCU has noted that, in comparison to their white counterparts, African American Virginians lack access to healthcare and

---

[47] *See supra* n. 44 (Stafford, et al.).

[48] Neal Augenstein, *Virginia governor seeks more data on how COVID-19 affects minorities*, WTOP (Apr. 9, 2020), https://wtop.com/virginia/2020/04/virginia-governor-seeks-more-data-on-how-covid-19-affects-minorities/.

[49] *Id.*

information, suffer from underlying health conditions, and are more likely to hold "essential jobs" and cannot work from home.[50]

57.     Virginia has a long history of racial discrimination in a wide range of areas in socioeconomic life, including in voting.

**Virginia's Absentee Voting Process and Witness Requirement**

58.     Virginia law sets out certain categories of individuals who may vote by mail ballot, known in Virginia as absentee voting. These categories include people absent from the jurisdiction on Election Day including students, service members on active duty, a person with a disability unable to vote in person because of "disability, illness, or pregnancy," people prevented from voting on Election Day due to religious observance, and several other categories. Va. Code § 24.2-700.

59.     During the 2020 legislative session, the Virginia General Assembly passed and the Governor signed a number of voting reforms, including an expansion of absentee voting to make all registered voters eligible to use this process without an excuse.[51] This takes effect July 1, 2020.

60.     Nonetheless, as previously noted, the Department of Elections has published informal guidance on their website providing that voters may apply for and submit an absentee ballot for the May and June elections by choosing reason "2A My disability or illness" due to COVID-19.

---

[50] *See supra* n. 46 (Fultz).

[51] *See* 2020 Va. H.B. 1, *available at* https://lis.virginia.gov/cgi-bin/legp604.exe?201+ful+HB1ER; Press Release, Officer of the Governor, "Governor Northam Signs Sweeping New Laws to Expand Access to Voting" (Apr. 12, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-856055-en.html.

61.    On June 23, 2020, Virginia will hold Democratic and Republican primaries for federal offices. Republicans have a statewide primary for a U.S. Senate seat as well as primaries in Virginia's Second and Third congressional districts. Meanwhile, Democrats have primaries for House races in the First, Fourth, Fifth, and Eleventh congressional districts.

62.    Absentee ballot applications submitted by mail for these races must be received by the appropriate registrar no later than June 16 at 5 PM. Va. Code § 24.2-701(B)(2). Completed absentee ballots must be returned to the registrar by the close of polls on Election Day. Va. Code § 24.2-709.

63.    Individuals may request an absentee ballot online or by sending in a mail request, among other methods. When applying, individuals must sign the application "subject to felony penalties for making false statements" that the "facts contained in the application are true and correct" and that they "will not vote in the election at any other place in Virginia or in any other state." Va. Code § 24.2-701(B)(1). An exception exists for individuals who cannot sign due to disability, in which case "a person assisting the applicant will note this fact on the applicant signature line and provide his signature, name, and address." *Id.*

64.    When a registrar receives an absentee ballot application and verifies that the individual properly competed the application and that they are a registered voter in the jurisdiction, the registrar mails to the individual the following items:

   a.   A sealed envelope containing the unmarked ballot;

   b.   An envelope for resealing the marked ballot on which is printed a "Statement of Voter," as well as spaces for the voter to sign and date and for a witness to sign. The "Statement of Voter" informs voters, among other things, that their signature certifies "subject to felony penalties for making false statements,"

22

their name, legal residence, that they received the ballot after requesting it, that they opened the ballot envelope "in the presence of the witness" but without assistance, that they sealed the ballot in the envelope, and that they "have not voted and will not vote in this election at any other time or place";

c. "A properly addressed envelope for the return of the ballot to the general registrar by mail or by the applicant in person"; and

d. "Printed instructions for completing the ballot and statement on the envelope and returning the ballot." Va. Code § 24.2-706.

65.    As noted by the instructions, when voters receive their mailed absentee ballots, they "shall, in the presence of a witness, (i) open the sealed envelope marked 'ballot within' and (ii) mark and refold the ballot . . . without assistance and without" indicating how they marked the ballot. Va. Code § 24.2-707(A).

66.    Once voters fill out their ballots, they "shall (a) enclose the ballot in the envelope provided for that purpose, (b) seal the envelope, (c) fill in and sign the statement printed on the back of the envelope in the presence of a witness, who shall sign the same envelope, (d) enclose the ballot envelope and any required assistance form within the envelope directed to the general registrar, and (e) seal that envelope and mail it to the office of the general registrar or deliver it personally to the general registrar." *Id.*

67.    When the absentee ballot process counting begins, election officers examine each absentee ballot envelope to determine whether to accept the ballot for counting. The relevant statute provides that an absentee ballot may not be rejected on the basis that the voter failed to provide a middle name, middle initial, or the date, Va. Code § 24.2-711, but is silent as to whether

23

an absentee ballot may or must be rejected if the voter failed to provide any of the other parts of the absentee ballot envelope, such as the witness signature.

68.     However, under regulations promulgated by the Board, the lack of a witness signature on the absentee ballot envelope is an omission that is "always material" and that renders the ballot invalid. 1 Va. Admin. Code 20-70-20(B).

69.     By contrast, absentee ballots that do contain a witness signature are not rendered invalid if the witness signature is illegible, even though there is no requirement that the witness print their name or otherwise identify themselves anywhere on the ballot envelope.

70.     Virginia statutes and regulations provide no process by which voters may correct any errors on their absentee ballot envelopes after they are mailed to the general registrar, and in practice, all absentee ballots lacking a witness signature are rejected as a matter of course without any effort to verify whether the absentee ballot came from the intended voter. Voters whose ballots are rejected because of a lack of a witness signature do not learn of this until after the election, when the electoral board "send[s] a written explanation of the reason for rejection of an absentee ballot to the voter whose absentee ballot is rejected within 90 days of the date on which the ballot is rejected." Va. Code § 24.2-711.1(B).

**Virginia's witness requirement will deny large numbers of Virginians the right to vote yet provides only marginal benefits for election integrity**

71.     As just noted, election officials currently have no discretion under the regulations promulgated by the Board as to whether to count an unwitnessed absentee ballot—they must reject such a ballot and are only obligated to inform the voter as such within 90 days after the ballot rejection.

72.     Yet in the current pandemic, individuals living alone and not isolating with a potential witness in accordance with Executive Orders No. 53 and 55 have no safe means to have

24

an individual witness and sign their ballot envelope. Under the Governor's orders, individuals should maintain at least six feet of distance from others with whom they do not live. These orders also reflect the consensus of doctors and public health officials.

73.    Older Virginians and those with certain preexisting medical conditions face even more grave risks by interacting with another individual to obtain a witness signature. But because COVID-19 can strike and kill individuals of any age and those without preexisting conditions, any individual living alone faces a real risk by seeking someone to witness their ballot.

74.    Enforcing the witness requirement in an environment in which COVID-19 is still being transmitted will likely prevent thousands of eligible Virginians from casting ballots.

75.    As of March 31, 2020, Virginia had over 5.73 million registered voters. In the June 2018 Democratic and Republican primaries, over 541,000 Virginians cast ballots. And in the November 2016 general election, over 3.98 million Virginians cast ballots. While many of these individuals voted in-person, the combination of the COVID-19 outbreak, the loosening of absentee voting excuse requirements, and the examples from states like Wisconsin—where absentee ballot requests were *five times higher* in this year's primary than in the 2016 primary[52]—indicate that voting by mail will explode in Virginia this year.

---

[52] *Compare* Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary, Wisc. Election Comm'n, https://elections.wi.gov/node/6833 (reporting over 1.28 million absentee ballots requested for April 7, 2020 primary) *with* Riley Vetterkind, *Absentee ballot requests in Wisconsin already exceed number in recent spring elections*, WISC. STATE JOURNAL (Mar. 18, 2020), https://madison.com/wsj/news/local/govt-and-politics/absentee-ballot-requests-in-wisconsin-already-exceed-number-in-recent-spring-elections/article_dfb34fc5-6aa8-5428-90c3-26c3f82a1d70.html (noting that just under 250,000 absentee ballots were requested for spring 2016 Wisconsin primary).

76.     According to 2018 Current Population Survey ("CPS") statistics from the Census Bureau,[53] 25.3% of Virginians age 18 and older live alone. Assuming similar numbers in the 2020 June primaries, over 136,000 Virginians will face the choice of either risking their health by voting in person or finding a witness for their absentee ballots, or not voting at all. For the general election, over a million Virginians will fall into this category. Like the individual Plaintiffs, many of them will be forced to risk their (and others') health in order to vote.

77.     To make matters worse, this burden on the right to vote will fall more heavily upon certain groups—older Virginians, Virginians with disabilities, and African American Virginians, among others.

78.     Approximately 33% of Virginians age 65 and older live alone compared to 25.3% of the general population. 37.2% of Virginians 18 and older with a disability live alone and 44% of Virginians aged 65 and older with a disability live alone. 31% of African American Virginians 18 and older live alone versus only 24.7% of white Virginians 18 and older.

79.     As noted above, older individuals already face higher rates of infection and death from COVID-19, further magnifying its impact. And the CDC has found that "some people with disabilities might be at a higher risk of infection or severe illness because of their underlying medical conditions."[54]

80.     Recent evidence also revealed racial disparities in the impact of COVID-19—disparities that will also likely transfer to burdens on voting. While Virginia is not yet fully

---

[53] 2018 Current Population Survey, U.S. Census Bureau, statistics accessed by using the Census Bureau Current Population Survey Table Creator tool at https://www.census.gov/cps/data/cpstablecreator.html..

[54] Centers for Disease Control and Prevention, *People Who Need Extra Precautions: People with Disabilities,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last visited Apr. 15, 2020).

collecting COVID-19 data by race, both Maryland and North Carolina have released data showing that African Americans face higher rates of both infection and death from COVID-19 than the population as a whole.[55]

81.  Virginia's witness requirement will therefore likely prevent tens of thousands of Virginians who might otherwise cast absentee ballots from doing so this year, with a disproportionate impact on older Virginians, Virginians with a disability, and African American Virginians.

82.  The witness requirement is particularly burdensome for African Americans in Virginia, who, as noted, are more likely to live alone and thus will be more likely to risk exposure to COVID-19 in the course of obtaining a witness signature. African Americans in Virginia continue to bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. It is precisely because of these patterns that African Americans in Virginia face particularly severe health risks from COVID-19 exposure. In these circumstances, the witness requirement interacts with these conditions to deny African Americans in Virginia an equal opportunity to participate in the political process.

83.  While protecting election integrity and preventing improper use of absentee ballots certainly are valid governmental interests, maintaining the witness requirement during this pandemic fails to even serve this interest, let alone present a narrowly tailored method of doing so.

---

[55] North Carolina Department of Health and Human Services, *COVID-19 Cases in North Carolina By Race*, https://www.ncdhhs.gov/divisions/public-health/covid19/covid-19-nc-case-count#by-race/ethnicity (last visited Apr. 15, 2020); Fenit Nirappil et al., *Record set for single-day covid-19 deaths in D.C., Maryland and Virginia at 53; black residents hit hardest*, Wash Post (Apr. 9, 2020, 3:47 PM), https://www.washingtonpost.com/local/covid-19-deaths-hit-new-high-in-dc-maryland-and-virginia-at-53-black-residents-hit-hardest/2020/04/09/cc85cd14-77b3-11ea-b6ff-597f170df8f8_story.html.

And to the extent it does serve these or any other governmental interests, it is substantially outweighed by its massive burden on Virginia voters and other Virginia procedures that serve the same interests.

84.    The witness requirement is not Virginia's sole method of policing the integrity of absentee ballots—far from it. Indeed, only 10 other states even contain such a requirement in their state laws yet the states without this requirement still have absentee balloting systems not undermined by fraud.[56]

85.    Meanwhile, Virginia has several other mechanisms to both confirm the legitimacy of the absentee ballot cast and disincentivize fraudulent use of absentee ballots.

86.    For one, the general registrar maintains a list of voters who applied for and returned absentee ballots, and that list is attested to by the secretary of the electoral board and delivered to the chief officer of election for each precinct. Absentee ballots are only accepted "from voters whose names appear on the attested list." Va. Code § 24.2-710.

87.    Most directly, voters themselves must attest under penalty of perjury their identity, residence, and that they did not double vote when they sign their ballot envelope. Va. Code § 24.2-706.

88.    Any individual who double votes or otherwise improperly uses an absentee ballot faces severe criminal penalties for violating their attestation: "Any person who intentionally (i) votes more than once in the same election . . . is guilty of a Class 6 felony." Va. Code § 24.2-1004(B).

---

[56] *See* Chart, "Verifying Authenticity of Absentee/Mailed Ballots," Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options, Nat'l Conf. of State Legislatures (Apr. 3, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

89.     Additionally, any "willfully false material statement or entry made by any person in any statement, form, or report required by this title shall constitute the crime of election fraud and be punishable as a Class 5 felony." Va. Code § 24.2-1016.

90.     And "[a]ny person attempting to vote by fraudulently signing the name of a qualified voter shall be guilty of forgery and shall be guilty of a Class 4 felony." Va. Code § 24.2-1012.

91.     In light of these attestation and verification requirements and criminal penalties associated with misusing absentee ballots, the additional step of requiring a witness signature adds little on top of these safeguards. And while instances of fraud are rare, an individual determined to break these laws and risk the penalties can just as easily forge the signature of another individual as they can falsely attest when they sign their own name. Indeed, the witness requirement has little if any practical utility for election integrity because Virginia law does not require witnesses to identify themselves by printing their name or providing any other information and Board regulations instruct election officials to accept ballots even where the witness signature is illegible.

92.     The burden on the voting rights of the many thousands of Virginians, including Plaintiffs, who will be prevented from either casting their ballots safely or having them counted by retaining the witness requirement far outweighs any upside of the requirement, if any.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the Fundamental Right to Vote**
**42 U.S.C. § 1983, First and Fourteenth Amendments to the U.S. Constitution**

93.     Eligible individuals have a fundamental right to vote under the First and Fourteenth Amendments of the United States Constitution. Under the First and Fourteenth Amendments, a

court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to the rights that the plaintiff seeks to vindicate against the justifications put forward for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

94.     In light of the COVID-19 pandemic, Virginia's witness requirement and its enforcement severely and unreasonably burdens the fundamental right to vote of Virginia voters. This requirement will likely prevent thousands of eligible Virginians from casting ballots, with particularly heavy burdens on older Virginians, Virginians with disabilities, and African American Virginians.

95.     And while Virginia has a general interest in election integrity, the witness requirement does very little to advance this interest in light of the substantial other protections against fraudulent submission of ballots, let alone providing a narrowly tailored way to address this potential issue. Whatever interests the witness requirement may serve pales in comparison to the substantial burden on voters during the COVID-19 pandemic.

96.     Therefore, Defendants, acting under color of state law, have and will continue to deprive Plaintiffs of rights secured to them by the First and Fourteenth Amendments to the United States Constitution— namely, the fundamental right to vote—and protected by 42 U.S.C. § 1983 by enforcing the witness requirement.

## COUNT II

### Violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

97.     Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any

State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

98.     The "essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238–39 (4th Cir. 2014) (internal quotation marks and citation omitted). "[A] Section 2 vote-denial claim consists of two elements:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
>
> Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Id.* at 240 (internal quotation marks and citations omitted).

99.     The witness requirement, if not declared illegal and enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on African-American voters in Virginia. African Americans in Virginia are more likely to suffer from severe health complications and to die from COVID-19, and are therefore more significantly burdened by the witness requirement.

100.   This disparate burden resulting from the witness requirement is directly linked to social and historical conditions. Virginia has a long history of voting-related discrimination. African Americans in Virginia continue to suffer from discrimination in areas such as education, employment, and health, which hinders their ability to participate effectively in the political process. In particular, these discriminatory patterns render African Americans more vulnerable to

COVID-19, such that the witness requirement is particularly burdensome for them as a group relative to other voters.

101.     Under the totality of the circumstances, the witness requirement interacts with these social and historical conditions to abridge and deny African Americans in Virginia the right to vote. As a result of the witness requirement, African Americans in Virginia will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.  Declare that Virginia's enforcement of the witness requirement (as stated in Va. Code § 24.2-706 and § 24.2-707 and as interpreted by 1 Va. Admin. Code 20-70-20(B)) while emergency orders by Virginia or federal authorities regarding COVID-19 transmission are in effect and/or while public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19 violates the fundamental right to vote under First and Fourteenth Amendments to United States Constitution as well as Section 2 of the Voting Rights Act;

B.  Issue a preliminary and permanent injunction that orders relief including:

1.   Prohibiting Defendants from enforcing the witness requirement (as stated in Va. Code § 24.2-706 and § 24.2-707 and as interpreted by 1 Va. Admin. Code 20-70-20(B)) for all voters, especially for voters at risk of health complications arising from COVID-19 exposure, while emergency orders concerning COVID-19 are in place and/or while public health officials continue to

recommend social distancing practices due to risk of community transmission of COVID-19;

2. Ordering Defendants to issue guidance instructing city and county election officials to count otherwise validly cast absentee ballots that are missing a witness signature for Virginia's primary and general elections in 2020; and

3. Ordering Defendants to conduct a public information campaign informing Virginia voters about the elimination of this requirement, in coordination with city and county election officials;

C. Award Plaintiffs attorneys' fees in this action;

D. Award Plaintiffs their costs of suit; and

E. Grant such other and further relief as this Court deems just and proper in the circumstances.

Dated:  June 15, 2020

Respectfully submitted,

*/s/* Vishal Agraharkar

Davin M. Rosborough (VSB # 85935)
Dale E. Ho*
Sophia Lin Lakin*
Theresa J. Lee*
Adriel I. Cepeda-Derieux*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
drosborough@aclu.org
dho@aclu.org
slakin@aclu.org
tlee@aclu.org
acepedaderieux@aclu.org

Vishal Agraharkar (VSB #93265)
Eden Heilman (VSB #93554)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA, INC.
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
vagraharkar@acluva.org
eheilman@acluva.org

*Attorneys for Plaintiffs*

* Admitted *pro hac vice*

33