**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| **LEAGUE OF WOMEN VOTERS OF VIRGINIA, et al.,** | |
| **Plaintiffs,** | **Case No. 6:20-cv-00024-NKM** |
| **v.** | |
| **VIRGINIA STATE BOARD OF ELECTIONS, et al.,** | |
| **Defendants.** | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

FACTUAL BACKGROUND ................................................................................................. 3

    A.    The COVID-19 Pandemic .......................................................................... 3

    B.    Public Health Guidance Regarding COVID-19 .......................................... 6

    C.    The Effect and Consequences of COVID-19 in Virginia ........................... 8

    D.    Virginia's Elections Since the March 3, 2020 Presidential Primary ............. 12

    E.    Virginia's Absentee Ballot Process and the Challenged Witness
        Requirement ............................................................................................. 13

    F.    Virginia's Laws Supporting Absentee Voting Election Integrity ................ 15

    G.    The Public Health and Disenfranchisement Consequences of
        Virginia's Absentee Witness Requirement During Significant COVID-
        19 Transmission ....................................................................................... 16

    H.    Injuries and Irreparable Harm to Plaintiffs and Other Virginia Voters .......... 19

ARGUMENT ..................................................................................................................... 22

    I.    Plaintiffs are likely to prevail on the merits because the First and
       Fourteenth Amendments require Virginia to eliminate the absentee
       witness requirement under the present circumstances. .................................. 22

      A.   The absentee witness requirement constitutes a significant, if not
          severe, burden as it will disenfranchise tens of thousands of voters in
          the November election and force hundreds of thousands of other voters
          to risk their health to vote. ..................................................................... 23

      B.   The absentee witness requirement's burden on voters far outweighs its
          minimal-to-nonexistent promotion of election integrity. ............................ 28

    II.   A preliminary injunction is necessary to prevent irreparable harm to
       Plaintiffs' constitutional rights. ................................................................. 33

    III.   The balance of equities and the public interest support injunctive
       relief. ....................................................................................................... 37

CONCLUSION .................................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Action NC* v. *Strach*,
  216 F. Supp. 3d 597 (M.D.N.C. 2016) ...................................................... 36

*American Life League, Inc. v. Reno*,
  47 F.3d 642 (4th Cir. 1995) ...................................................................... 33

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ................................................................................... 23

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ................................................................................... 23

*Common Cause Georgia v. Kemp*,
  347 F. Supp. 3d 1270 (N.D. Ga. 2018) ..................................................... 35

*Common Cause Indiana v. Lawson*,
  327 F. Supp. 3d 1139 (S.D. Ind. 2018) ..................................................... 36

*Crawford v. Marion County Election Board*,
  553 U.S. 181 (2008) ............................................................................ 23, 28

*Di Biase v. SPX Corp.*,
  872 F.3d 224 (4th Cir. 2017) .................................................................... 22

*Diretto v. Country Inn & Suites by Carlson*,
  No. 1:16CV1037 (JCC/IDD), 2016 WL 4400498 (E.D. Va. Aug. 18, 2016) ........................ 37

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ................................................................ 32

*Florida Democratic Party v. Scott*,
  215 F. Supp. 3d 125 (N.D. Fla. 2016).................................................. 26, 34

*Forest Hills Early Learning Center, Inc. v. Lukhard*,
  728 F.2d 230 (4th Cir. 1984) .................................................................... 33

*Frank v. Walker*,
  819 F.3d 384 (7th Cir. 2016) .................................................................... 24

*Fusaro v. Cogan*,
  930 F.3d 241 (4th Cir. 2019) .................................................................... 23

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) .................................................................... 38

*Givens v. Mountain Valley Pipeline, LLC*,
  140 S. Ct. 300 (2019).................................................................................. 34

*Indiana State Conference of the NAACP v. Lawson*,
  326 F. Supp. 3d 646 (S.D. Ind. 2018) ....................................................... 36

*League of Women Voters of Florida v. Browning*
  863 F. Supp. 2d 1155 (N.D. Fla. 2012).................................................... 36

*League of Women Voters of Missouri v. Ashcroft*,
  336 F. Supp. 3d 998 (W.D. Mo. 2018) ...................................................... 36

*League of Women Voters of North Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014).......................................................... 34, 36, 37

*League of Women Voters of the United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)....................................................................... 36

*League of Women Voters of Virginia v. Virginia State Board of Elections*,
    No. 6:20-CV-00024, --- F. Supp. 3d ----, 2020 WL 2158249
    (W.D. Va. May 5, 2020) ............................................................................ passim

*McLaughlin v. North Carolina Board of Elections*,
    65 F.3d 1215 (4th Cir. 1995) ................................................................................. 23

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
    722 F.3d 591 (4th Cir. 2013) ................................................................................. 22

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
    915 F.3d 197 (4th Cir. 2019) ................................................................................. 34

*Norman v. Reed*,
    502 U.S. 279 (1992) ............................................................................................... 28

*North Carolina State Conference of NAACP v. Cooper*,
    430 F. Supp. 3d 15 (M.D.N.C. 2019) .................................................................... 35

*Northeast Ohio Coalition for the Homeless v. Husted*,
    837 F.3d 612 (6th Cir. 2016) ......................................................................... 28, 29

*Paher v. Cegavske*,
    No. 320-CV-00243-MMD-WGC, --- F.Supp.3d ----, 2020 WL 2089813 ............... 33

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ................................................................................. 37

*Perez-Perez v. Adducci*,
    No. 20-10833, --- F. Supp. 3d ----, 2020 WL 2305276, (E.D. Mich. May 9, 2020) ............... 35

*Price v. New York State Board of Elections*,
    540 F.3d 101 (2nd Cir. 2008) ......................................................................... 26, 28

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ............................................................................................... 34

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ............................................................................................. 3

*Thakker v. Doll*,
    No. 1:20-CV-480, --- F. Supp. 3d ----, 2020 WL 167156 (M.D. Pa. Mar. 31, 2020) .............. 35

*Thomas v. Andino*,
    No. 3:20-CV-01552-JMC, --- F. Supp.3d ----,
    2020 WL 2617329, (D.S.C. May 25, 2020) ...................................................... passim

*United States v. Cecil*,
    836 F.2d 1431 (4th Cir. 1988) ............................................................................... 24

**Statutes**
1 Va. Admin. Code 20-70-20 ............................................................................... passim
17 R.I. Gen. Laws § 17-20-23 ........................................................................... 15, 30
Ala. Code § 17-11-10 ......................................................................................... 15, 30
Ala. Code § 17-11-7 ........................................................................................... 15, 30
Ala. Code § 17-9-30 ........................................................................................... 15, 30
Alaska Stat. § 15.20.030 ..................................................................................... 15, 30
La. Stat. Ann. § 18:1306 ..................................................................................... 15, 30
Miss. Code Ann. § 23-15-627 ............................................................................ 15, 30
Miss. Code Ann. § 23-15-633 ............................................................................ 15, 30
Miss. Code Ann. § 23-15-635 ............................................................................ 15, 30
Mo. Rev. Stat. § 115.279 .................................................................................... 15, 30

Mo. Rev. Stat. § 115.283 ................................................................................................ 15, 30
Mo. Rev. Stat. § 115.295 ................................................................................................ 15, 30
N.C. Gen. Stat. § 163-231 .............................................................................................. 15, 30
Okla. Stat. Title 26 § 14-108 .......................................................................................... 15, 30
S.C. Code Ann. § 7-15- 220 ........................................................................................... 15, 30
S.C. Code Ann. § 7-15-230 ............................................................................................ 15, 30
Va. Code § 24.2-1004 ........................................................................................................... 16
Va. Code § 24.2-1012 .................................................................................................... 16, 31
Va. Code § 24.2-1016 .................................................................................................... 16, 31
Va. Code § 24.2-612 ............................................................................................................. 13
Va. Code § 24.2-701 ............................................................................................................. 13
Va. Code § 24.2-706 ...................................................................................................... passim
Va. Code § 24.2-707 .............................................................................................. 14, 30, 38
Va. Code § 24.2-710 ...................................................................................................... 16, 30
Va. Code § 24.2-711 ............................................................................................................. 14
Va. Code § 24.2-711.1 ................................................................................................... 15, 27
Wisc. Stat. § 6.87 ........................................................................................................... 15, 30

**Other Authorities**

Am. Standing Order Nos. 2020-10 & 2020-14, *In re: Court Operations Under the Exigent Circumstances Created by COVID-19: Postponement of Resumption of Criminal Trials Until August 31, 2020* (W.D. Va. July 10, 2020), http://www.vawd.uscourts.gov/media/31967083/amended-so-2020-10-and-2020-14.pdf. ..... 11

Amber McReynolds & Charles Stewart III, *Let's Put the Vote-by-mail 'Fraud' Myth to Rest*, The Hill (Apr. 28, 2020), https://thehill.com/opinion/campaign/494189-lets-put-the-vote-by-mail-fraud-myth-to-rest ........................................................................................................... 32

Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, South Florida Sun Sentinel, Mar. 26, 2020, https://www.sun-sentinel.com/coronavirus/fl-ne-broward-elections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html ...................................................................... 7

Betsy McKay, et al., *Coronavirus Declared Pandemic by World Health Organization*, Wall Street Journal, Mar. 11, 2020, https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794 .................................................................................................................... 3

Centers for Disease Control and Prevention, *Considerations for Election Polling Locations & Voters*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020) .............................................................................. 7

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases & Deaths in the U.S.* (last updated July 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html ............................................................................ 4

Centers for Disease Control and Prevention, *Groups at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 15, 2020) .................................................................................... 4

Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 6, 2020). ...................................................................................... 3, 4

Chart, "Verifying Authenticity of Absentee/Mailed Ballots," Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options, Nat'l Conf. of State Legislatures (Apr.

3, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx ........................................................................................................................ 15

*Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (last updated July 24, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=RelatedLinks&pgtype=Article ............................................ 4

*Dr. Anthony Fauci & CDC Director Senate Testimony May 12* at 32:06, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12 ............................................................................................ 6

Dr. Chad D. Cotti, et al., *The Relationship between In-Person Voting and COVID-19: Evidence from the Wisconsin Primary* at 14, NBER Working Paper No. 27187 (last updated June 2020), https://www.nber.org/papers/w27187.pdf. ....................................................... 8

Gov. Pritzker Encourages Illinoisans to Vote by Mail After In-Person Voter Tests Positive for Coronavirus, NBC Chicago, Apr. 12, 2020, https://www.nbcchicago.com/news/local/gov-pritzker-encourages-illinoisans-to-vote-by-mail-in-upcoming-general-election/2254687/ ....... 7

Jason Silverstein, *Fauci Says He "Can't Guarantee" In-Person Voting in November Will be Safe,* CBS News (last updated Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a ................................................................................................................................. 6

Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine (last visited Apr. 15, 2020) ............................................ 6

Kristine A. Moore, M.D., M.P.H., et al., *COVID-19: The CIDRAP Viewpoint, Part 1: The Future of the COVID-19 Pandemic: Lessons Learned from Pandemic Influenza*, Ctr. for Infectious Disease Research & Policy, 3 (Apr. 30, 2020), https://www.cidrap.umn.edu/sites/default/files/public/downloads/cidrap-covid19-viewpoint-part1_0.pdf ................................................................................................................... 5

Luanne Rife, *Hospitals Admit More, and Younger, COVID-19 Patients in Southwest Virginia*, Roanoke Times (July 15, 2020),  https://roanoke.com/news/local/hospitals-admits-more-and-younger-covid-19-patients-in-southwest-virginia/article_de193ec4-76d7-56e2-b2fd-2dcb95790a90.html ....................................................................................................... 11

Marc Lipsitch, DPhil, Professor of Epidemiology and Director, Center for Communicable Disease Dynamics, Harvard T.H. Chan School of Public Health, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?,* https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/ ................................................................ 12

Mary Ann Ahern, Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say, NBC Chicago, Apr. 13, 2020, https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/ ............................................................................................................... 7

Monica Gandhi, M.D., M.P.H., et. al. *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control COVID-19*, New England Journal of Med. (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/NEJMe2009758 ...................................................... 3

Neal Augenstein, *Virginia Governor Seeks More Data on How COVID-19 Affects Minorities*, WTOP News (Apr. 9, 2020), https://wtop.com/virginia/2020/04/virginia-governor-seeks-more-data-on-how-covid-19-affects-minorities/ ......................................................................... 17

Nick Niedzwiadek, *10 States Added to New York-area Quarantine Order, Bringing Total to 31*, Politico (July 21, 2020), https://www.politico.com/states/new-york/city-

hall/story/2020/07/21/10-states-added-to-regional-quarantine-order-bringing-total-to-31-
1302603 ........................................................................................................................................ 11

Press Release, Ralph Northam, Gov. of Va., *Governor Northam Announces Phase One
Guidelines to Slowly Ease Public Health Restrictions* (May 9, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/may/headline-856681-
en.html. ........................................................................................................................................ 9

Press Release, Ralph Northam, Gov. of Va., *Governor Northam Announces Phase Two
Guidelines to Further Ease Public Health Restrictions* (June 2, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/june/headline-857141
-en.html ........................................................................................................................................ 10

Press Release, Ralph Northam, Gov. of Va., *Governor Northam Delays Phase One for Accomack
County & the City of Richmond* (May 14, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/may/headline-856796-
en.html. ........................................................................................................................................ 9

Press Release, Ralph Northam, Gov. of Va., *Governor Northam Delays Phase One for Northern
Va. Localities* (May 12, 2020), https://www.governor.virginia.gov/newsroom/all-
releases/2020/may/headline-856741-en.html. ........................................................................... 9

Press Release, Ralph Northam, Gov. of Va., *Governor Northam Outlines Phase Three
Guidelines to Lift Additional Public Health Restrictions* (June 18, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/june/headline-858266
-en.html ........................................................................................................................................ 10

Press Release, Ralph Northam, Gov. of Va., *Governor Northam Prohibits Congregating
in Bars, Stresses Caution As Virginia Moves to Phase Three* (June 30, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/june/headline-
859008-en.html ........................................................................................................................... 10

Press Release, Ralph Northam, Governor of Virginia, Governor Northam Announces New
Measures to Combat COVID-19 and Support Impacted Virginians (Mar. 17, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854487-
en.html ........................................................................................................................................ 8

Press Release, Ralph Northam, Governor of Virginia, Governor Northam Announces Plans to
Postpone Upcoming Virginia Elections in Response to COVID-19 (Apr. 8, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-855995-
en.html ........................................................................................................................................ 12

Press Release, Ralph Northam, Governor of Virginia, Governor Northam Issues Statewide
Stay at Home Order (Mar. 30, 2020), https://www.governor.virginia.gov/newsroom/all-
releases/2020/march/headline-855702-en.html ........................................................................ 9

Press Release, Ralph Northam, Governor of Virginia, Governor Northam Orders
All Virginia K-12 Schools Closed for Minimum of Two Weeks (Mar. 13, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854442-
en.html ........................................................................................................................................ 8

Press Release, Ralph Northam, Governor of Virginia, Governor Northam Orders Statewide
Closure of Certain Non-Essential Businesses, K-12 Schools (Mar. 23, 2020),
https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855292-
en.html ........................................................................................................................................ 8

Press Release, Ralph Northam, Governor of Virginia, *Governor* Northam Orders Statewide
Closure of Certain Non-Essential Businesses, K-12 Schools (Mar. 23, 2020),

https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855292-en.html. ..................................................................................................................... 8

Press Release, United States Postal Service, USPS Statement on Coronavirus (Apr. 2, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General) ................................ 7

Rudy Mehrbani, *Heritage Fraud Database: An Assessment*, The Brennan Center, Sept. 8, 2017, https://www.brennancenter.org/our-work/research-reports/heritage-fraud-database-assessment.................................................................................................................. 32

Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (last updated Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/. .............................................................. 5

Sharon Begley, *3 Potential Futures for COVID-19: Recurring Small Outbreaks, a Monster Wave, or a Persistent Crisis*, Boston.com (May 5, 2020), https://www.boston.com/news/coronavirus/2020/05/05/3-potential-futures-covid-19. ............. 5

Sheryl Gay Stolberg and Noah Weiland, *Fauci Says U.S. Could Reach 100,000 Virus Cases a Day as Warnings Grow Darker*, N.Y. Times (last updated July 1, 2020), https://www.nytimes.com/2020/06/30/us/politics/fauci-coronavirus.html................................ 5

The Heritage Foundation, Election Fraud Cases, https://www.heritage.org/voterfraud/search?state=VA (last visited Apr. 21, 2020) ............... 32

UVA COVID-19 Model Weekly Update, U. of Va. Biocomplexity Inst. & Va. Dep't of Health (July 17, 2020), https://www.vdh.virginia.gov/content/uploads/sites/182/2020/07/UVA-COVID-19-Model-Weekly-Report-2020-07-17.pdf.................................................................................. 11

Va. Dep't of Elections, *2020 Election Results*, https://www.elections.virginia.gov/2020-election-results/ (last visited July 18, 2020) .................................................................... 12

Va. Dep't of Elections, *November General Elections: 1976 – Present*, https://www.elections.virginia.gov/resultsreports/registrationturnout-statistics/ (last visited Apr. 21, 2020............................................................................................................ 32

Va. Dep't of Health (hereinafter "VDH"), *Prevention Tips*, https://www.vdh.virginia.gov/coronavirus/prevention-tips/ (last visited July 24, 2020). .......... 6

Va. Dep't of Health, *COVID-19 Cases in Virginia*, http://www.vdh.virginia.gov/coronavirus/ (last visited Apr. 21, 2020) ..................................................................................... 10, 11

Va. Dep't of Health, Schools, Workplaces & Community Locations, http://www.vdh.virginia.gov/coronavirus/schools-workplaces-community-locations/ (last visited Apr. 15, 2020) ...................................................................................................... 6

Va. Exec. Order No. 2020-51 (Mar. 12, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/eo/EO-51-Declaration-of-a-State-of-Emergency-Due-to-Novel-Coronavirus-(COVID-19).pdf....................................................................................................................... 8

## INTRODUCTION

Just weeks ago, this Court held that the "Constitution does not permit a state to force" a choice between protecting not only one's "own health, but the health of those around them, and undertaking their fundamental right—and, indeed, their civic duty—to vote in an election." *League of Women Voters of Va. v. Va. State Bd. of Elections* ("*LWV Va.*"), No. 6:20-CV-00024, --- F. Supp. 3d ----, 2020 WL 2158249, at *8 (W.D. Va. May 5, 2020). At that time, some thought that the COVID-19 pandemic might recede and life would return to normal. Unfortunately, after a brief decrease in new cases, transmission has surged across the country, and is on the rise again in Virginia. As Plaintiffs' expert Dr. Reingold explains, the virus will be here in November, presenting the same or greater risks as it did in June. Decl. of Dr. Arthur Reingold ¶¶ 15–17 (attached as Ex. A). Enforcement of the absentee ballot witness requirement in November will again dissuade many Virginians "from exercising their vote both on account of the remaining health risks and required steps to mitigate them," forcing them to choose between their health and their right to vote. *LWV Va.*, 2020 WL 2158249, at *8.

These burdens certainly continue to outweigh the Commonwealth's interest in enforcing the witness requirement, as there is still no evidence that allowing voters "to opt-out of the witness signature requirement would increase voter fraud in a meaningful way." *Id.* at *9. Other courts have agreed with this analysis. *See, e.g., Thomas v. Andino*, No. 3:20-CV-01552-JMC, --- F. Supp.3d ----, 2020 WL 2617329, at *21 (D.S.C. May 25, 2020) (holding that "the character and magnitude of the burdens imposed on [plaintiffs] in having to place their health at risk during the COVID-19 pandemic likely outweigh the extent to which the Witness Requirement advances the state's interests"). Indeed, Defendants have already admitted that for the June 23 primary, the witness requirement would have "likely prevent[ed] thousands of eligible Virginians from casting

1

ballots," Defs.' Answer, ECF No. 72 ¶ 76, and that for that election, "the burden placed on voters at higher risk of contracting COVID-19 who live alone outweighs the enforcement of the witness requirement," *id.* ¶¶ 84, 85. The same is true for November.

Data from the May 2020 local elections show an increased rate of ballot rejection for lack of witness signatures. Decl. of John Holbein at 17–18 (attached as Ex. B). As Plaintiffs' expert Professor John Holbein of the University of Virginia has found, over 16,000 Virginians are likely to have their absentee ballots rejected for lack of a witness signature in November, with many thousands more discouraged from voting at all for this reason. *Id.* at 18. And as Professor Holbein explains, just as the virus has disproportionately struck certain communities—Black and Latino Virginians, Virginians with disabilities, older Virginians, and Virginians facing poverty—so too will these communities be disproportionately impacted by the witness requirement because they are more likely to live alone, creating a one-two punch to voting opportunities. *Id.* at 13–15.

As declarations from the individual Plaintiffs and members of Plaintiffs League of Women Voters show, these Virginians and many in their shoes—particularly older Virginians and those with certain preexisting existing conditions like asthma, hypertension, and immune disorders—will face the terrible choice of risking their health in order to vote, or not voting at all. Indeed, Plaintiff Carol Petersen ultimately was unable to vote in the Arlington special election in July because she did not feel she could safely find a witness. Decl. of Carol D. Petersen ¶ 5 (attached as Ex. C). As this Court and others have recognized, no voter should be forced to risk their health and that of others in order to vote. But without an order enjoining enforcement of the witness requirement for November and future elections affected by COVID-19, that is exactly what will happen.

## FACTUAL BACKGROUND

### A.     The COVID-19 Pandemic

"COVID–19 [is] a novel severe acute respiratory illness that has killed . . . more than 100,000 nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, J., concurring). According to the New England Journal of Medicine, "[a]symptomatic transmission of [COVID-19] is the Achilles' heel of COVID-19 pandemic control."[1] As Plaintiffs' expert Dr. Arthur Reingold explains, the novel coronavirus, SARS-CoV-2, causes individuals to contract COVID-19, a disease that has now for months been a global pandemic.[2] Reingold Decl. ¶ 8.

COVID-19 spreads mainly from person-to-person through close contact with one another and through respiratory droplets when an infected person coughs or sneezes.[3] Medical experts have also found evidence that the virus is "aerosolized, such that tiny droplets containing the virus remain in the air and can be inhaled by others . . . and [that] SARS-CoV-2 can also be transmitted in that fashion." Reingold Decl. ¶ 10. The CDC has confirmed that people infected with the virus may transmit it to others even without showing symptoms themselves,[4] and that it "may be possible

---

[1] Monica Gandhi, M.D., M.P.H., et. al. *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control COVID-19*, New England Journal of Med. (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/NEJMe2009758.

[2] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, Wall Street Journal (Mar. 11, 2020), https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794.

[3] Ctrs. for Disease Control & Prevention (hereinafter "CDC"), *How It Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated June 16, 2020).

[4] *Id.*

3

that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes."[5]

COVID-19 can cause severe consequences, including long-term illness and death. Reingold Decl. ¶ 8. COVID-19 also threatens to infect any individual no matter their age. *Id.* While people of all ages have contracted and died from COVID-19, it is particularly fatal for older individuals. *Id.* COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions including hypertension and asthma, individuals with compromised immune systems, and those with many other conditions.[6] Reingold Decl. ¶ 9. And members of racial and ethnic minority communities, and especially Black Americans, "tend to experience higher infection rates than white communities," and also "are at a substantially elevated risk of developing life-threatening illness and [dying] of COVID-19. Reingold Decl. ¶ 9.

The United States has far more COVID-19 cases than any other country in the world. As of July 24, 2020, the number of confirmed cases in the United States has neared four million, and at least 142,000 Americans have died as a result of contracting COVID-19.[7] And this public health crisis will not end in the next year. *See, e.g., LWV Va.*, 2020 WL 2158249, at *6. Currently, 40 states and territories including Virginia are experiencing an increase in the number of new cases per day.[8] Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases

---

[5] CDC, *supra* n. 3.

[6] *See also* CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated July 17, 2020).

[7] CDC, *Coronavirus Disease 2019 (COVID-19): Cases & Deaths in the U.S.* (last updated July 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html.

[8] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (last updated July 24, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=RelatedLinks&pgtype=Article.

at the National Institutes of Health, recently testified that he "would not be surprised" if new cases in the United States went "up to 100,000 a day."[9]

Many public health experts warn that a further resurgence of cases in the fall and/or winter is inevitable, with Dr. Fauci explaining that "[w]e will have coronavirus in the fall. . . . I am convinced of that because of the degree of transmissibility that it has, the global nature."[10] *See also* Reingold Decl. ¶¶ 15, 17–18. Emerging diseases expert Amesh Adalja of the Johns Hopkins University Center for Health Security has explained that "October 2020 . . . won't look nothing like October 2019."[11] And as a recent report from the Center for Infectious Disease Research and Policy at the University of Minnesota found, "this outbreak will likely last 18 to 24 months" and "likely won't be halted until 60% to 70% of the population is immune."[12]

 Because there is no realistic prospect of "herd immunity" in the near future, COVID-19 will continue to impose an imminent and serious threat to Americans' health and safety until a reliable and widely accessible vaccine is available. Reingold Decl. ¶¶ 15–16. It is highly unlikely

---

[9] Sheryl Gay Stolberg and Noah Weiland, *Fauci Says U.S. Could Reach 100,000 Virus Cases a Day as Warnings Grow Darker*, N.Y. Times (last updated July 1, 2020), https://www.nytimes.com/2020/06/30/us/politics/fauci-coronavirus.html.

[10] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (last updated Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

[11] Sharon Begley, *3 Potential Futures for COVID-19: Recurring Small Outbreaks, a Monster Wave, or a Persistent Crisis*, Boston.com (May 5, 2020), https://www.boston.com/news/coronavirus/2020/05/05/3-potential-futures-covid-19.

[12] Kristine A. Moore, M.D., M.P.H., et al., *COVID-19: The CIDRAP Viewpoint, Part 1: The Future of the COVID-19 Pandemic: Lessons Learned from Pandemic Influenza*, Ctr. for Infectious Disease Research & Policy, 3 (Apr. 30, 2020), https://www.cidrap.umn.edu/sites/default/files/public/downloads/cidrap-covid19-viewpoint-part1_0.pdf.

that an effective vaccine will be available by the fall.[13] Reingold Decl. ¶ 15. Indeed, Dr. Fauci has

noted that he "can't guarantee" in-person voting will be safe in November.[14]

### B.     Public Health Guidance Regarding COVID-19

Because no vaccine currently exists and will likely not for at least another year, at least

for the public at large, Reingold Decl. ¶ 15, public health experts have explained that social

distancing measures including maintaining at least six feet of space between people (as well as

consistent hygiene practices) are the only known effective measures for protecting against

transmission of COVID-19, *id.* ¶ 12.[15] Accordingly, the Virginia Department of Health ("VDH")

continues to urge Virginians to do their "part to help stop the spread of COVID-19 by staying at

home as much as possible."[16] VDH's community mitigation principles also require considering

"all aspects of a community that might be impacted, including populations most vulnerable to

severe illness and those that may be more impacted socially or economically."[17]

The CDC has also issued guidelines concerning voting during the COVID-19 pandemic.

Among other things, it notes ways to lower risk include "a wide variety of voting options" and

"any other feasible options for reducing the number of voters who congregate indoors in polling

---

[13] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 32:06, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

[14] Jason Silverstein, *Fauci Says He "Can't Guarantee" In-Person Voting in November Will be Safe,* CBS News (last updated Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.

[15] *See also* Johns Hopkins U., *Coronavirus, Social and Physical Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine (last visited July 18, 2020).

[16] Va. Dep't of Health (hereinafter "VDH"), *Prevention Tips*, https://www.vdh.virginia.gov/coronavirus/prevention-tips/ (last visited July 24, 2020).

[17] *Id.*, *Schools, Workplaces & Community Locations* https://www.vdh.virginia.gov/peninsula/schools-workplaces-and-community-locations/ (last visited July 24, 2020).

locations at the same time."[18] This is because there is no evidence that SARS-COV-2—the virus

that causes COVID-19—is being spread through the mail.[19] As Defendants admit, "in person

activities, such a[s] voting, increase the risk of the spread of the virus that causes COVID-19."

ECF No. 72 ¶ 37. Specifically, Dr. Reingold describes, how "[p]olling locations are a prime area

for increased transmission of SARS-CoV-2, due to the close proximity of a large number of

individuals—voters, observers, poll workers—in a limited space." Reingold Decl. ¶ 19.

Indeed, there is a growing body of evidence about COVID-19 transmission and the risk

of transmission from in-person voting after recent primaries. In Chicago, a March 17 primary

worker died from COVID-19, [20] with at least one other person in Chicago testing positive for

COVID-19 after voting in person as well.[21] In Florida, two Broward County poll workers tested

positive for COVID-19, one of whom was handling driver's licenses as part of the identification

verification process.[22] And as discussed by Dr. Reingold, in Wisconsin, state officials have

reported that at least 71 people who voted in-person in that primary have been diagnosed with

COVID-19. Reingold Decl. ¶ 21. As one team of experts has found in performing a multi-factor

---

[18] CDC, *Considerations for Election Polling Locations & Voters*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

[19] Press Release, U.S. Postal Serv., Media Statement – COVID-19 (Apr. 30, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Org., CDC, and Surgeon General).

[20] Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, NBC Chi. (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[21] NBC Chi., *Gov. Pritzker Encourages Illinoisans to Vote by Mail After In-Person Voter Tests Positive for Coronavirus* (Apr. 12, 2020), https://www.nbcchicago.com/news/local/gov-pritzker-encourages-illinoisans-to-vote-by-mail-in-upcoming-general-election/2254687/.

[22] Anthony Man, *Two Broward Poll Workers, including One Who Handled Voters' Driver Licenses, Test Positive for Coronavirus*, South Fla. Sun Sentinel (Mar. 26, 2020), https://www.sun-sentinel.com/coronavirus/fl-ne-broward-elections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

regression analysis and accounting for other potential cases, the April primary election caused approximately 700 more COVID-19 cases in Wisconsin and these cases related to increased human interaction from in-person voting.[23] *See also* Reingold Decl. ¶ 21.

### C.     The Effect and Consequences of COVID-19 in Virginia

In response to the pandemic, Governor Northam declared a State of Emergency for Virginia to continue indefinitely "to continue to prepare and coordinate our response to the potential spread of COVID-19."[24] Virginia K-12 schools closed in March for the remainder of the academic year.[25] The Governor advised on March 17 that Virginians "with chronic health conditions or aged 65 or older should self-quarantine," and ordered all DMV offices closed.[26] On March 23, Gov. Northam ordered all non-essential businesses closed until at least April 23 and banned public gatherings of more than 10 people.[27] On March 30—with 1,020 COVID-19 cases, 136 hospitalizations, and 25 deaths reported in Virginia[28]— Governor Northam issued a

---

[23] Dr. Chad D. Cotti, et al., *The Relationship between In-Person Voting and COVID-19: Evidence from the Wisconsin Primary* at 14, NBER Working Paper No. 27187 (last updated June 2020), https://www.nber.org/papers/w27187.pdf.

[24] Va. Exec. Order No. 2020-51 (Mar. 12, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/eo/EO-51-Declaration-of-a-State-of-Emergency-Due-to-Novel-Coronavirus-(COVID-19).pdf.

[25] Press Release, Ralph Northam, Gov. of Va., Governor Northam Orders All Virginia K-12 Schools Closed for Minimum of Two Weeks (Mar. 13, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854442-en.html; Press Release, Ralph Northam, Gov. of Va., Governor Northam Orders Statewide Closure of Certain Non-Essential Businesses, K-12 Schools (Mar. 23, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855292-en.html.

[26] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Announces New Measures to Combat COVID-19 Support Impacted Virginians* (Mar. 17, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854487-en.html.

[27] Press Release, Ralph Northam, Gov. of Va., *Gov. Northam Orders Statewide Closure of Certain Non-Essential Businesses, K-12 Schools* (Mar. 23, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855292-en.html.

[28] *See* Ex. 1 to Decl. of Davin Rosborough (attached as Ex. D).

statewide "Stay at Home" order to last until June 10, directing all Virginians to stay at home except under extremely limited circumstances.[29]

In early May, Governor Northam began easing public health restrictions, with "Phase One" beginning on May 15—with delayed implementation for Northern Virginia,[30] and the City of Richmond and Accomack County.[31] This continued the "ban on social gatherings of more than 10 people and maintain[ed] recommendations for social distancing, teleworking, and wearing face coverings," but which allowed limited capacity outdoor dining and fitness services.[32] As of May 15, Virginia had 28,672 cases with 3,657 hospitalizations and 977 deaths.[33]

On June 2, Governor Northam announced that Virginia would enter "Phase Two" on June 5—except for Northern Virginia and Richmond—requesting that Virginians "continue to wear a face covering, maintain physical distance, and stay home if you are high-risk or experience COVID-19 symptoms," while allowing indoor dining and fitness center use at

---

[29] Va. Exec. Order No. 2020-55 (Mar. 30, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf; Press Release, Ralph Northam, Gov. of Va., *Governor Northam Issues Statewide Stay at Home Order* (Mar. 30, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855702-en.html (emphasis added).

[30] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Delays Phase One for Northern Va. Localities* (May 12, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/may/headline-856741-en.html.

[31] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Delays Phase One for Accomack County & the City of Richmond* (May 14, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/may/headline-856796-en.html.

[32] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Announces Phase One Guidelines to Slowly Ease Public Health Restrictions* (May 9, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/may/headline-856681-en.html.

[33] *See* Ex. 1 to Rosborough Decl.

reduced capacity, and expanding social gatherings permitted from 10 to 50 people.[34] As of

June 5, Virginia had 48,532 cases with 5,008 hospitalizations and 1,453 deaths.[35]

Governor Northam announced that the entire Commonwealth would enter "Phase Three"

on July 1, "with continued recommendations for social distancing and teleworking, and the

requirement that individuals wear face coverings in indoor public settings," but increasing the

"maximum number of individuals allowed in social gatherings" from 50 to 250 people and

further reducing other restrictions.[36] By then, Virginia had 63,203 cases with 6,262

hospitalizations and 1,786 deaths,[37] more than double the number of cases from when Phase One

began with an 82% increase in deaths. On June 30, however, amid rising cases across the

country, Governor Northam announced a prohibition on congregating in bars or bar-areas of

restaurants.[38]

In fact, new cases began rising in Virginia in mid-June, with particular spikes in

Southwestern and Eastern Virginia.[39] As this Court noted recently, "the number of COVID-19

cases in the Virginia Department of Health Southwest Region has spiked" since June 15, which

---

[34] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Announces Phase Two Guidelines to Further Ease Public Health Restrictions* (June 2, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/june/headline-857141-en.html.

[35] *See* Ex. 1 to Rosborough Decl.

[36] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Outlines Phase Three Guidelines to Lift Additional Public Health Restrictions* (June 18, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/june/headline-858266-en.html

[37] *See* Ex. 1 to Rosborough Decl.

[38] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Prohibits Congregating in Bars, Stresses Caution As Virginia Moves to Phase Three* (June 30, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/june/headline-859008-en.html.

[39] Va. Dep't of Health, *COVID-19 Cases in Virginia*, https://www.vdh.virginia.gov/coronavirus/covid-19-daily-dashboard/ (last updated July 24, 2020).

"tracks what is happening nationally."[40] One health system in that region reports that the pace of COVID-19 hospital admissions is "accelerating so rapidly. . . that if it goes unchecked, the health system will be overwhelmed."[41] And New York and New Jersey have just added Virginia to their list of states whose residents are subject to a two-week quarantine order upon arrival.[42]

As of July 24, VDH reported over 82,000 COVID-19 diagnoses in Virginia, resulting in 7,515 hospitalizations and 2,054 deaths.[43] And in places like Virginia where testing is not "sufficiently wide-spread and easily accessible . . . to accurately detect the number of new cases," VDH's numbers are likely underreporting the true totals. Reingold Decl.¶ 11. A report from July 17 prepared by the University of Virginia's Biocomplexity Institute in conjunction with VDH notes, "10 of Virginia's 35 Local Health Districts (LHDs) are experiencing significant surges" including "eight LHDs in the Hampton Roads area. . .along with Thomas Jefferson [centered in Charlottesville] & Pittsylvania-Danville."[44] The percentages of Black and Latino Virginians killed by COVID-19 are particularly disproportionate.[45]

---

[40] Am. Standing Order Nos. 2020-10 & 2020-14, *In re: Court Operations Under the Exigent Circumstances Created by COVID-19: Postponement of Resumption of Criminal Trials Until August 31, 2020* (W.D. Va. July 10, 2020), http://www.vawd.uscourts.gov/media/31967083/amended-so-2020-10-and-2020-14.pdf.

[41] Luanne Rife, *Hospitals Admit More, and Younger, COVID-19 Patients in Southwest Virginia*, Roanoke Times (July 15, 2020), https://roanoke.com/news/local/hospitals-admits-more-and-younger-covid-19-patients-in-southwest-virginia/article_de193ec4-76d7-56e2-b2fd-2dcb95790a90.html.

[42] Nick Niedzwiadek, *10 States Added to New York-area Quarantine Order, Bringing Total to 31*, Politico (July 21, 2020), https://www.politico.com/states/new-york/city-hall/story/2020/07/21/10-states-added-to-regional-quarantine-order-bringing-total-to-31-1302603.

[43] Va. Dep't of Health, *COVID-19 Cases in Virginia*, https://www.vdh.virginia.gov/coronavirus/covid-19-daily-dashboard/ (last updated July 23, 2020).

[44] UVA COVID-19 Model Weekly Update, U. of Va. Biocomplexity Inst. & Va. Dep't of Health (July 17, 2020), https://www.vdh.virginia.gov/content/uploads/sites/182/2020/07/UVA-COVID-19-Model-Weekly-Report-2020-07-17.pdf.

[45] Va. Dep't of Health, *COVID-19 Cases in Virginia: Demographics*, https://www.vdh.virginia.gov/coronavirus/covid-19-daily-dashboard/ (last updated July 24, 2020).

The evidence suggests that community transmission of COVID-19 in Virginia and elsewhere will persist through 2020 and into next year as season changes are "unlikely to stop transmission."[46] As Dr. Reingold testifies, "transmission of the virus will continue through the population until the development and widespread use of a vaccine and/or herd immunity develops." Reingold Decl. ¶ 14, and it "is unlikely that an FDA-approved vaccine will be available for at least 12 to 18 months," *id.* ¶ 15.

### D.   Virginia's Elections Since the March 3, 2020 Presidential Primary

Virginia originally had elections for many local races scheduled for May 5 and a primary for federal races on June 9. But Governor Northam moved the local elections for most towns and cities to May 19 and the June primary elections to June 23, "to further mitigate the spread of COVID-19" and for purposes of "protecting the health and safety of Virginians during this pandemic."[47] While the witness requirement remained in place for the May elections, it was lifted for the June 23 primaries under a partial consent decree approved by this Court for people who did not believe they could safely comply with the requirement. *See* ECF No. 68. Additionally, Arlington County and Smyth County held special elections on July 7 and July 14, respectively, which also maintained the witness requirement.[48]

---

[46] Marc Lipsitch, D.Phil., Professor of Epidemiology & Director, Ctr. for Communicable Disease Dynamics, Harvard T.H. Chan School of Public Health, *Seasonality of SARS-CoV-2: Will COVID-19 Go Away on Its Own in Warmer Weather?,* https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/.

[47] Press Release, Ralph Northam, Gov. of Va., *Governor Northam Announces Plans to Postpone Upcoming Virginia Elections in Response to COVID-19* (Apr. 8, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-855995-en.html; *see also* Va. Dep't of Elections, *2020 Election Results*, https://www.elections.virginia.gov/2020-election-results/ (last visited July 24, 2020).

[48] Va. Dep't of Elections, *2020 Election Results*, https://www.elections.virginia.gov/2020-election-results/ (last visited July 18, 2020).

All of these elections saw a tremendous surge in absentee voting. For example, the percentage of people voting by absentee ballots in the May local town and city elections rose from 4% in 2016 to 55% in 2020. Holbein Decl. at 17–18.

The general election will occur on November 3 this year, with absentee ballots beginning to be sent to voters 45 days before the election. Va. Code § 24.2-612. Voters may request absentee ballots up to a year in advance of an election. Va. Code § 24.2-701(A).

### E.  Virginia's Absentee Ballot Process and the Challenged Witness Requirement

Governor Northam signed legislation this year eliminating the requirement of needing an "excuse" in order to vote by absentee ballot, which took effect on July 1.[49] But the Department of Elections informed Virginia registered voters that they could apply for and submit an absentee ballot for the May and June elections by choosing reason "2A My disability or illness" due to COVID-19, and Department "encourage[d] voters to protect their health during COVID-19 outbreak," and noted that absentee voting "is strongly encouraged." *See* ECF No. 72 ¶ 51.

An individual requesting an absentee ballot must sign the application "subject to felony penalties for making false statements" that the "facts contained in the application are true and correct" and they "will not vote in the election at any other place in Virginia or in any other state." Va. Code § 24.2-701(A),(B)(1).[50] When a registrar receives an absentee ballot application and verifies that the individual properly completed the application and is a registered voter in the jurisdiction, the registrar mails to the individual:

---

[49] *See* 2020 Va. H.B. 1, *available at* https://lis.virginia.gov/cgi-bin/legp604.exe?201+ful+HB1ER; Press Release, Gov. of Va., *Governor Northam Signs Sweeping New Laws to Expand Access to Voting* (Apr. 12, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-856055-en.html.

[50] An exception exists for individuals who cannot sign due to disability, in which case "a person assisting the applicant will note this fact on the applicant signature line and provide his signature, name, and address." *Id.*

- A sealed envelope containing the unmarked ballot;

- An envelope for resealing the marked ballot with a "Statement of Voter," and spaces for the voter to sign and date and for a witness to sign. The "Statement of Voter" informs voters, among other things, that their signature certifies "subject to felony penalties for making false statements," their name, legal residence, that they received the ballot after requesting it, that they opened the ballot envelope "in the presence of the witness" but without assistance, that they sealed the ballot in the envelope, and that they "have not voted and will not vote in this election at any other time or place;"

- A pre-addressed envelope to mail the ballot to the general registrar; and

- Instructions for completing the ballot and envelope statement and for returning the ballot.

Va. Code § 24.2-706(B). When voters receive their absentee ballots, they "shall, in the presence of a witness, (i) open the sealed envelope marked 'ballot within' and (ii) mark and refold the ballot . . . without assistance and without" indicating how they marked the ballot. Va. Code § 24.2-707. Once voters mark their ballots, they must seal the ballot in its envelope, "fill in and sign the statement printed on the back of the envelope in the presence of a witness, who shall sign the same envelope," and enclose the ballot envelope in another envelope and mail or deliver it to the general registrar. *Id.*

When the absentee ballot counting process begins, election officers examine each absentee ballot envelope to determine whether to accept the ballot for counting. Va. Code § 24.2-711 provides that the voter's failure to provide a middle name, middle initial, or the date shall not be grounds for rejecting the ballot, but is silent as to other requirements including the witness signature. Regulations promulgated by the Board, however, state that the lack of a witness signature on the envelope of the absentee ballot is an omission that is "always material" and such ballots "shall be rendered invalid," 1 Va. Admin. Code 20-70-20(B). As former Charlottesville and New Kent Elections Director and General Registrar Rosanna Bencoach explains and as the regulations provide, neither the witness signature nor the voter signature need to be legible to count

the ballot, and no additional information about the witness such as the witness's printed name or address is required. *Id.*; Decl. of Rosanna Bencoach ¶ 7 (attached as Ex. E); *see also* Decl. of Stephanie Isles ¶ 11 (attached as Ex. F).

Defendants admit that "Virginia statutes and regulations provide no process by which voters may correct any errors on their absentee ballot envelopes after they are mailed to the general registrar, and in practice, all absentee ballots lacking a witness signature are rejected as a matter of course without any effort to verify whether the absentee ballot came from the intended voter." ECF No. 72 ¶ 72; *see also* Bencoach Decl. ¶ 9; Isles Decl. ¶ 11. Voters whose ballots are rejected because of a lack of a witness signature do not learn of this until after the election, when the electoral board "send[s] a written explanation of the reason for rejection of an absentee ballot to the voter whose absentee ballot is rejected within 90 days of the date on which the ballot is rejected." Va. Code § 24.2-711.1(B); *see also* Bencoach Decl. ¶ 9.

### F.    Virginia's Laws Supporting Absentee Voting Election Integrity

Virginia has a number of different laws designed to ensure the integrity of absentee balloting procedures, but is only one of eleven states with a witness or notarization requirement.[51] As Defendants admit, the "witness requirement is not Virginia's sole method of policing the integrity of absentee ballots—far from it." ECF No. 72 ¶ 86. Rather, "Virginia has several other mechanisms to both confirm the legitimacy of the absentee ballot cast and disincentivize fraudulent use of absentee ballots." *Id.* ¶ 87; *see also* Bencoach Decl. ¶ 10.

---

[51] *See* Chart, "Verification of Absentee Ballots: Other Methods of Verifying Absentee Ballots," Nat'l Conf. of State Legs. (Apr. 3, 2020), https://www.ncsl.org/research/elections-and-campaigns/verification-of-absentee-ballots.aspx; *cf.* Ala. Code §§ 17-9-30(b) , 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15- 220, 7-15-230; Wis. Stat. § 6.87(4)(b)(1).

For one, Virginia registrars maintain a list of voters who applied for and returned absentee ballots, and that list is attested to by the secretary of the electoral board and delivered to the chief officer of election for each precinct. Absentee ballots are only accepted "from voters whose names appear on the attested list." Va. Code § 24.2-710. "Ballots received from persons who are not still registered or did not apply for a ballot, or additional ballots from the same voter are not counted." Bencoach Decl. ¶ 10. And voters themselves must attest under penalty of perjury their identity, residence, and that they did not double vote when they sign their ballot envelope. Va. Code § 24.2-706. As Director Bencoach explains, ballots "are secured and accounted for at every step in the process" and when absentee ballots are tabulated either "electronically using state-approved election equipment, or manually using the state's standards for hand-counting," this is "performed by sworn Officers of Election appointed by the local, bi-partisan Electoral Board." Bencoach Decl. ¶ 10.

Virginia also has several criminal provisions aimed at discouraging misuse of absentee ballots. A person who "intentionally votes more than once in the same election" commits a Class 6 felony. Va. Code § 24.2-1004(B). Similarly, any "willfully false material statement or entry made by any person" on any ballot constitutes "the crime of election fraud and [is] punishable as a Class 5 felony." Va. Code § 24.2-1016. And any person "attempting to vote by fraudulently signing the name of a qualified voter shall be guilty of forgery and shall be guilty of a Class 4 felony." Va. Code § 24.2-1012.

G.     **The Public Health and Disenfranchisement Consequences of Virginia's Absentee Witness Requirement During Significant COVID-19 Transmission**

According to Dr. Reingold, for "individuals without another person able to witness in their household, the requirement that they have someone witness their absentee ballot would place them at increased risk of exposure to and/or transmission of COVID-19." Reingold

16

Decl. ¶ 24. This is because coming "into close enough proximity to witness their ballot would place them at increased risk of infection," and "would be particularly risky for those who are at a greater risk of complications and death from COVID-19." *Id.* For public health purposes, "to prevent increasing the scope of the outbreak of COVID-19, we must assume that anyone could be infected and transmit infection to others." *Id.* ¶ 13. Indeed, Defendants "admit that as a result of the COVID-19 pandemic, there are absentee voters who believe they may not, and who in reality may not, safely have a witness present while completing their ballot." ECF No. 72 ¶ 1.

In terms of how many Virginians of voting age live by themselves, Plaintiffs' expert John Holbein—a professor at the University of Virginia and an expert in American political behavior and the effects of mail voting policies—explains that Census Bureau figures identify that 25.3% of Virginians 18 and older live alone, with even higher percentages for Virginians 65 and older, Black Virginians, Virginians with disabilities, and Virginians living below the poverty line. Holbein Decl. at 13–15. These same disparities appear when examining Virginia registered voters. *Id.* at 14–15. And these disparities matter because, as Professor Holbein identifies, people who live alone already vote at lower rates than the population as a whole, *id.* at 16–17, as do people who face greater health challenges, including Black Virginians, Virginians with disabilities, and Virginians over 75, *id.* at 11–12. Governor Northam has acknowledged that racial inequities make Black Virginians "more likely to have some of the underlying health conditions that put them at greater risk with COVID-19,"[52] and Defendants admit that "Virginia has long experienced patterns of racial discrimination in health and socioeconomic life patterns

---

[52] Neal Augenstein, *Virginia Governor Seeks More Data on How COVID-19 Affects Minorities*, WTOP News (Apr. 9, 2020), https://wtop.com/virginia/2020/04/virginia-governor-seeks-more-data-on-how-covid-19-affects-minorities/.

that render African-American Virginians at greater risk of severe health complications from COVID-19," ECF No. 72 ¶ 57.

As Professor Holbein explains, because of these existing voting barriers and burdens on individuals who live alone, people who face health challenges, and the groups more likely to fall into these categories, in the context "of a pandemic, witness requirements are likely to lower turnout and make it more unequal—substantially harming those who are older, minorities, have disabilities, or are otherwise homebound." Holbein Decl. at 12. As such, "with many vulnerable populations looking to vote-by-mail, those who live by themselves and yet still need to comply with the witness requirement face an even more crucial challenge [to] participating in the 2020 elections." *Id.* at 20. For those who are practicing social distancing and live alone, they will "face a substantial burden to fulfilling the witness signature requirement." *Id.* at 13.

Additionally, as Professor Holbein found, the data from May 2020 city and town elections for which the witness requirement was in place show a substantial increase of the rate of ballots rejected this year as compared to the May 2016 and May 2018 elections, a problem compounded by an explosion of absentee voting in this year's election. *Id.* at 18–19. If similar patterns of absentee ballot usage and rejection rates continue, and November turnout is comparable to 2016, "a full 16,689 voters will have their ballots that they submitted rejected" for lack of witness signature. *Id.* at 20. These rejections "will be concentrated in areas where more African Americans live." *Id.* For example, in Norfolk, zero absentee ballots were rejected for lack of a witness signature in the May 2016 local election, only four in the May 2018 local election, but 99 in the May 2020 election. Iles Decl. ¶ 8. Moreover, these numbers do not include the many thousands more who will not submit ballots at all because of this requirement, like Plaintiff Carol Petersen in the Arlington July special election. Petersen Decl. ¶ 5.

These challenges are on top of the fact that the witness requirement likely already has negative effects on these groups during normal times according to Professor Holbein, Holbein Decl. at 20, and often leads to confusion and rejected ballots for several reasons, as explained by former Elections Director Bencoach, *see* Bencoach Decl.¶¶ 8–9. Not surprisingly, groups representing communities that face greater risks of COVID-19 have advocated for Virginia to lift the witness requirement during the pandemic. AARP Virginia wrote to Attorney General Herring on May 21 praising the easing of the requirement for the June 23 primaries, but noting that "[n]o voter should have to endanger their own health, or the health of a potential witness, to cast an absentee ballot," and that no action had been taken on the witness requirement for November.[53] It urged the Commonwealth to take action on the witness requirement because it is "counter to social distancing recommendations" and "will discourage voters from using this method to cast their ballot and force them to choose between going to the polls to exercise their fundamental right to vote, or to forego casting a ballot in order to protect their health."[54]

## H.    Injuries and Irreparable Harm to Plaintiffs and Other Virginia Voters

If the witness requirement remains in place in November, all five individual Plaintiffs—registered Virginia voters who live by themselves and have been following social distancing recommendations—will be forced to choose risking their health or voting. Decl. of Seijra Toogood ¶ 8 (attached as Ex. G); Decl. of Katherine Crowley ¶¶ 5, 7 (attached as Ex. H); Decl. of Gayle Hardy ¶¶ 4–5, 7 (attached as Ex. I); Petersen Decl. ¶ 6; Decl. of Tracy Safran ¶¶ 5–6 (attached as Ex. J). In fact, Ms. Petersen was already disenfranchised in the Arlington special election in July

---

[53] AARP Virginia Ltr., May 21, 2020 (attached as Ex. 2 to Rosborough Decl.).

[54] *Id.*

because she did not feel that she could either safely vote in-person or have her absentee ballot that had arrived witnessed, Petersen Decl. ¶ 5, and Ms. Safran did not vote in the June 23 primary despite having an absentee ballot application because she did not realize the witness requirement had been lifted for those like her who did not believe they could not safely comply with it, Safran Decl. ¶ 4. Several of the plaintiffs have medical conditions that place them at higher risk for serious illness resulting from COVID-19, making the choice posed to them by the witness requirement particularly dangerous. Crowley Decl. ¶ 4; Toogood Decl. ¶ 5 (asthma and postural orthostatic tachycardia syndrome); Hardy Decl. ¶ 3 (breast cancer survivor and rheumatoid arthritis); Petersen Decl. ¶ 2 (autoimmune disorder and high blood pressure); Safran Decl. ¶ 3 (asthma and high blood pressure). As Ms. Toogood and Ms. Hardy know from experience, the witness requirement is yet another burden on Black voters in Virginia who have already been hard hit by COVID-19. Toogood Decl. ¶ 6; Hardy Decl. ¶ 6.

A number of the over-2,000 members of Plaintiff League of Women Voters of Virginia also live alone and face the situation of putting themselves at risk by finding a witness outside of their home. *See* Decls. of Debora Wake ¶¶ 2, 7–8 (attached as Ex. K), Patricia McGrady ¶¶ 3, 9 (attached as Ex. L), Jerome Weingart ¶¶ 2, 6, 8 (attached as Ex. M), Karen Kallay ¶¶ 2, 7 (attached as Ex. N), Joan Porte ¶ 11 (attached as Ex. O), Carole Garrison ¶¶ 3, 8 (attached as Ex. P), Laura Lawson ¶¶ 2, 7–8 (attached as Ex. Q). Some of these members face greater risks from COVID-19 because of their age and therefore want to vote absentee in November but do not want to risk their health by coming into contact with another individual to witness their ballot, like Pat McGrady, who is 84, Jerome Weingart, who is 80, Karen Kallay, who is in her mid-70s, and Joan Porte, who is 64. McGrady Decl. ¶ 3; Weingart Decl. ¶ 2; Kallay Decl. ¶ 2; Porte Decl. ¶ 11. These members also include people in the same position who are cancer survivors or have asthma or diabetes, like

Ms. Kallay and Mr. Weingart, *see* Kallay Decl. ¶ 2; Weingart Decl. ¶¶ 2–3, or those who may be called upon to care for those with weakened immune systems, like Carole Garrison, *see* Garrison Decl. ¶¶ 3–4.

League members like Ms. McGrady and Ms. Lawson and other Virginians who live in continuing care retirement communities ("CCRC"), where quarantines have been at times strictly enforced and where as many as half of the residents live alone, are particularly affected. McGrady Decl. ¶¶ 3–5, 8; Lawson Decl. ¶¶ 3–4, 6–8. In the past, Ms. Lawson ran a state-certified Voter Aid Project at her CCRC, and would help witness the absentee ballots of people who lived alone. Lawson Decl. ¶ 5. Now, she and her program are unable to perform this service, and having "staff members serve as witnesses is not a good option because [their] staff is terribly overburdened as it is." *Id.* ¶ 6. From phone and online conversations, both Ms. McGrady and Ms. Lawson expressed great worry about the witness requirement for November and the great relief when it was lifted for those could not safely comply for June. *Id.* ¶ 7; McGrady Decl. ¶ 8.

For Virginia voters with certain physical disabilities like Eva DeCourcey—who is paralyzed from the shoulders down and has limited mobility in her arms—the witness requirement interferes with her ability to vote privately and autonomously. Decl. of Eva DeCourcey ¶¶ 3, 8–9 (attached as Ex. R). The only way she can vote privately without someone else entering her ballot choices for her is by voting in-person using Arlington's wheelchair accessible booths and an accessible touch screen device. *Id.* ¶ 7. But the witness requirement threatens to drive more people to the polls at the last minute, making it more dangerous and difficult for her to exercise this option. *Id.* ¶¶ 8–9.

Additionally, dealing with the implications of the witness requirement has caused, and will continue to cause, the League to divert resources from other core activities such as voter

registration, voter education, and voter mobilization activities in order to educate voters about the requirement and try to find mitigation methods. Wake Decl. ¶¶ 9–11. As President of the Arlington local League, Joan Porte describes that, even with the low-turnout in Arlington's July special election, she had to make the difficult decision to send members out in response to community member requests to serve as witnesses for their ballots, at risk to their health. Porte Decl. ¶¶ 3–6. If this witness requirement stays in place for November, the League will need to shift time and resources from priorities such as mailing out voter registration information postcards, educating Virginians about the November redistricting initiative, and trying to fill the gap in lost high school voter registration, among other things. *Id.* ¶ 8; Wake Decl. ¶¶ 10–11.

## ARGUMENT

A movant merits a preliminary injunction by showing (1) a likelihood of success on the merits, (2) likelihood of suffering irreparable harm, (3) the balance of hardships favor them, and (4) the injunction serves the public interest. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Here, each factor decisively favors Plaintiffs.

**I.   Plaintiffs are likely to prevail on the merits because the First and Fourteenth Amendments require Virginia to eliminate the absentee witness requirement under the present circumstances.**

Plaintiffs "need not establish a 'certainty of success,'" but they must "make a clear showing" they are likely to succeed. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Here, Plaintiffs are highly likely to succeed on their claim because the First and Fourteenth Amendments do not permit a state to deprive tens of thousands of its qualified citizens of the right to vote or to have their vote counted by maintaining a witness requirement that runs counter to public health guidance and does little, if anything, to promote election integrity.

As the Supreme Court set forth in *Anderson v. Celebrezze* and *Burdick v. Takushi*, any government burden on the right to vote must be balanced against an important government interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). The Fourth Circuit describes the *Anderson-Burdick* framework as follows:

> When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes."

*Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019) (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)).

**A. The absentee witness requirement constitutes a significant, if not severe, burden as it will disenfranchise tens of thousands of voters in the November election and force hundreds of thousands of other voters to risk their health to vote.**

Under the first step of the *Anderson-Burdick* inquiry, the Court must assess whether, in the midst of the COVID-19 pandemic, requiring Virginians either to: (1) appear in-person at the polls, or (2) find another adult to witness and sign their absentee ballot envelope, severely or at least significantly burdens the right to vote. In considering the burdens imposed, the Court considers both the reach of the burden and the severity of the burden on the individuals it reaches. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198–99 (2008). Because the "right to vote is personal," an *Anderson-Burdick* claim "is not defeated by the fact that 99% of

23

other people can" easily exercise the franchise despite the challenged provision. *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016).[55]

Here, the witness requirement will force, at a minimum, hundreds of thousands of voters who live alone to choose between putting themselves and others in serious physical jeopardy or forfeiting their fundamental right to vote in the November general election, making the burden extreme both in its reach and in its depth. As the Court held in approving the partial consent decree, the witness requirement presents a "significant burden" during the pandemic, meaning it should apply at least heightened, if not strict, scrutiny to this requirement because of its devastating effects on the franchise while COVID-19 ravages our communities. *LWV Va.*, 2020 WL 2158249, at *8; *Thomas*, 2020 WL 2617329 at *19 ("Plaintiffs have identified burdens inflicted by the Witness Requirement, which are at least of sufficient magnitude to warrant the injunction.").

In terms of its breadth, the number of Virginians who will be forced to either brave the polls or break social distancing to have someone witness and sign their ballot envelope is striking. As of 2018, 25.3% of Virginians 18 and older lived alone. Holbein Decl. at 13–15. Applying that percentage to Virginia's 5.75 million registered voters,[56] one can expect that *well over 1.4 million registered Virginia voters* live alone. To make matters worse, the affected voters will disproportionately be members of populations at heightened risk of severe health complications from COVID-19 exposure. Voting-age populations of Black Virginians,

---

[55] In evaluating the burdens on voters, the Court may and should "take judicial notice of official government reports and statistics," including election and voter registration statistics and public health reports from government agencies such as the CDC and VDH. *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988) (internal citations omitted).

[56] Va. Dep't of Elections, *Registration Statistics and Polling Places*, https://www.elections.virginia.gov/resultsreports/registration-statistics/ (last visited July 24, 2020).

Virginians over 65, Virginians with a disability, and Virginians experiencing poverty all live alone at substantially higher rates than the population as a whole. *Id.*

Professor Holbein has found severe, widespread consequences for Virginia voters, both with respect to the likely rejection rate of absentee ballots cast as well as the number of people who are likely to be deterred from attempting to cast a ballot at all. In terms of the former, using absentee voting rates and witness requirement rejection rates from the May local elections along with turnout numbers for 2016, Professor Holbein projects that *well over 16,000 Virginians* will have their absentee ballots rejected in November for lack of a witness signature. Holbein Decl. at 2, 20. These rejections will not be evenly spread, and instead "will be concentrated in areas where more African Americans live." *Id.* at 20. As an example, as Norfolk Director of Elections Iles notes, in Norfolk, zero absentee ballots were rejected for lack of a witness signature in the May 2016 local election and only four in the May 2018 local election, but 99 were rejected for this reason in the May 2020 election. Iles Decl. ¶ 8.

With respect to the deterrence effect of the witness requirement, "Virginia's witness requirement will decrease voter turnout, especially so among older, disabled, disadvantaged, and minority citizens," to such an extent during this pandemic that it "effectively neuters the gains that vote-by-mail systems afford and disenfranchises voters." Holbein Decl. at 2. As Professor Holbein explains, the witness requirement interacts with both existing patterns of obstacles that already make it less likely for Black Virginians, Virginians with disabilities, and poor Virginians to vote—as well as people who live alone, in which all of these groups are overrepresented. *Id.* at 5–7, 13–16. And the witness requirement interacts with the pandemic to create more barriers to voting for people with health challenges—another group that already faces voting barriers and votes in lower number. *Id.* at 7–9.

These burdens extend not only to health risks, but also to the time-consuming, complicated, and in some cases, implausible steps some voters will need to take to comply. *See Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 107 n.8 (2nd Cir. 2008) (for "housebound" voters, the burden of a lack of absentee voting opportunity "could be quite significant"). For example, for League member Karen Kallay, Fredericksburg's May election coincided with a procedure she had at the hospital, and she was required to strictly quarantine before the procedure and did not have a good option for witnesses, particularly with both of her children working in the medical field. Kallay Decl. ¶¶ 4–5. Ultimately, her daughter, who lives 30 minutes away, had to take a COVID test and wait for a negative result in order to witness her ballot, a process she rightly found "inexcusable" at a time when she was dealing with "serious medical issues." *Id.* at 5.

Regardless of other facts, forcing people to face disenfranchisement or put their health on the line in order to cast a valid ballot imposes a severe or at least significant burden on the right to vote. *See, e.g.*, *Price*, 540 F.3d at 107 n.8; *LWV Va.*, 2020 WL 2158249, at *8 ("in ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote. But these are not ordinary times."); *Thomas*, 2020 WL 2617329, at *19 (holding that South Carolina's witness requirement burdens plaintiffs and other voters "from exercising their right to vote by absentee ballot by requiring them to expose themselves to other people in contravention of maintaining safe social distancing practices"); *see also Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (holding that Florida's voter registration deadline unconstitutionally burdened the right to vote in light of Hurricane Matthew where the disaster "foreclosed the only methods of registering to vote" during the final week of Florida's voter registration window).

26

As Dr. Reingold explains, "[r]equiring individuals to have someone they are not otherwise being exposed to come into close enough proximity to witness their ballot would place them at increased risk of infection." Reingold Decl. ¶ 24. This risk is even greater for those over 65, who "are at the greatest risk of severe cases, long-term impairment, and death." *Id.* ¶ 8. Similarly, those with immunologic or other pre-existing conditions, like Plaintiffs Crowley, Toogood, Hardy, Petersen, and Safran, and League members Weingart and Kallay, "are at high risk of a life-threatening COVID-19 illness." *Id.* ¶ 8; Crowley Decl. ¶ 4; Toogood Decl. ¶ 5; Hardy Decl. ¶ 3; Petersen Decl. ¶ 2; Safran Decl. ¶ 3; Weingart Decl. ¶¶ 2–3; Kallay Decl. ¶¶ 2–3. And as Dr. Reingold explains, Black Americans are also contracting COVID-19 and dying at much higher percentages than the population as a whole, meaning the witness requirement particularly impacts Black Virginians in this manner as well. Reingold Decl. ¶ 9.

That is precisely why the witness requirement not only casts a wide burden, but also a profound one. And the way the requirement is carried out in Virginia ensures disenfranchisement for those who do not follow it. For those individuals who submit their absentee ballot in spite of not having a witness, election officials have no discretion whether to accept the ballot. *See* 1 Va. Admin. Code 20-70-20(B). Current and former elections officials agree that once a ballot comes into the office, it is considered cast, so if it is missing something material like a witness signature, it is rejected without a chance to cure Bencoach Decl. ¶ 9; Iles Decl. ¶ 10. Indeed, voters are not even informed that their ballot is rejected until after the election when the electoral board "sends[s] a written explanation of the reason for rejection of an absentee ballot to the voter whose absentee ballot is rejected within 90 days of the date on which the ballot is rejected." Va. Code § 24.2-711.1 (B); *see also* Bencoach Decl. ¶ 9.

27

Many thousands of Virginia voters live by themselves and will be unable to vote without undertaking serious risks to their health and, collectively, to public health. This is precisely the opposite of what the Commonwealth has demanded that people do to protect their health and safety. The witness requirement's burden for the November election in light of continued COVID-19 transmission will not only be widespread, but also severe for the voters affected in terms of both the disenfranchisement consequences and health risks it promotes.

**B. The absentee witness requirement's burden on voters far outweighs its minimal-to-nonexistent promotion of election integrity.**

Even "[s]light" burdens on the fundamental right to vote must still "be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). As such, even in situations of minimal burdens, a court must still "actually weigh the burdens imposed on the plaintiff against the *precise* interests put forward by the State," and take into account "the extent to which those interests make it necessary to burden the plaintiff's rights," unlike traditional rational basis review. *Price*, 540 F.3d at 108–09 (internal citations and quotation marks omitted). As explained above, the witness requirement imposes a severe burden on voters who are living alone and are social distancing during the COVID-19 pandemic, such that at least heightened, if not strict, scrutiny should apply. But even if the Court were to find that the witness requirement places a lesser burden on Virginia voters, that burden would still outweigh any benefits of the witness requirement.

As an example, in *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 632 (6th Cir. 2016), the Sixth Circuit affirmed the district court's decision to strike down Ohio's law rejecting absentee ballot envelopes that had technical errors in the birthdate or address field. It explained that although "the burden is small for most voters, . . . none of the precise interests

28

put forward by Ohio," including a generalized interest in "[c]ombatting voter fraud perpetrated by mail," was sufficient to overcome that burden. *Id.* Because Ohio's interest was justified by only "the 'rare' instances where a fraudster manages to swipe the ballot of a registered absentee voter, forge the signature, and return the ballot" with the individual's identifying information, a burden on even a small number of voters was enough to render the law unconstitutional. *Id* at 633.

Like *Northeast Ohio Coalition*, the witness requirement cannot survive even under a less stringent standard of review because it does not actually serve the important government interest of election integrity, and that interest is sufficiently protected by other laws. In fact, the witness requirement is likely the least effective one of several laws designed to promote election integrity in the absentee process. As this Court correctly noted, although the witness requirement will burden Virginians seeking to protect their health and those around them, "the record does not demonstrate that it is especially effective in preventing voter fraud . . . . The Court does find persuasive, however, the enforcement weaknesses apparent in the statute." *LWV Va.*, 2020 WL 2158249, at \*8–\*9 (internal citations omitted).

Similarly, the federal court in South Carolina that preliminarily enjoined that State's witness requirement held that "the burdens placed upon [the plaintiffs] by the Witness Requirement far outweigh the imprecise, and (as admitted by [the South Carolina Election Commission] Defendants) ineffective, state interests of combating voter fraud and protecting voting integrity." *Thomas*, 2020 WL 2617329, at \*21. The *Thomas* court relied in part on the South Carolina Election Commission's own statement that the state's similar witness requirement offers "*no benefit*" to election officials, because officials "have no ability to verify the witness's signature." *See* ECF No. 17-3 at 60.

29

For one, a witness signature adds very little to nothing to other election integrity procedures for absentee ballots. While the presence of the witness signature is mandatory and the lack of one causes the ballot's rejection, the illegibility of the witness signature does not result in ballot rejection and the witness is not required to print their name or otherwise identify themselves. *See* 1 Va. Admin. Code 20-70-20(B); Bencoach Decl. ¶ 7. Therefore, while election officials check for the presence of a signature on the witness line, it offers nothing to those officials' verification or authentication procedures. *See* Iles Decl. ¶ 11. This is likely why 39 states and the District of Columbia have rejected witness requirements, except for the narrow category of voters who require assistance filling out their ballots.[57] If anything, the witness requirement may disenfranchise some voters through confusion. As Director Bencoach explains, in her experience, the witness requirement already makes absentee voting more confusing and difficult, because of the "presence of two signature spaces on the 'oath envelope,'" which can lead to situations that "invalidate the ballot" such as when "the voter has signed as the witness and the witness as the voter." Bencoach Decl. ¶ 8.

More importantly, Virginia has several other mechanisms to confirm both the legitimacy of the absentee ballot cast and disincentivize fraudulent use of absentee ballots. ECF No. 72 ¶ 87; *see also* Bencoach Decl. ¶ 10. Virginia registrars maintain a list of voters who applied for and returned absentee ballots, and absentee ballots are only accepted from voters whose names appear on that list. Va. Code § 24.2-710. "Ballots received from persons who are not still registered or did not apply for a ballot, or additional ballots from the same voter are not

---

[57] *Cf.* Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15- 220, 7-15-230; Va. Code §§ 24.2-706, 707; Wis. Stat. § 6.87(4)(b)1.

counted." Bencoach Decl. ¶ 10. And as Director Bencoach explains, ballots "are secured and accounted for at every step in the process" and when absentee ballots are tabulated either "electronically using state-approved election equipment, or manually using the state's standards for hand-counting," this is "performed by sworn Officers of Election appointed by the local, bi-partisan Electoral Board." Bencoach Decl. ¶ 10.

Absentee ballot envelopes must contain several other pieces of identifying information about the voters themselves—such as their first and last name, house number, street name or rural route address, city, and zip code—the omission of any of which results in their vote being rejected. 1 Va. Admin. Code 20-70-20(B) (2)-(5). Voters must also attest under penalty of perjury that they are who they say they are, they live where they say they live, and that they did not double vote when they sign their ballot envelope. *See* Va. Code § 24.2-706; 1 Va. Admin. Code 20-70-20(B)(6). Further, Virginia laws make it a felony to intentionally double vote, Va. Code § 24.2-1004(B), make a "willfully false material statement" on a ballot, Va. Code § 24.2-1016, or forge another person's name, Va. Code § 24.2-1012.

The witness requirement provides no additional benefit to election integrity beyond these significant protections. Manipulating the absentee voting process already requires being able to provide all the identifying information needed for a ballot application and the ballot, and the willingness to fraudulently sign under penalty of perjury that someone else's ballot is their own. "For the fraudster who would dare to sign the name of another qualified voter at the risk of being charged with Class 4 and Class 5 felonies, writing out an illegible scrawl on an envelope to satisfy the witness requirement would seem to present little to no additional obstacle . . . ." *LWV Va.*, 2020 WL 2158249, at *9 (internal citations omitted).

And what little evidence exists of attempts to manipulate the absentee process in Virginia suggests that such occurrences are exceedingly rare. As recently explained by MIT Professor Charles Stewart and Amber McReynolds, "[v]oter fraud in the United States is exceedingly rare, with mailed ballots and otherwise."[58] Even a database from the Heritage Foundation—which nonpartisan, independent researchers have called "grossly exaggerated and devoid of context"[59]—has identified only two cases of election fraud in Virginia concerning absentee voting in the past 13 years.[60] During the same time period, almost 33 million voters cast their ballots in Virginia elections.[61] Thus, these statistics would lead to a total voting fraud incidence related to absentee balloting of approximately .00000006% votes cast in Virginia over the past thirteen years.

As the Tenth Circuit unanimously held in affirming an injunction against Kansas's documentary proof of citizenship requirement for voter registration, there was only "incredibly slight evidence that [the state's] interest in counting only the votes of eligible voters is under threat," leading the Court to rule that the challenged restrictions were unconstitutionally burdensome. *Fish v. Schwab*, 957 F.3d 1105, 1134 (10th Cir. 2020). Similarly, another federal court rejected a similar voter fraud rationale in opposing broadened mail voting, finding "their

---

[58] Amber McReynolds & Charles Stewart III, *Let's Put the Vote-by-mail 'Fraud' Myth to Rest*, The Hill (Apr. 28, 2020), https://thehill.com/opinion/campaign/494189-lets-put-the-vote-by-mail-fraud-myth-to-rest.

[59] Rudy Mehrbani, *Heritage Fraud Database: An Assessment*, Brennan Ctr. (Sept. 8, 2017), https://www.brennancenter.org/our-work/research-reports/heritage-fraud-database-assessment.

[60] Heritage Found., *Election Fraud Cases*, https://www.heritage.org/voterfraud/search?state=VA (last visited July 24, 2020).

[61] *See* Va. Dep't of Elections, *November General Elections: 1976 – Present*, https://www.elections.virginia.gov/resultsreports/registrationturnout-statistics/ (last visited July 24, 2020).

claim of voter fraud is without any factual basis." *Paher v. Cegavske*, No. 320-CV-00243-MMD-WGC, --- F.Supp.3d ----, 2020 WL 2089813, at *6 (D. Nev. Apr. 30, 2020).

Far from serving an important government interest, the witness requirement in fact undermines the government's compelling interest in protecting public health during the COVID-19 pandemic. As the *Thomas* court in South Carolina pointed out, "the Witness Requirement would still apply to voters who have already contracted COVID-19, therefore affirmatively mandating that an infected individual go 'find' someone to witness their absentee ballot and risk exposing the witness (and whoever comes in contact with the witness) to the virus." *Thomas*, 2020 WL 2617329, at *24; *see also Am. Life League, Inc. v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995) (upholding law because it serves the "sufficiently compelling governmental interest[]" of "protect[ing] public health"); *Forest Hills Early Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 241 (4th Cir. 1984) (recognizing the government's "compelling state interest arising from [a] substantial threat to public health . . .").

The witness requirement requires people who live by themselves to leave their homes or invite people into them in order to cast a valid ballot, at significant risk not only to their own health and that of their witnesses, but to public health. Because the witness requirement offers little if any benefit to election integrity, even were the burden of the requirement not so massive, those burdens would still outweigh any governmental benefit and make the provision unconstitutional during community transmission of COVID-19.

## II.    A preliminary injunction is necessary to prevent irreparable harm to Plaintiffs' constitutional rights.

Irreparable harm requires a movant to "make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent. Additionally, the harm must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial."

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citations and internal quotation marks omitted), *cert. denied sub nom. Givens v. Mountain Valley Pipeline, LLC*, 140 S. Ct. 300 (2019).

"Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina* ("*LWVNC*"), 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). This is partly because "the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). And it is partly also because "once the election occurs, there can be no do-over and no redress," so the injury to "voters is real and completely irreparable if nothing is done to enjoin [the challenged] law." *LWVNC*, 769 F.3d at 247; *see also Fla. Democratic Party*, 215 F. Supp. 3d at 1258 (voting rights cases are not situations "where failing to grant the requested relief would be a mere inconvenience to Plaintiff and its members"—an election "isn't golf: there are no mulligans.").

Here, individual Plaintiffs and many League members who live alone wish to vote by absentee ballot to protect their health. *See* Toogood Decl. ¶ 8; Crowley Decl. ¶¶ 5, 7; Hardy Decl. ¶¶ 4–5, 7; Petersen Decl. ¶ 6; Safran Decl. ¶¶ 5–6; Wake Decl. ¶¶ 2, 7–8; McGrady Decl. ¶¶ 3, 9; Weingart Decl. ¶¶ 2, 6, 8; Kallay Decl. ¶¶ 2, 7; Porte Decl. ¶ 11; Garrison Decl. ¶¶ 3, 8; Lawson ¶¶ 2, 7–8. Many of these individuals are at greater risk for severe consequences from COVID-19 due to their age and/or medical conditions, or may be called upon to care for a family member in this position. Crowley Decl. ¶ 4; Toogood Decl. ¶ 5; Hardy Decl. ¶ 3; Petersen Decl. ¶ 2; Safran Decl. ¶ 3; McGrady Decl. ¶ 3; Weingart Decl. ¶¶ 2–3; Kallay Decl. ¶ 2; Porte Decl. ¶ 11; Garrison Decl. ¶¶ 3–4. And the fact that the unexpected presence of the witness requirement may drive voters who intended to vote absentee to the polls on Election Day will make polling place conditions more difficult and riskier for some voters with physical

34

disabilities like Eva DeCourcey, who can only vote autonomously and privately by doing so in-person using accessible equipment.  DeCourcey Decl. ¶¶ 3, 8–9.

On the one hand, these individuals face disenfranchisement if they cast an absentee mail ballot without a witness signature or decide they cannot safely vote at all, like Plaintiff Petersen early this month. Petersen Decl. ¶ 5. On the other, they face an unconscionable risk to their health if they are compelled to either satisfy the witness requirements for absentee voting or vote in person at the polls. *See LWV Va.*, 2020 WL 2158249, at *8. As noted above, disenfranchisement certainly causes irreparable harm, and of course there "can be no injury more irreparable" than "serious, lasting illness or death." *Thakker v. Doll*, No. 1:20-CV-480, --- F. Supp. 3d ----, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020); *see also Perez-Perez v. Adducci*, No. 20-10833, --- F. Supp. 3d ----, 2020 WL 2305276, at *8 (E.D. Mich. May 9, 2020) (holding "unnecessary exposure to COVID-19 . . . provides a basis to find that [Plaintiffs] will suffer irreparable injury" by forcing voters to choose between the right to vote and their health). A preliminary injunction provides the only effective means for protecting Plaintiffs' and many other Virginians' constitutional rights to vote in the November election without asking them to seriously risk their health.

The League also faces irreparable harm as an organization in several respects. For one, a voting rights organization is "irreparably harmed when the right to vote is wrongfully denied or abridged—whether belonging to its membership or the electorate at large." *N.C. State Conf. of NAACP v. Cooper*, 430 F. Supp. 3d 15, 24 (M.D.N.C. 2019); *see also Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) (finding plaintiff organization's harm "to its organizational interests is coterminous with the harms suffered by its citizen members"); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1154 (S.D. Ind. 2018), *aff'd,* 937 F.3d 944

35

(7th Cir. 2019) (accepting that organization faced irreparable harm based on such harm to its members and the state electorate at large).

Additionally, the witness requirement harms the League's mission of ensuring that all qualified Virginians are registered to vote and participate in the democratic process, because it "impair[s] the organization's programs, making it more difficult to carry out its mission." *Action NC v. Strach*, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (noting irreparable harm based on legal barriers that "ma[de] it more difficult for [the organization] to accomplish their primary mission of registering voters"). Further, the League will need to continue to divert its limited resources from other efforts including registering voters—including making up for missed opportunities with high schools closed—and educating them about ballot initiatives such as the redistricting initiative that will be voted on in November—to attempting to educate Virginians about the witness requirement. Wake Decl. ¶¶ 9–11. These lost opportunities are irreparable harm, because "when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012); *see also LWVNC*, 769 F.3d at 247; *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018); *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662–63 (S.D. Ind. 2018); *Action NC*, 216 F. Supp. 3d at 642–43.

Finally, the harm to Plaintiffs is not only irreparable, but imminent. As both Dr. Reingold and other leading public health authorities describe above, the strong weight of the evidence points to continuing and perhaps increasing transmission in Virginia into November and beyond. Therefore, the irreparable injuries faced by Plaintiffs are imminent and merit immediate relief.

### III.    The balance of equities and the public interest support injunctive relief.

The "public interest . . . favors permitting as many qualified voters to vote as possible." *LWVNC*, 769 F.3d at 247–48 (citations and internal quotation marks omitted). Here, reliable estimates show that over 16,000 Virginians will likely have their absentee ballots rejected for lack of a witness signature in November, with many tens of thousands more prevented or deterred from voting at all by the witness requirement. Holbein Decl. at 17–20.

Additionally, enjoining the witness rule promotes "the public interest in . . . safeguarding public health." *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013) (holding that "the public interest in this case lies with safeguarding public health"); *Diretto v. Country Inn & Suites by Carlson*, No. 1:16CV1037 (JCC/IDD), 2016 WL 4400498, at *4 (E.D. Va. Aug. 18, 2016) ("The public interest is clearly in remedying dangerous or unhealthy situations and preventing the further spread of disease."). As this Court already held, this case centers around "the worst pandemic this state, country, and planet has seen in over a century"—a pandemic with "vast and unprecedented" consequences and "no one left untouched by the risk of transmission." *LWV Va.*, 2020 WL 2158249, at *10. In the context of the consent decree, this Court found that the "adherence to the witness signature requirement in June would only increase th[e] risk" to public health. *Id.*; *see also Thomas*, 2020 WL 2617329, at *23–*24 (finding that adhering to South Carolina's witness requirement "would only increase the risk for contracting COVID-19 for members of the public with underlying medical conditions, the disabled, and racial and ethnic minorities." (internal citations omitted)). The evidence in this record merits the same conclusion.

For "individuals without another person able to witness in their household, the requirement that they have someone witness their absentee ballot would place them at increased risk of exposure to and/or transmission of COVID-19." Reingold Decl. ¶ 24. This is "particularly risky

for those who are at a greater risk of complications and death from COVID-19." *Id.* And for public health purposes, "to prevent increasing the scope of the outbreak of COVID-19, we must assume that anyone could be infected and transmit infection to others." *Id.* ¶ 13. And as the *Thomas* court acknowledged, enforcement of witness requirement during the pandemic actually encourages people infected with COVID-19, whether they know it or not, to expose others to the virus in order to vote. 2020 WL 2617329, at *24. Of course, this risk cannot be avoided by directing people to vote in person. As Defendants admit, "in person activities, such a[s] voting, increase the risk of the spread of the virus that causes COVID-19," ECF No. 72 ¶ 37, and as Dr. Reingold describes, "[p]olling locations are a prime area for increased transmission of SARS-CoV-2." Reingold Decl. ¶ 19.

On the Commonwealth's end, it is "in no way harmed by the issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation and internal quotation marks omitted). After all, "upholding constitutional rights surely serves the public interest," of which the State is the custodian. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs seek a preliminary injunction for the November 3, 2020 general election and any future elections in which COVID-19 community transmission continues to occur without an effective vaccine widely available: (1) prohibiting Defendants from enforcing the witness requirement (as stated in Va. Code § 24.2-706 and § 24.2-707 and as interpreted by 1 Va. Admin. Code 20-70-20(B)) for all Virginia voters; (2) ordering Defendants to issue guidance instructing city and county election officials to count otherwise validly cast absentee ballots that are missing a witness signature; and (3) ordering Defendants to

conduct a public information campaign informing Virginia voters about the elimination of this

requirement, in coordination with city and county election officials.

Dated: July 24, 2020                                    Respectfully submitted,

                                                        /s/ Davin M. Rosborough

  Vishal Agraharkar (VSB #93265)                        Davin M. Rosborough (VSB # 85935)
  Eden Heilman (VSB #93554)                             Dale E. Ho*
  AMERICAN CIVIL LIBERTIES UNION                        Sophia Lin Lakin*
  FOUNDATION OF AMERICA, INC.                           Theresa J. Lee*
  701 E. Franklin Street, Suite 1412                    Adriel I. Cepeda-Derieux*
  Richmond, Virginia 23219                              AMERICAN CIVIL LIBERTIES UNION
  Phone: (804) 644-8080                                 FOUNDATION
  Fax: (804) 649-2733                                   125 Broad Street, 18th Floor
  vagraharkar@acluva.org                                New York, NY 10004
  eheilman@acluva.org                                   Tel.: (212) 549-2500
                                                        drosborough@aclu.org
                                                        dho@aclu.org
                                                        slakin@aclu.org
                                                        tlee@aclu.org
                                                        acepedaderieux@aclu.org


                                                        *Attorneys for Plaintiffs*

                                                        * Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on July 24, 2020, I served a copy of the foregoing Brief in Support of

Plaintiffs' Motion for a Preliminary Injunction via filing with the Court's CM/ECF system,

which sent copies of this document to Counsel of Record.


*/s/* Davin M. Rosborough_____
Davin M. Rosborough (VSB # 85935)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
drosborough@aclu.org

*Counsel for Plaintiffs*